**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GREAT AMERICAN E&S INSURANCE COMPANY,

Plaintiff,

v.

ARTHUR J. GALLAGHER & CO., ARTHUR J. GALLAGHER RISK MANAGEMENT SERVICES, LLC, and GALLAGHER IP SOLUTIONS, LLC,

Defendants.

Civil Action No.: 1:25-cv-05406

**COMPLAINT**

**JURY DEMANDED**

Plaintiff Great American E&S Insurance Company ("Great American") brings this action against Defendants Arthur J. Gallagher & Co. ("AJG"), Arthur J. Gallagher Risk Management Services, LLC ("Gallagher Risk"), and Gallagher IP Solutions LLC ("GIPS"; together with AJG and Gallagher Risk, "Gallagher" or the "Gallagher Entities").

## INTRODUCTION

1. This litigation arises out of a business program in which private lenders made loans to companies selected by Gallagher (the "Program"). UMB Bank, National Association ("UMB Bank") acted as trustee for the lenders. Great American insurance policies were issued to UMB Bank insuring, subject to all the policies' terms and conditions, the covered residual value loss amount following a payment default and the inadequacy of the borrowing companies' collateral to repay the loan in full. Gallagher brought all the parties together, and served a number of different roles, including underwriting the loans, brokering and underwriting the policies, servicing and monitoring the loans and collateral and, in the event of a payment default,

marketing the collateral for sale and mitigating any loss. The loans were secured by certain collateral, as represented by Gallagher.

2. Gallagher received fees and payments through the duration of the loan transactions: at the outset, it received fees from the borrowers, fees from the lenders, and a share of the policy premium; during the pendency of the loans, it received fees for monitoring the progress of the loans and preserving the collateral; and, in the event of a payment default, it could charge fees for marketing the collateral.

3. After a time, losses began to emerge in the Program. UMB Bank, as trustee for certain lenders involved in the Program, is seeking to recover Program losses from, among others, Great American. Three arbitrations involving UMB Bank and Great American are currently pending before the American Arbitration Association. Allegations in the arbitrations include that the borrowing companies were undercapitalized, that the value of their collateral was overstated, that the loans were not adequately monitored and, when the borrowing companies defaulted on required payments under the loans, the collateral was not properly marketed for sale to mitigate losses.

4. Great American believes that its policies do not provide coverage for the losses. But if Great American is nevertheless found liable for coverage, Gallagher is obligated to indemnify it for any amounts it must pay in connection with the Program per its contracts with Great American. In addition, even if Great American is not found liable for coverage under any of the policies, Gallagher is obligated to defend it, indemnify it, and hold it harmless for all sums incurred in mitigating losses, in addressing the claims, and in prosecuting and defending the arbitrations.

5. Although the Great American policies provide for arbitration of disputes, Gallagher is not a party to those policies or to any arbitration agreement with Great American, and it has declined to voluntarily participate in arbitration. Earlier this year, the arbitrator in one of the arbitrations granted Great American's motion to join Gallagher on the principle, recognized in New York law, that a party that has received benefits under an agreement may be compelled to arbitrate.

6. In response to the arbitrator's order, Gallagher filed a petition for injunctive relief in the United States District Court for the Northern District of Illinois seeking to enjoin Great American from pursuing arbitration with Gallagher.

7. The federal court in Illinois denied Gallagher's motion on procedural grounds. Gallagher responded by amending its petition to seek declarations that it is not bound by the arbitration. Although Great American believes the arbitrator's order was proper and it would have been appropriate for Gallagher to participate in the arbitration, Great American has reached the conclusion that continuing to pursue arbitration against an unwilling party will dissipate the efficiencies arbitration presents. Accordingly, Great American has now withdrawn its request to add Gallagher to the arbitration and has withdrawn its discovery request to Gallagher in the arbitration.

8. Great American now submits to this Court for its adjudication the claims described below, as required by several of the contracts at issue in the dispute.

## PARTIES

9. Great American is an Ohio corporation with its principal place of business in Ohio.

10. Defendant AJG is a Delaware corporation with its principal place of business in Illinois.

11. Gallagher Risk, f/k/a Arthur J. Gallagher Risk Management Services, Inc., is a limited liability company. AJG is the sole member of Gallagher Risk.

12. GIPS is a limited liability company. AJG is the sole member of GIPS.

**JURISDICTION AND VENUE**

13. Plaintiff Great American is solely an Ohio citizen.

14. Defendants AJG, Gallagher Risk, and GIPS are all Delaware and Illinois citizens.

15. The amount in controversy here exceeds $75,000, exclusive of interest and costs.

16. Accordingly, complete diversity exists between the plaintiff and all defendants, and the amount in controversy is sufficiently high such that this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

17. Personal jurisdiction over AJG, Gallagher Risk, and GIPS is proper in New York, and New York is a proper venue, because various of the contracts at issue state as follows or contain very similar language: "This Agreement shall be governed in all respects by the laws of the State of New York applicable to the contracts executed and to be performed wholly within such State, and without regard to principles of conflicts of law which might result in the application of the laws of any other State. Each party submits to the exclusive jurisdiction of the State and Federal courts in the Borough of Manhattan, New York[.]"

18. Additionally, a substantial part of the events or omissions giving rise to Great American's claims occurred in New York, and specifically involved Gallagher employees based in New York, such that venue is also proper pursuant to 28 U.S.C. § 1391(b)(2).

19. Further, because all of AJG, Gallagher Risk, and GIPS are subject to personal jurisdiction in New York, venue is also proper pursuant to 28 U.S.C. § 1391(b)(3).

## FACTS

### A. The Program

20. This litigation involves the Program, which was designed and implemented by Gallagher.

21. The Program involved Gallagher arranging commercial loan transactions to various companies (the "Program Companies"), most of them engaged in high-technology businesses, who provided as collateral their entire business, including their purportedly valuable intellectual property. Gallagher evaluated the creditworthiness of the Program Companies.

22. Gallagher solicited various institutional lenders (the "Noteholders") to lend to the Program Companies through the purchase of promissory notes. UMB Bank, a national bank, acted as trustee for the lenders (the "Trustee").

23. Great American insurance policies, subject to all of their terms and conditions, covered residual value loss amounts following payment default and inadequacy of the Program Companies' collateral to repay the loans (the "Program Policies").

24. The Trustee was the named insured of the various Program Policies.

25. Various of the Program Companies have defaulted on their repayment obligations and others have threatened to do so.

26. Gallagher's evaluation of the financial condition and creditworthiness of the various Program Companies proved to be grossly incomplete and inaccurate. The Program

Companies' collateral had far too little commercial value to repay the millions of dollars that the Program Companies were being lent by the Noteholders.

27. As related to this action, at least three commercial arbitrations have been initiated between the Trustee and Great American relating to the Trustee's demands for payment under the Program Policies.

**B. Gallagher's Instrumentalities**

28. For a lengthy period of time, Gallagher conducted its operations under the Program through Newlight Capital, LLC ("Newlight") and PIUS Limited, LLC ("PIUS"). PIUS and Newlight were sister companies, sharing the same principal officer and the same employees, so that they were functionally alter egos of one another.

29. PIUS and Newlight, and their common principal officer and director, designed, promoted, and administered the Program. They carried out the underwriting of the loans, issued the Program Policies, were responsible to monitor and service the loans, and, in the event of payment default, they were charged with mitigating loss and managing recovery from the sale of the collateral.[1]

30. On November 8, 2022, Gallagher Risk assumed the business and obligations of PIUS and Newlight by virtue of an assignment, the "Bill of Sale and Assignment." All, or the vast majority, of the acts and omissions complained of by Great American occurred after the Bill of Sale and Assignment was entered.

[1] The obligations undertaken by Gallagher do not relieve UMB Bank of its independent obligations under the policies. Any disputes between UMB Bank and Great American are being addressed in arbitrations pending before the American Arbitration Association, and are not a part of this case.

31. By the terms of the Bill of Sale and Assignment, Gallagher Risk assumed "[a]ll of the assets, property (whether real, personal or mixed), business and goodwill of Sellers of every kind, nature and description used or held for use by Sellers[,]" including "[a]ll of the right, title and interest of (i) PIUS in its managing general agency business in which PIUS places insurance policies which insure loans or other indebtedness secured by borrower's assets, including intellectual property and (ii) Newlight service business which provides loan monitoring and secured property liquidation services (collectively, the 'Acquired Business')[.]"

32. Great American was asked to, and did, consent to that assignment.

33. AJG and Gallagher Risk were both signatories of the Bill of Sale and Assignment.

34. Subsequently, upon information and belief, some if not all PIUS and Newlight employees became employees of AJG.

35. Both before and after the execution of the Bill of Sale and Assignment on November 8, 2022, Newlight and PIUS were operated without regard to any purported separate corporate identity.

36. Upon information and belief, AJG not only employed the former director and officer (and a seller) of PIUS and Newlight, but also specifically directed him and other former PIUS and Newlight employees in matters at the core of this dispute.

37. AJG is, therefore, also the alter ego of PIUS and Newlight.

38. In mid-2023, Gallagher Risk and/or AJG further formed the entity GIPS.

39. Gallagher representatives have advised Great American that GIPS also assumed the PIUS and Newlight obligations, presumably from Gallagher Risk, and performed certain functions previously performed by Newlight or PIUS.

40. In short, all three Gallagher Entities are directly involved in all issues impacting the dispute between Great American and the Trustee and, thus, Great American has claims against all three Gallagher entities to present in this case.

**C. Gallagher's Contractual Obligations**

1. The Producer Agreement and Underwriting Authority Addendum

41. The relationship between Great American and the Gallagher Entities is governed in part by the U.S. Producer Agreement between Great American and PIUS dated as of October 15, 2021 (the "Producer Agreement"), as amended by an Underwriting Authority Addendum between the same parties and also dated as of October 15, 2021 (the "Underwriting Addendum") (with minor subsequent written amendments), particularly as respects the Gallagher Entities' underwriting responsibilities.

42. Appendix A to the Underwriting Addendum contains the underwriting guidelines, stating in part:

> VI. Insured Loan Criteria
>
> The loan associated with the insured collateral will:
>
> ***
>
> 2. have a loan agreement that includes protective and financial covenants to ensure adherence to the borrower's plan and repayment of the insured loan.
>
> ***
>
> 6. be fully secured by all assets of the borrower, including the pledge of all intellectual property (i.e., Senior secured on all IP; senior secured on all other assets, subject to PERMITTED LIENS).

At closing of the loan associated with the insured collateral:

1. there will be a discernible path to the insured collateral liquidation in the event of a payment default, and

2. the borrower enterprise value will be at least 2.5x the loan commitment amount, regardless of whether the loan commitment has been fully funded.

VII. Borrower Criteria

The borrower:

***

2. possesses adequate intellectual property, whether in the form of trade secrets, know-how, contractual rights, patents, and/or patent applications, or other intangible assets that provide either the underpinnings of the business or accounts for a significant portion of the cash flows of the enterprise.

***

4. has achieved commercial acceptance. If not already achieved, commercial acceptance is not perceived to be a significant hurdle to overcome.

5. has achieved break-even annual cash flow. If break-even has not been achieved yet, the borrower has provided reasonable projections and break-even is expected to be achieved during the term of the insured loan and the business plan is fully funded.

***

7. has an active board of directors.

***

IX. Producer Underwriting

Producer underwriting services will include analysis of the borrower, competitive market, products, technology, collateral, and the insured loan. Each insured loan will be individually underwritten by Producer without reliance on lender or trustee underwriting. Key borrower underwriting considerations for each submission include:

***

4. Historical financial performance and validation of repayment history

5. Financial condition and capitalization

6. Business strategy, plan, and projections

   a. Validation of revenue growth assumptions

   b. Stress analysis of projections based on business risks

   c. Repayment ability

7. Assessment of Technology & Products

   a. Benefits and applications

   b. Differentiators

   c. Product development

***

43. The Producer Agreement also sets forth the following indemnification obligations for Gallagher:

> Producer will indemnify, hold harmless and defend Company and its officers, directors, employees, agents, affiliates, subsidiaries, successors and permitted assigns (collectively, "**Company Indemnified Parties**") against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees, that are incurred by Company Indemnified Parties, arising out of, or related to any: (i) breach or non-fulfillment of any representation, warranty or covenant under this Agreement by Producer, its employees, agents, contractors or Subproducers; or (ii) any negligent or more culpable act or omission of Producer, its employees, agents, contractors or Subproducers.

2. <u>The Disbursement Monitoring Agreements</u>

44. Great American, Gallagher, the Trustee, and the various Program Companies entered into a monitoring agreement for each Program Company called the "Disbursement Monitoring Agreement."

45. The Disbursement Monitoring Agreements, the basic form of which is attached to the Underwriting Addendum, are substantially identical form contracts drafted primarily by Gallagher. Each contains a provision identical or practically identical to the following section 2:

> 2. Services. During the term of this Agreement:
>
> (a) Newlight shall, in such manner and at such times as Newlight determines in its sole discretion to be advisable, perform the following services (collectively, the "Monitoring Services"):
>
> (i) inspect, monitor and assess the books and records of the Obligors and their Subsidiaries (A) to determine the amounts and sources of all revenue, expenses and cash flow of the Obligors and their Subsidiaries, including all other consideration and remuneration collected or received by the Obligors and their Subsidiaries, (B) to determine whether the use of funds is consistent with the terms of the Loan Documents and (C) to evaluate such other matters as Newlight determines, in its sole discretion, may be necessary or advisable;
>
> (ii) evaluate the financial statements, annual budgets and projections prepared by the Obligors and their Subsidiaries and all such other information from the books and records of the Obligors and their Subsidiaries, and any deviations from prior periods or such budgets and projections (including, if possible, the explanation of the basis or bases for any such deviations provided by the Obligors or their Subsidiaries);
>
> (iii) obtain information and assist Insurer in obtaining additional information reasonably requested by Insurer relating to the operations, property (including without limitation the Collateral), condition and prospects of the Obligors and their Subsidiaries; and
>
> (iv) monitor the compliance of the Obligors and their Subsidiaries with the covenants set forth in the Loan Documents.
>
> (b) Newlight shall, in such manner and at such times (if any) as Newlight determines in its sole discretion to be advisable, perform the following services on behalf of the Disbursing Agent and/or Insurer (the "Collateral Enforcement Services") during the continuance of any Triggering Event or Payment Default:

(i) prepare and submit a Claim Notice to Insurer in accordance with the terms of the Insurance Policy;

(ii) consult with Disbursing Agent and Insurer regarding any possible responses and responses to any Occurrences (as defined in Section 5(a) of this Agreement);

(iii) market and assist the Disbursing Agent and/or Insurer in liquidating or monetizing the Collateral;

(iv) prepare and submit a Proof of Loss to Insurer in accordance with the terms of the Insurance Policy;

(v) take such other actions as Disbursing Agent or Insurer reasonably requests to protect their interests in the Collateral; and

(vi) direct the Disbursing Agent regarding what Disbursing Agent enforcement actions, costs and expenses and other actions are commercially reasonable, do not have an adverse impact on Insurer and do not unnecessarily impair the Collateral and shall be approved as commercially reasonable Collection Efforts and Collection Costs and shall be deemed to satisfy the obligation to have Mitigated Losses as required under the Insurance Policy.

For the avoidance of doubt, Newlight may not enter into any commitment to sell or transfer any of the Collateral without first obtaining any prior written consents required pursuant to the Insurance Policy.

* * *

(c) Each of the Insurer, the Disbursing Agent and each of the Obligors acknowledges and agrees that any information obtained by Newlight in the course of performance of the Services may be provided by Newlight to Insurer or Disbursing Agent (or both) at Newlight's sole discretion.

(d) The Insurer, the Disbursing Agent, and the Obligors shall, and the Obligors shall direct and cause their Subsidiaries to, authorize Newlight to perform the Services to be provided by Newlight under this Agreement and consent thereto. Insurer and Disbursing Agent further consent to the performance by the Obligors and their Subsidiaries of their obligations under this Agreement.

46. Each of the Disbursement Monitoring Agreements also contains a provision identical or practically identical to the following section 5:

> 5. Disbursing Agent and Other Newlight Duties.
>
> (a) Upon the occurrence of a Triggering Event, Payment Default and/or the acceleration of the Loan or any other amounts under the Loan Documents (each, an "Occurrence") Disbursing Agent and Newlight shall:
>
> (i) promptly notify the other (and, if required under Article 6 of the Insurance Policy, notify the Insurer), which notice shall provide reasonable detail of the nature and cause of such Occurrence; provided, however, that Disbursing Agent's or Newlight's failure to provide such notice shall not affect Disbursing Agent's rights hereunder or under the Insurance Policy, provided that such notice (if required under Article 6 of the Insurance Policy) is provided promptly after Disbursing Agent or Newlight becomes aware of such Occurrence (and notice of any Payment Default is provided within the time required under the Insurance Policy); and
>
> (ii) promptly provide additional information to, and cooperate with, Insurer as may reasonably be requested.

47. Each of the Disbursement Monitoring Agreements also contains a provision identical or practically identical to the following section 6:

> 6. Newlight's Execution of its Duties.
>
> (a) Subject to Sections 4.3 and 6.3(c) of the PDSA, each Obligor shall, and each Obligor shall cause each of its Subsidiaries to, give Newlight access to such properties, books and records of such Obligor and its Subsidiaries as Newlight may request for the purposes of performing the Services. However, prior to the occurrence of a Triggering Event Newlight (i) shall provide each Obligor with at least three (3) Business Days' written notice of any requested access, and (ii) shall access and inspect the properties, books and records of such Obligor and its Subsidiaries only during regular business hours. Newlight shall be allowed to make copies of all such books and records as determined by Newlight in its discretion. Notwithstanding the foregoing or any other provision of this Agreement, any audit or inspection of live Collateral or Inventory shall be subject to

> Newlight's compliance with the reasonable biosecurity requirements of the Obligors.
>
> In carrying out the Services or any of its other obligations under this Agreement, Newlight may act either directly or through agents, attorneys, accountants, auditors and/or independent contractors (collectively, "Newlight Agents") and may enter into agreements with any of them, and whose reasonable, documented and out-of-pocket fees, costs and expenses shall be paid by the Obligors as provided in Section 7(d) of this Agreement. Failure to advance or reimburse Newlight for any such fees, costs and expenses shall be considered a material breach of this Agreement and the other Loan Documents by the Obligors.
> For the avoidance of doubt, Newlight is not obligated to pay any fees, costs or expenses associated with Newlight's responsibilities under this Agreement unless advanced or reimbursed by the Obligors. If Newlight is not advanced or reimbursed fees, costs and expenses associated with this Agreement, Newlight will be relieved of any obligations under this Agreement without any liability.

48. The Disbursement Monitoring Agreements, in most instances in paragraph 13, further provided for Gallagher's assumption of the following indemnification obligations:

> Indemnification
>
> ***
>
> (b) Between Newlight and Insurer: Newlight agrees to indemnify, defend and hold harmless Insurer, its parent, subsidiaries and affiliates and their respective officers, directors, employees and agents from and against any and all liabilities, claims, suits, actions, demands, settlements, losses, judgments, costs, damages, expenses (including reasonable attorneys' fees), fines, penalties, and all reasonable costs of defense (collectively "Indemnified Losses") arising out of, caused by or resulting from: (A) any negligent act or omission by Newlight or its members, officers, directors, employees, representatives, contractors, consultants, or agents related to or arising out of this Agreement or (B) a breach by Newlight of any of its agreements contained in this Agreement; provided, that neither Newlight nor Insurer shall have any obligation to any Indemnified Party to the extent directly caused by or directly resulting from the willful misconduct or gross negligence of such Indemnified Party.
>
> ***
>
> (d) Subject to the terms of the foregoing sub-sections (a) through (c), assuming that the indemnification demand has been accepted, each indemnifying

> party covenants that it will reimburse or pay over to the indemnified parties on demand all monies which the indemnified parties shall pay or become legally liable to pay by reason of any of the foregoing and will make such payments to the indemnified parties as soon as the indemnified parties shall have paid out any such sums.

**D. Gallagher's Breaches**

49. Gallagher did not comply with the underwriting criteria in the Producer Agreement and the Underwriting Addendum.

50. On the contrary, relying on an inadequate analysis that failed to share important financial information with Great American, and based on promises of active monitoring that was not in place and did not occur, Gallagher provided an incomplete, inaccurate, and misleadingly favorable picture of the financial condition of various Program Companies.

51. Gallagher provided incomplete and inaccurate facts, misstatements, and omissions that were not the result of diligent underwriting and evaluation of the Program Companies and were provided to induce Great American into agreeing to the issuance of the various Program Policies.

52. Gallagher underplayed the problems at the Program Companies and failed to make Great American aware of key information that contradicted the financial condition of the Program Companies presented by Gallagher.

53. Gallagher provided Great American with one or more underwriting submissions (the "Summary Submissions") for each Program Company, specifically recommending that Great American agree to the issuance of the various Program Policies based on Gallagher's financial evaluations of each Program Company.

54. The incomplete and inaccurate facts, misstatements, or omissions presented to Great American in the Summary Submissions cannot be reconciled with the facts discovered after various claims were submitted.

55. The introduction of virtually each Summary Submission stated that "PIUS has completed its underwriting review for the Transaction. Our review includes, among other things, consideration of loan terms, borrower creditworthiness and technical analysis of the intellectual property collateral." This was inaccurate.

56. Each Summary Submission contained a Deal Executive Summary, Recommendation, which stated that every Program Company respectively would be able to pay back their loans and that "in the unlikely event of default" Gallagher would be able to dispose of the respective Program Companies' assets "to ensure that a claim does not result in a loss."

57. The Deal Executive Summary, Recommendation of each Summary Submission contained gross understatements of the problems with the various Program Companies.

58. Based on the information known to Gallagher at the time of underwriting, but withheld from Great American, no reasonable person would conclude that Gallagher had conducted a meaningful, diligent, and independent evaluation of the Program Companies' respective future prospects and abilities to repay their substantial, multi-million dollar loans.

59. In the Summary Submissions, Gallagher also promised a financial covenant methodology to monitor the Program Companies' abilities to pay back the proposed loans and provide adequate time to react in the event of a deteriorating credit profile. Gallagher failed to do so.

60. Had Great American been made aware of the true facts and state of affairs at the various Program Companies, it would not have agreed to the issuance of the Program Policies.

61. In addition, Gallagher did not perform the services required in Sections 2, 5, and 6 of the various Disbursement Monitoring Agreements in the manner required or befitting the services described and required in good faith.

**E. Consequences of Gallagher's Breaches**

62. The Trustee has made claims upon Great American under several Program Policies and is seeking sums from Great American after the failures of various Program Companies to make their respective loan repayments. Great American maintains that it is not liable to the Trustee under its Program Policies for various reasons under the policies' terms.

63. Arbitrations have been commenced pursuant to the arbitration provisions of those various Program Policies. Gallagher refuses to join in those arbitrations.

64. While Great American maintains that there is no coverage available for the Trustee under those Program Policies currently subject to arbitration, Great American contends that Gallagher would be liable to Great American for any arbitration awards in favor of the Trustee because of the acts or omissions of Gallagher and/or its employee(s), including breaches of the respective various agreements and because of the negligent or more culpable acts and omissions of Gallagher and/or its employee(s) in underwriting the Program Policies, monitoring the loans, mitigating losses, marketing the collateral, and otherwise.

65. Great American also contends that, even if Great American is not found liable for coverage under any of the Program Policies, Gallagher is obligated to defend it, indemnify it, and hold it harmless for any and all sums it incurs in mitigating losses, in addressing the claims, in

prosecuting and defending the arbitrations, and otherwise. Great American already has incurred well in excess of $75,000 of such sums and expects to incur more in the future.

66. Upon information and belief, Gallagher disputes that it is liable to Great American for any awards in the arbitrations, as well as for any sums Great American incurs in mitigating losses, in addressing the claims, in prosecuting and defending the arbitrations, or otherwise, for Great American's attorneys' fees and costs, or for any settlement payments that may be made.

67. Great American, accordingly, seeks a declaration of the various obligations and liabilities of Gallagher to Great American relating to the Program and future recoveries under the Program Policies, if any, as well as damages due to Gallagher's failures to perform and its breaches.

**COUNT I – DECLARATORY JUDGMENT**

68. Great American incorporates paragraphs 1 through 67 as if pled herein.

69. Gallagher owes Great American certain defense, indemnification and hold-harmless obligations, as more fully set out in the various contracts at issue, for its various roles in the Program.

70. Gallagher has denied any and all of those defense, indemnification and hold-harmless obligations and has refused to perform them.

71. Gallagher has also repudiated those obligations, asserting that it has done no wrong and will not defend, indemnify, or hold harmless Great American in the future.

72. There is, accordingly, a live controversy between the parties.

73. Great American seeks a declaration of the scope of the defense, indemnification and hold-harmless obligations owed by Gallagher to Great American.

## COUNT II – BREACH OF CONTRACT

74. Great American incorporates paragraphs 1 through 73 as if pled herein.

75. Gallagher owes Great American certain defense, indemnification and hold-harmless obligations, as more fully set out in the various contracts at issue, for its various roles in the Program.

76. Gallagher has denied any and all of those defense, indemnification and hold-harmless obligations and has refused to perform them.

77. Gallagher has also repudiated those obligations, asserting that it has done no wrong and will not defend, indemnify, or hold harmless Great American in the future.

78. Great American has already incurred costs, such as attorneys' fees, that are specifically contemplated in the defense, indemnification and hold harmless obligations of Gallagher.

79. Pursuant to the terms of some or all of the various contracts between Great American and Gallagher, Gallagher's performance is due and payable, yet has not been performed.

80. Great American, accordingly, seeks actual damages for all costs within the scope of Gallagher's defense, indemnification and hold harmless obligations.

## COUNT III – NEGLIGENT PROVISION OF PROFESSIONAL SERVICES

81. Great American incorporates paragraphs 1 through 80 as if pled herein.

82. Pursuant to the Producer Agreement and the Underwriting Addendum as well as the Disbursement Monitoring Agreements, Gallagher agreed to provide certain professional services for Great American.

83. Gallagher owed Great American a duty of care in connection with its provision of professional services.

84. Gallagher breached that duty.

85. As a result of Gallagher's breaches, Great American has suffered damages.

**COUNT IV – NEGLIGENT MISREPRESENTATION**

86. Great American incorporates paragraphs 1 through 85 as if pled herein.

87. Because of its special relationship with Great American, Gallagher had a duty to provide Great American with correct and accurate information.

88. On numerous occasions in the course of the Program, Gallagher made incorrect and inaccurate representations to Great American as to the financial condition of the Program Companies, the value of the collateral of the Program Companies, and the measures it was taking to comply with its duties to Great American under the Program.

89. Gallagher knew or should have known that these representations were incorrect.

90. Gallagher knew that Great American sought information about the Program and specifically about the collateral of the Program Companies for a serious purpose and that Great American relied on Gallagher to provide such information.

91. Gallagher knew that Great American relied on Gallagher to comply with its duties to Great American under the Program.

92. Great American intended to, and did, rely and act upon what turned out to be incorrect and inaccurate information provided by Gallagher, and that Great American intended to, and did, rely and act upon Gallagher's compliance with its duties to Great American under the Program, and it did so to its detriment.

## COUNT V – SPECIFIC PERFORMANCE

93. Great American incorporates paragraphs 1 through 92 as if pled herein.

94. Among other of Gallagher's obligations to Great American is Gallagher's ongoing obligation to turn over all of its books and records about the Program to Great American at Great American's request.

95. The Producer Agreement contains the following obligations:

11. Records.

a. Great American has the right upon reasonable written notice and during normal business hours of Producer, to inspect and audit all records, systems, Policy files, claims files, documents and other data related to the Business (collectively, "**Books and Records**") as Great American, in its sole discretion, deems necessary. Producer agrees to reasonably cooperate with Great American in conducting such inspections and audits. Producer will provide reasonable access to employees, records, data, and office facilities in the event of any audit, inspection, suit, complaint, claim, or regulatory exam or inquiry.

b. Producer will maintain all Books and Records in hard copy or electronic form. Such Books and Records will be retained for the longer of seven years after Policy termination, or such longer time as may be required by law.

c. At any time, upon written request of Great American, Producer will deliver copies of all, or any portion of, Books and Records to Great American, in a format designated by Great American, which may include electronically readable format, at no cost to Great American.

d. Producer agrees to provide Great American with any information Great American reasonably requests to maintain its status as an admitted insurer or an eligible surplus lines insurer.

96. As is provided by the Producer Agreement, "[a]t any time, upon written request of Great American, Producer **will deliver** copies of all, or any portion of, Books and Records to Great American, in a format designated by Great American, which may include electronically readable format, at no cost to Great American." Producer Agreement ¶ 11.c.

97. Gallagher has repeatedly refused to provide Great American with the Books and Records, notwithstanding its mandatory obligation that it "will deliver copies of all, or any portion of, Books and Records to Great American, in a format designated by Great American, which may include electronically readable format, at no cost to Great American." Producer Agreement ¶ 11.c.

98. Gallagher's obligation to turn over "all" of the Books and Records is not compensable as damages, nor is there any other remedy at law which would remedy Gallagher's breach other than to compel Gallagher to specifically perform this obligation.

99. Great American accordingly requests that the Court grant Great American relief and compel Gallagher's specific performance to provide Great American with an electronically readable format of all Books and Records, in unredacted form, as expressly provided in the Producer Agreement.

## JURY DEMAND

100. Plaintiff hereby demands a trial by jury on all issues triable before a jury.

## CONCLUSION

For the reasons stated above, Great American respectfully requests the Court enter judgment in Great American's favor:

1. Declaring Gallagher has defense, indemnification, and hold harmless obligations that cover all of Great American's various financial losses from the Program, including any future payments which are or may become due from the various arbitrations pending between Great American and the Trustee or which may arise in the future;

2. Awarding Great American all of its damages, with interest, from Gallagher's breaches of contract and duties to provide professional services;

3. Awarding Great American all of its damages, with interest, from Gallagher's negligent misrepresentations; and

4. Ordering Gallagher to specifically perform its contractual obligations to provide Great American with all Books and Records as discussed under the Producer Agreement in unredacted, electronically readable form.

Dated June 30, 2025

Respectfully submitted,

/s/ *James P. Ruggeri*

James P. Ruggeri (Bar ID 98489720)
Edward B. Parks, II (*pro hac vice* forthcoming)
RUGGERI PARKS WEINBERG LLP
1875 K Street NW, Suite 800
Washington, DC 20006
Tel: (202) 984-1400
Fax: (202) 984-1401
jruggeri@ruggerilaw.com
eparks@ruggerilaw.com