**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GREAT AMERICAN E&S INSURANCE COMPANY,

Plaintiff,

v.

ARTHUR J. GALLAGHER & CO., ARTHUR J. GALLAGHER RISK MANAGEMENT SERVICES, LLC, and GALLAGHER IP SOLUTIONS, LLC,

Defendants.

Civil Action No.: 1:25-cv-05406

**OPPOSITION OF GREAT AMERICAN E&S INSURANCE COMPANY TO DEFENDANTS' PARTIAL MOTION TO DISMISS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6)**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

FACTUAL BACKGROUND ....................................................................................................4

LEGAL STANDARD ....................................................................................................6

ARGUMENT ....................................................................................................7

I. GREAT AMERICAN'S CLAIMS ARE RIPE AND ADEQUATELY PLEADED ............7

A. Great American's Claim for Breach of Contract Is Ripe ........................................7

B. Great American's Claim Specifically for Defense Costs Is Ripe ............................9

C. Great American Has Properly Pleaded Its Breach Claim ......................................14

II. GREAT AMERICAN'S DECLARATORY JUDGMENT CLAIM IS RIPE AND NOT DUPLICATIVE OF ITS CONTRACT CLAIM, AND THE COURT SHOULD EXERCISE ITS DISCRETION TO HEAR IT ..............................................................17

A. Great American's Declaratory Judgment Claim Is Ripe and Not Duplicative of Its Contract Claim ..............................................................................17

B. The Court Should Exercise Its Discretion to Hear Great American's Claim for Declaratory Relief ..............................................................................19

III. THE ECONOMIC LOSS DOCTRINE DOES NOT BAR GREAT AMERICAN'S CLAIMS FOR NEGLIGENT PROVISION OF PROFESSIONAL SERVICES AND NEGLIGENT MISREPRESENTATION ....................................................22

IV. GREAT AMERICAN HAS ADEQUATELY PLEADED ITS CLAIM FOR NEGLIGENT MISREPRESENTATION ..............................................................27

CONCLUSION ....................................................................................................29

## TABLE OF AUTHORITIES

### CASES

*Admiral Insurance Co. v. Niagara Transformer Corp.*,
57 F.4th 85 (2d Cir. 2023) ....................19

*Allen v. Westpoint-Pepperell, Inc.*,
11 F. Supp. 2d 277 (S.D.N.Y. 1997)....................28

*Amidax Trading Group v. S.W.I.F.T. SCRL*,
671 F.3d 140 (2d Cir. 2011)....................6

*Associated Indemnity Corp. v. Fairchild Industries, Inc.*,
961 F.2d 32 (2d Cir. 1992)....................7, 17, 21

*Barbagallo v. Marcum LLP*,
No. 11-CV-1358, 2012 WL 1664238 (E.D.N.Y. May 11, 2012) ....................13

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)....................16

*Bradley v. Earl B. Feiden, Inc.*,
30 A.D.3d 709, 817 N.Y.S.2d 409 (2006) ....................10

*Brunckhorst v. Bischoff*,
No. 21 CIV. 4362 (JPC), 2024 WL 5443172 (S.D.N.Y. Oct. 7, 2024) ....................20

*Carter v. HealthPort Technologies, LLC*,
822 F.3d 47 (2d Cir. 2016)....................6

*Catlin Insurance Co. v. Champ Construction Co.*,
No. 24-CV-4499 (LJL), 2025 WL 2494291 (S.D.N.Y. Aug. 29, 2025)....................10, 11, 14

*Chase Scientific Research, Inc. v. NIA Group, Inc.*,
96 N.Y.2d 20, 749 N.E.2d 161 (2001)....................24 n.6

*Dormitory Authority v. Samson Construction Co.*,
30 N.Y.3d 704, 94 N.E.3d 456 (2018)....................22, 25

*Dresser-Rand Co. v. Ingersoll Rand Co.*,
No. 14 CIV. 7222 KPF, 2015 WL 4254033 (S.D.N.Y. July 14, 2015)....................11, 12, 13, 14

*Harleysville Insurance Co. v. Certified Testing Laboratories Inc.*,
681 F. Supp. 3d 155 (S.D.N.Y. 2023)....................20

*Hydro Investors, Inc. v. Trafalgar Power Inc.*,
227 F.3d 8 (2d Cir. 2000)....................26

*Maalouf v. Salomon Smith Barney, Inc.*,
No. 02 CIV. 4770(SAS), 2003 WL 1858153 (S.D.N.Y. Apr. 10, 2003)....................28

*In re Navidea Biopharmaceuticals Litigation*,
No. 19-CV-1578 (VEC), 2024 WL 1311896 (S.D.N.Y. Mar. 25, 2024) ....................18 n.5

*Negrete v. Citibank, N.A.*,
187 F. Supp. 3d 454 (S.D.N.Y. 2016)....................22

*Negrete v. Citibank, N.A.*,
237 F. Supp. 3d 112 (S.D.N.Y. 2017 ....................16

*New York & Presbyterian Hospital v. Tishman Construction Co.*,
180 Misc. 2d 193, 688 N.Y.S.2d 424 (Sup. Ct. 1999)....................23

*Olin Corp. v. Lamorak Insurance Co.*,
332 F. Supp. 3d 818 (S.D.N.Y. 2018)....................18

*Palin v. New York Times Co.*,
940 F.3d 804 (2d Cir. 2019)....................7

*Phoenix Light SF Ltd. v. Deutsche Bank National Trust Co.*,
585 F. Supp. 3d 540 (S.D.N.Y. 2022)....................22

*Sandoor Alex Telegdi v. A.M.R. Services Corp.*,
No. 97 CV 1177 RJD, 2000 WL 264333 (E.D.N.Y. Jan. 21, 2000)....................23

*Sawicki v. GameStop Corp.*,
106 A.D.3d 979, 966 N.Y.S.2d 447 (2013) ....................13

*Schiavone Construction Co. v. Elgood Mayo Corp.*,
56 N.Y.2d 667, 451 N.Y.S.2d 720, 436 N.E.2d 1322 (1982)....................26

*Silvercreek Management, Inc. v. Citigroup, Inc.*,
248 F. Supp. 3d 428 (S.D.N.Y. 2017)....................27, 28

*Singer Co. v. Stott & Davis Motor Express, Inc.*,
79 A.D.2d 227, 436 N.Y.S.2d 508 (1981) ....................25

*Sommer v. Federal Signal Corp.*,
79 N.Y.2d 540, 593 N.E.2d 1365 (1992)....................23, 25

*Sookul v. Fresh Clean Threads, Inc.*,
754 F. Supp. 3d 395 (S.D.N.Y. 2024)....................7

*Starr Indemnity & Liability Co. v. Exist, Inc.*,
No. 23-912, 2024 WL 503729 (2d Cir. Feb. 9, 2024) ....................18 n.5

*VR Optics, LLC v. Peloton Interactive, Inc.*,
No. 2021-1900, 2023 WL 2031213 (Fed. Cir. Feb. 16, 2023) ....................11, 12, 14

**STATUTES**

New York Civil Practice Law and Rules § 214 ....................24

Plaintiff Great American E&S Insurance Company ("Great American") respectfully submits this opposition to the Partial Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) filed by Defendants Arthur J. Gallagher & Co. ("AJG"), Arthur J. Gallagher Risk Management Services, LLC ("Gallagher Risk"), and Gallagher IP Solutions LLC ("GIPS") (collectively "Gallagher").

## INTRODUCTION

In its memorandum in support of its motion to dismiss ("Memorandum: or "Mem."), Gallagher fails to support why dismissal should be granted. Instead, the allegations explain at length and in detail how Gallagher has refused to honor its obligation to indemnify Great American for Great American's already incurred losses. It has refused to participate in pending arbitrations with Great American and UMB Bank, N.A. ("UMB Bank") (the "Related Arbitrations") as a party, as a witness under a summons issued by the arbitrator, or even in discovery. Most tellingly, it has refused to comply with its express and undeniable obligation to share with Great American the books and records relating to the transactions at issue. The refusal is all the more remarkable because Gallagher, relying on information it refuses to share with Great American, filed a claim of fraud against its former employee and the architect of the transactions at issue, yet it has kept all its support for the fraud allegations under seal. Gallagher's meritless motion to dismiss seeks to stave off responsibility as long as possible.

Gallagher's Memorandum makes two overarching contentions: first, Great American's claims are not ripe because Great American has not yet sustained indemnifiable losses; second, Great American has failed to plead its claims with adequate specificity. Neither contention withstands even minimal scrutiny.

<u>*Ripeness*</u>. Gallagher's ripeness argument is based on three premises – (1) the outcome of Great American's pending arbitrations with UMB Bank will determine whether Great American is entitled to indemnification from Gallagher under the Producer Agreement or the Disbursement Monitoring Agreements ("DMA"), (2) if Great American prevails in the arbitrations, "Great American would not be entitled to any indemnification whatsoever," Mem. at 14, and (3) the indemnification provisions on which Great American relies do not require Gallagher to indemnify Great American for losses as those losses are incurred.

All three premises are false.

First, the Related Arbitrations will not address, one way or the other, whether Great American is entitled to indemnification from Gallagher. Those arbitrations concern whether Great American owes coverage to UMB Bank, the Named Insured, under the Program Policies. They will not resolve the issues in this case. For example, whether Gallagher has indemnity obligations under the Producer Agreement comes down to (1) whether Gallagher breached its underwriting obligations under the Producer Agreement or (2) whether Great American's losses, those that it has already incurred and those contingent losses that are dependent on the results of the Related Arbitrations, are the result of Gallagher's negligent or more culpable acts in presenting the proposed transactions to Great American and recommending that Great American issue insurance policies under the Program. These issues are not raised in the Related Arbitrations.

Second, Great American's right to indemnification does not depend on the outcome of the Related Arbitrations. Regardless of that outcome, Great American has already sustained significant losses well in excess of $75,000 that Gallagher must reimburse, and Great American

has ongoing losses that will continue into the future. Great American alleged this explicitly in Paragraph 65 of its Complaint:

> 65. Great American also contends that, even if Great American is not found liable for coverage under any of the Program Policies, Gallagher is obligated to defend it, indemnify it, and hold it harmless for any and all sums it incurs in mitigating losses, in addressing the claims, in prosecuting and defending the arbitrations, and otherwise. Great American already has incurred well in excess of $75,000 of such sums and expects to incur more in the future.

These allegations, which must be accepted as true for purposes of Gallagher's motion, are more than sufficient to allege a ripe controversy with respect to Great American's breach claims. And because they encompass future indemnifiable losses, the allegations also are sufficient to support Great American's claim for declaratory judgment. Moreover, Gallagher has not just breached its obligations but repudiated them, making a declaratory judgment particularly appropriate.

Third, Gallagher is obligated to indemnify Great American's losses as they are incurred. The indemnity provisions at issue are broad and include a duty to defend. Nothing in them suggests that Gallagher may defer payment until Great American's losses have ceased, possibly years down the road. In arguing the contrary, Gallagher relies on one case depending on unique policy language not present here.

*Adequacy of Pleadings*. Great American's pleading is more than adequate to satisfy Rule 8(a)(2). The Complaint quotes Gallagher's indemnification obligations, recites the contractual provisions Gallagher breached, and devotes a dozen paragraphs to alleging the specifics of those breaches. Citing no authority, Gallagher seemingly demands the itemization of every single misleading statement in the continual communications between the parties spanning a period of years. Not only is there no legal basis for this demand, but this demand is especially

inappropriate since the parties have *remained* in continual contact since Gallagher's breaches became apparent, and, for purposes of putting it on the notice required by Rule 8(a)(2), Gallagher is in no need whatever of further information in order to answer the Complaint.

Gallagher's objections to Great American's pleading of its tort claims are similarly baseless. Great American pleaded all the elements of negligent misrepresentation and professional negligence with more than sufficient detail. The tort claims are not barred by the economic loss doctrine, which applies principally to product liability claims and has no application here. Finally, Great American's negligent misrepresentation claim does not sound in fraud, as Gallagher asserts, and is not subject to the heightened pleading requirements of Rule 9(b). It alleges negligence, and no more.

For these reasons and those set forth below, Gallagher's motion to dismiss should be denied.

## FACTUAL BACKGROUND

As Great American alleges in the Complaint, the parties' dispute arises out of the PIUS Lender IP Collateral Insurance Program (the "Program") designed, promoted, and implemented by Joseph Agiato, the original owner and chief executive officer of PIUS Limited, LLC ("PIUS[1]") and of Newlight Capital, LLC ("Newlight"). At the time of the breaches of contract and tortious acts enumerated in Great American's Complaint, Gallagher owned and controlled PIUS and Newlight and employed Agiato. Complaint ¶¶ 21-24, 28-29.[2]

---

1 PIUS is an acronym for Patent Insurance Underwriting Services.
2 The Complaint does not identify Agiato by name.

Agiato's concept was to bring together private lenders and growth-stage companies with intellectual property assets in need of capital by enabling these borrowing companies to use their intellectual property as their principal collateral. *Id.* ¶ 21. Once PIUS identified the lenders and the borrowers, the borrowers issued notes to the lenders in return for funding. *Id.* ¶ 22. UMB Bank served as the indenture trustee for the transactions. *Id.* Newlight played a variety of roles in servicing, administering, and monitoring the loans; in particular, it served as UMB Bank's collateral agent with the responsibility of identifying and vetting the collateral and ensuring that it was secured and not impaired. *Id*. ¶ 29. In the event of a payment default by the borrower, Newlight was responsible for mitigating damages and maximizing recovery from the collateral. *Id.* If, after these measures were taken, the collateral still proved to be insufficient to pay off the notes, PIUS arranged for the residual loss to be insured by insurance policies, subject to their terms and conditions, issued to the named insured UMB Bank, the trustee. *Id.* ¶ 23.

PIUS recruited Great American to serve as the insurer. *Id.* Their relationship was governed by a Producer Agreement and the Underwriting Authority Addendum thereto, pursuant to which PIUS agreed to underwrite policies for the Program in accordance with specified guidelines and criteria intended to ensure the creditworthiness of the borrowers. *Id.* ¶ 41-42. PIUS undertook to indemnify Great American for losses caused by PIUS's breaches. *Id.* ¶ 43.

For each individual loan under the Program, Gallagher, UMB Bank, and Great American entered into a Disbursement Monitoring Agreement (the "DMA") obligating Newlight to perform various services. *Id.* ¶ 44-45. Each of these agreements obligated Newlight to indemnify both UMB Bank and Great American for any losses caused by Newlight's breaches. *Id.* ¶ 46.

As the Program unfolded, PIUS did not observe the contractual guidelines. *Id.* ¶ 49-61. PIUS's breaches misled Great American and induced it to issue policies to UMB Bank relating to borrowers that were not creditworthy, which it would not have done absent Gallagher's breaches and tortious misrepresentations. *Id.* ¶ 60. Moreover, Newlight, in its capacity as UMB Bank's representative, committed acts of misfeasance, malfeasance, or gross negligence that doomed the Program. *Id.* ¶ 63, 84.

UMB Bank and Great American are now engaged in the Related Arbitrations. Gallagher resisted participating in the arbitrations – yet Gallagher itself appears to believe that it is obligated to indemnify Great American and UMB Bank. In an action it filed against its employee Agiato, Gallagher sought and received leave to add a claim seeking "relief for a fraudulent scheme through which Agiato induced [Gallagher] to permit Agiato and PIUS's participation in certain risky transactions that benefited him personally but have since failed." *See* Plaintiffs' Motion for Leave to File an Amended Complaint, Del. Ch. Ct. No. 2024-0494-LWW (May 27, 2025) (attached as Exhibit A).

**LEGAL STANDARD**

In opposing a motion to dismiss under Rule 12(b)(1) based solely on the allegations of the complaint, the plaintiff has no evidentiary burden. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). Rather, it "must allege facts that affirmatively and plausibly suggest that it has standing to sue." *Amidax Trading Grp. v. S.W.I.F.T. SCRL,* 671 F.3d 140, 145 (2d Cir. 2011). A court must accept the complaint's allegations as true. *Id.*

In deciding a motion to dismiss under Rule 12(b)(6), a court "constru[es] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable

inferences in the plaintiff's favor." *Sookul v. Fresh Clean Threads, Inc.*, 754 F. Supp. 3d 395, 401 (S.D.N.Y. 2024) (quoting *Palin v. N.Y. Times Co.*, 940 F.3d 804, 810 (2d Cir. 2019)).

## ARGUMENT

### I. GREAT AMERICAN'S CLAIMS ARE RIPE AND ADEQUATELY PLEADED.

#### A. Great American's Claim for Breach of Contract Is Ripe.

Gallagher argues that Great American's breach claim is unripe because (1) the outcome of Great American's Related Arbitrations with UMB Bank will determine whether Great American is entitled to indemnification, and (2) an indemnification claim requires out-of-pocket loss, which Great American has not suffered because it has not been found liable in the Related Arbitrations. Neither argument is valid.

First, the Related Arbitrations involve issues independent from those here. Here, the issues are whether Gallagher performed in accordance with its obligations to Great American in contract and tort. The Related Arbitrations will not resolve the adequacy of Gallagher's performance. Rather, they concern the respective contractual obligations of Great American and UMB Bank under the policies and other loan documents in each borrower transaction.

Gallagher's second argument is wrong in two different ways. First, it assumes that only an out-of-pocket loss is indemnifiable, not a contingent loss. In fact, the Second Circuit has said: "That the liability may be contingent does not necessarily defeat jurisdiction of a declaratory judgment action. Rather, courts should focus on 'the practical likelihood that the contingencies will occur.'" *Associated Indem. Corp. v. Fairchild Indus., Inc.*, 961 F.2d 32, 35 (2d Cir. 1992).

But even if out-of-pocket losses were required, the breach claim is still ripe, because Great American has already sustained significant out-of-pocket losses that Gallagher is already

obligated to indemnify. Gallagher is obligated to indemnify Great American for *all* its losses and expenses arising from Gallagher's breaches, not just for liability that may result depending on the ultimate resolutions in the Related Arbitrations. Because of Gallagher's breaches, Great American issued policies under which it has already sustained out-of-pocket losses, most obviously defense costs in the Related Arbitrations but there are many more. Gallagher has refused to indemnify those losses, and therefore Great American's claim is ripe.

Under the Producer Agreement, Gallagher "will indemnify, hold harmless and defend" Great American "against any and all losses, damages . . . costs, or expenses of whatever kind, including reasonable attorneys' fees . . . that are incurred by Company . . . arising out of, or related to any . . . i) breach or non-fulfillment of any representation, warranty or covenant under this Agreement by Producer, its employees, agents, contractors or Subproducers, or any negligent or more culpable act or omission of Producer, its employees, agents, contractors or Subproducers." The indemnity provision in the DMAs is similarly broad, extending to "any and all liabilities, claims, . . . costs, damages, expenses . . . arising out of, caused by or resulting from . . . a breach" by Gallagher. Gallagher's broad indemnity duty would of course include an obligation to indemnify Great American for any sum it may ultimately have to pay in the Related Arbitrations, but it is not limited to such sums. It also includes any other costs and expenses "of whatever kind" arising from Gallagher's breach.

Gallagher's primary breach under the Producer Agreement is its failure to underwrite the policies in accordance with the guidelines and criteria set forth in the Underwriting Authority Addendum. As Great American clearly alleged, that failure caused Great American to issue policies it would not have issued but for Gallagher's breaches. *See* Complaint at ¶ 60 ("Had

Great American been made aware of the true facts and state of affairs at the various Program Companies, it would not have agreed to the issuance of the Program Policies.").

As a direct result of Gallagher's breaches, Great American has already incurred significant out-of-pocket expenses. Those expenses have arisen from (1) defending the claims and counterclaims against Great American in the Related Arbitrations, (2) hiring professionals, at a cost of many multiples of the jurisdictional limit, to perform various functions that Gallagher should have performed, such as attempting to mitigate losses from the defaults of the borrowers in the Program and expenses related to the marketing their collateral, and (3) otherwise addressing the financial, legal, and regulatory consequences of the collapse of the Program. These expenses are substantial, easily exceeding the jurisdictional minimum. Great American's claim for indemnification of these expenses does not depend on the outcome of the Related Arbitrations, nor is it contingent or hypothetical in any other way: to repeat, these are expenses Great American has already incurred, and which Gallagher has refused to indemnify, as it is contractually obligated to do.

**B. Great American's Claim Specifically for Defense Costs Is Ripe.**

Gallagher argues that Great American's claim for indemnification of defense costs is not ripe. Motion at 15-16. This argument fails. The Producer Agreement provides that Gallagher "will indemnify, hold harmless and defend" Great American "against any and all losses, damages . . . costs, or expenses of whatever kind, including reasonable attorneys' fees . . . that are incurred by Company . . . arising out of, or related to any . . . breach." Expenses of "whatever kind" could hardly be broader; it is certainly broad enough to include defense costs, particularly when the provision states that it "include[es] reasonable attorneys' fees." Moreover, Gallagher is

obligated not only to "indemnify" and "hold harmless" but also to "defend."[3] The duty to defend includes the duty to indemnify defense costs but it is broader, extending to the duty to mount and supervise the defense. *See Bradley v. Earl B. Feiden, Inc.*, 30 A.D.3d 709, 714, 817 N.Y.S.2d 409 (2006), *aff'd as modified*, 8 N.Y.3d 265, 864 N.E.2d 600 (2007) ("Inasmuch as the contract at issue clearly requires Mid-South to *defend* GE for any product liability claims . . . Mid-South is required to indemnify GE for all costs associated with defending this action"). Here, Gallagher has breached both the duty to defend and the duty to indemnify defense costs. Great American plainly has a ripe claim for these already incurred costs.

The case law is in accord. In *Catlin Insurance Co. v. Champ Construction Co.*, No. 24-CV-4499 (LJL), 2025 WL 2494291 (S.D.N.Y. Aug. 29, 2025), the plaintiff was an insurer, but the case hinged not on an insurance policy but rather on an indemnification agreement between a consultant and a building owner. That agreement was essentially identical to the one here, obligating the contractor to "indemnify, defend, and hold harmless the Owner" against all claims arising out of its services. The court noted that "[i]n contrast to the duty to indemnify, which occurs retroactively after the costs are actually borne by the indemnitee, the duty to defend connotes an obligation of active responsibility, from the outset, for the promised defense, against the covered claims." *Id*. at *5 (S.D.N.Y. Aug. 29, 2025). It then concluded that specifying a duty to defend in addition to the duty to indemnify created a duty to pay defense costs *as they are incurred*:

---

[3] Similarly, the DMAs provide that "[t]he indemnifying party shall conduct the defense for all claims or suits with reputable counsel of its choice, and reasonably acceptable to the indemnified party, and decide, in its sole opinion, whether any such claims or suits may be settled." DMA, p. 17, Section 13(e).

> The inclusion of "defend" would be illusory if, as GZA contends, it imposed no more than an obligation on GZA, after liability was determined, to reimburse Broadway 371 for its legal expenses. The GZA Consultant Agreement already requires GZA to reimburse the Owner for its "expenses (including but not limited to reasonable attorney's fees and legal costs, disbursements, and expenses)." The obligation to "defend" the Owner does more and different work. **It requires GZA, at a minimum, to fund the Owner's reasonable legal expenses as they are incurred and not only after a determination of liability.** The inclusion of both terms indicates that "the parties understood the duty to defend was distinct from the duty to indemnify." *VR Optics, LLC v. Peloton Interactive, Inc.*, 2023 WL 2031213, at *9 (Fed. Cir. Feb. 16, 2023).

*Id.* at *6 (emphasis supplied).

In the *VR Optics* case cited in *Catlin*, the Federal Circuit, applying New York law, reached the same conclusion interpreting virtually identical language: "VDG agreed to 'indemnify, defend and hold harmless Peloton'—not just 'indemnify.' . . . Accordingly, VDG also had a duty to defend Peloton that was separate and distinct from its duty to indemnify." *VR Optics, LLC v. Peloton Interactive, Inc.*, No. 2021-1900, 2023 WL 2031213, at *9 (Fed. Cir. Feb. 16, 2023).

*Catlin* and *VR Optics* show that language creating a separate and distinct duty to defend, such as that in the Producer Agreement, also creates a duty to pay defense costs as they are incurred. These cases are a sufficient response to Gallagher's complaint that "Great American has not cited any contractual language requiring that defense costs be paid immediately as soon as they are incurred by Great American." Mem. at 16.

Gallagher, relying principally on *Dresser-Rand Co. v. Ingersoll Rand Co.*, No. 14 CIV. 7222 KPF, 2015 WL 4254033 (S.D.N.Y. July 14, 2015), argues that "[i]n the non-insurance context, a party's defense obligations (if any) are presumed to be no broader than the party's indemnification obligations. . . . Because Gallagher's alleged duty to defend and duty to

indemnify are co-extensive, it would be similarly premature to adjudicate the duty to defend claim." Mem. at 15. In short, Gallagher is arguing that there is no duty to defend unless there is a duty to indemnify, and, as the issue of duty to indemnify is not yet ripe, neither is the duty to defend.

This argument fails. Gallagher has mischaracterized *Dresser-Rand* and the law governing contracts of indemnity. The point of *Dresser-Rand* is that an indemnity agreement does not impose an obligation to defend broader than the duty to indemnify ***unless the agreement specifically makes that obligation broader***. The *VR Optics* court explained this by relying on *Dresser-Rand* itself:

> In New York, "the 'duty to defend' is presumed only in insurance policies, [and] the common law imposes no such duty on contractual indemnitors more generally. Accordingly, an indemnitor's obligation to defend must emanate (if at all) from the language of the contract." *Dresser-Rand Co. v. Ingersoll Rand Co.*, No. 14-cv-7222, 2015 WL 4254033, at *7 (S.D.N.Y. 2015). ***Dresser-Rand*** **clarified that this presumption is not meant to undermine unambiguous contract language. "If a contractual defense obligation is, by its own terms, exceedingly broad, a court will not artificially circumscribe it simply because the indemnitor is not an insurer."** *Id.*

*VR Optics,* 2023 WL 2031213, at *9 (emphasis supplied.) In short, if the indemnity agreement provides for a defense obligation independent of the duty to indemnify, a court will enforce that obligation. And, as shown above, the contractual language here is the same as in *Catlin* and *VR Optics*, where the court held that, by specifying a duty to defend "separate and distinct" from the duty to indemnify, the language created a duty to pay defense costs as they are incurred. Here, Great American has already incurred defense costs in the Related Arbitrations, which Gallagher has refused to pay. Great American's breach claim is therefore ripe.

*Dresser-Rand* involved different contractual language and different circumstances. First, rather than creating a "separate and distinct" duty to defend, as in *VR Optics* and this case, the contractual language specifically made the duty to pay defense costs as incurred depend on a right to indemnity: "Significantly for purposes of the present motion, Section 8.1(f) provides that only a party 'entitled to indemnification' must be reimbursed defense costs in real time, as they accrue[.]" 2015 WL 4254033, at *2. Second, in *Dresser-Rand*, "Plaintiffs conceded at the conference that their claim for indemnification was not ripe for adjudication." *Id.* at *4. The concession was more or less forced on the plaintiffs because their right to indemnification depended on the outcome of the underlying case. Where a plaintiff's right to defense costs as incurred depends on first establishing a right to indemnity and where the plaintiff also concedes that the indemnity issue is not ripe, it is not surprising that the court concluded that the defense-cost issue was not ripe.

Here, the situation is entirely different. Gallagher's obligation to defend is separate and distinct from its obligation to indemnify. Unlike the *Dresser-Rand* plaintiff, Great American does not, and has no reason to, concede that the duty to indemnify is unripe. Those arbitrations will decide only rights as between Great American and UMB Bank; they will not determine Gallagher's liability to either party. It is therefore misleading for Gallagher to refer to them as the "Underlying Arbitrations." They are not "underlying" in the ordinary sense that their outcome determines any rights here. They are more accurately characterized as "related."

In addition to *Dresser-Rand*, Gallagher relies on two other cases, *Barbagallo v. Marcum LLP*, No. 11-CV-1358, 2012 WL 1664238, at *5 (E.D.N.Y. May 11, 2012), and *Sawicki v. GameStop Corp.*, 106 A.D.3d 979, 979, 966 N.Y.S.2d 447, 448 (2013). Neither case addresses

the issue of ripeness. Both make the routine point that when the indemnitor is not an insurer, its duty to defend is no broader than its duty to indemnify. But in contrast, *Catlin*, *VR Optics*, and indeed Gallagher's own lead case *Dresser-Rand* all clarify what common sense would in any case demand: an indemnitor's duty to defend may indeed be broader than its duty to indemnify *if the contractual language makes it broader*. Here, as in *Catlin* and *VR Optics*, the contractual language does make the duty to defend broader by making it separate and distinct from the duty to indemnify.

### C. Great American Has Properly Pleaded Its Breach Claim.

Gallagher argues, incorrectly, that Great American has failed to plead its breach claim adequately. As Gallagher recognizes, to state a claim for breach under both New York and Ohio law, a plaintiff must allege only (1) the existence of a contract; (2) the performance of the contract by plaintiff; (3) breach of the contract by defendant; and (4) damages. Mem. at 22. Here, Great American pleaded all these elements. It alleged that (1) the parties entered into the Producer Agreement, the Underwriting Authority Addendum, and the DMAs, Complaint ¶¶ 41, 44; (2) Great American fulfilled the only obligations it had under the contracts, to engage Gallagher as its underwriter, to pay Gallagher's fees, and to issue the policies, *id.* ¶¶ 1, 2, 92; (3) Gallagher breached these contracts, *id.* ¶¶ 49-59, and (4) Great American sustained damages, *id.* ¶¶ 78-80.

Gallagher does not take issue with any of this. Instead, it argues that Great American has not plausibly alleged that its "losses were caused by Gallagher's breach of the agreements at issue." Mem. at 22. Gallagher does not appear to have read the Complaint, which alleges that "[h]ad Great American been made aware of the true facts and state of affairs at the various

Program Companies, it would not have agreed to the issuance of the Program Policies." Complaint at ¶ 60. In other words, Great American alleges that, but for Gallagher's breach of the underwriting criteria in the Producer Agreement and the Underwriting Authority Addendum, it would not have issued the policies and would not have suffered the losses that ensued. This allegation is not merely plausible, it is virtually undeniable: *of course* Great American would not have issued the policies related to unsound companies or suffered the ensuing losses if Gallagher had properly performed its obligation to underwrite in accordance with the agreed criteria.

Gallagher then shifts gears, alleging that "Great American fails to allege what provision(s) of the contract were supposedly breached." Mem. at 22. Once again, one need only glance at the Complaint to prove Gallagher wrong. Paragraph 42 of the Complaint, which extends for nearly two pages, itemizes the underwriting standards in the Producer Agreement that Gallagher breached. The similarly lengthy paragraph 45 itemizes the service obligations in the DMAs that Gallagher breached. And paragraphs 49 through 61 itemize specific breaches. In short, the Complaint provides the very detail that Gallagher alleges it lacks.[4]

Gallagher continues in a similar vein at some length, complaining that Great American does not identify "what information was provided or how it was supposedly misleading" or "any of the 'facts' that were supposedly provided to Great American, nor does it provide any of the later-discovered 'facts' purportedly demonstrating that Great American was misled." Mem. at 23. This argument is frivolous. The Complaint devotes seven paragraphs to describing the Summary Submissions Gallagher provided to Great American in the course of its underwriting

---

[4] The Complaint also alleges that Gallagher "failed to provide the services required in Sections 2, 5, and 6 of various Disbursement Monitoring Agreements." Despite the specification of the provisions at issue, Gallagher professes to find this inadequate.

and generally identifies their inadequacies. *See* Complaint ¶¶ 53-59. Gallagher appears to be demanding citation of specific false or misleading statements in individual Summary Submissions – in short, an extreme particularity utterly at odds with the requirements of Rule 8(a)(2), which calls only for "a short and plain statement of the claim showing that the pleader is entitled to relief." *See Negrete v. Citibank, N.A.*, 237 F. Supp. 3d 112, 127 (S.D.N.Y. 2017), *aff'd*, 759 F. App'x 42 (2d Cir. 2019) ("there is no requirement in the Federal Rules of Civil Procedure that the details of a breach of contract claim be pleaded with particularity. Instead, the short, plain notice rule of Fed. R. Civ. P. 8 applies."). In support of its demand for particularity, Gallagher provides no citation whatever.

But Gallagher's argument is not merely without support in the case law, it is essentially theatrical. The purpose of Rule 8(a)(2) is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (ellipsis in original). Gallagher therefore presents itself as struggling to discern the gravamen of the claims against it: "As best as Gallagher can interpret Great American's vague pleading . . ." Mem. at 20. This is one of six separate occasions on which Gallagher uses the words "vague" or "vaguely" to describe the Complaint. *See also* Mem. at 7, 11, 21, 21 n.6, 27. But there are no hidden mysteries here for Gallagher. The parties have been in virtually continuous contact since problems emerged in the Program, although their negotiations have not borne fruit. As described in the Complaint, for months Great American tried, unsuccessfully, to induce Gallagher to participate in the Related Arbitrations. Complaint ¶¶ 5-7. Great American's cards have long been on the table. Few defendants have ever been less in need of more detailed "fair notice" than Gallagher.

## II. GREAT AMERICAN'S DECLARATORY JUDGMENT CLAIM IS RIPE AND NOT DUPLICATIVE OF ITS CONTRACT CLAIM, AND THE COURT SHOULD EXERCISE ITS DISCRETION TO HEAR IT.

### A. Great American's Declaratory Judgment Claim Is Ripe and Not Duplicative of Its Contract Claim.

Gallagher argues that "Great American's declaratory judgment claim does not present an actual controversy" because "any dispute regarding Gallagher's purported indemnification obligations cannot be decided unless and until there is a finding of liability against Great American in the underlying arbitrations." Mem. at 14. Gallagher also argues that "Great American's declaratory judgment claim is entirely duplicative of its breach of contract claim." Mem. at 19. These arguments overlap and fail for the same reason.

As shown above, Gallagher wrongly assumes that Great American's indemnification claim solely concerns possible indemnification for its yet undetermined liability to UMB Bank. In fact, as discussed above, Great American is owed indemnification for the defense and other out-of-pocket expenses already incurred, making Great American's breach claim ripe. But, in addition to those expenses already incurred, Great American is incurring additional expenses of the same type every day and will continue to do so for some time.

Gallagher ignores these accumulating expenses, but it would apparently take the position that the Court cannot address them here because, not having been incurred yet, they are contingent and Great American has no ripe claim. As already shown, the contingency of liability "does not necessarily defeat jurisdiction of a declaratory judgment action. Rather, courts should focus on 'the practical likelihood that the contingencies will occur[.]'" *Associated Indem.*, 961 F.2d at 35. It is therefore routine for insurers to state claims for breach of contract concerning costs incurred and for declaratory judgment concerning future costs likely to occur. For

example, in *Olin Corp. v. Lamorak Ins. Co.*, 332 F. Supp. 3d 818, 840 (S.D.N.Y. 2018), the court noted that "[i]n addition to seeking, through its breach of contract claims, past costs covered by Lamorak's Policies through 2016, Olin is seeking, through claims for declaratory judgment, coverage of all covered costs incurred or allocated after 2016 for environmental remediation at the Remaining Sites." With respect to seven different sites, the court granted both forms of relief. *Id.* at 884.

Here, there is not merely a practical likelihood that Great American will incur indemnifiable expenses but rather a certainty. The Related Arbitrations are ongoing, and Great American must incur attorneys' fees to defend against the claims and counterclaims in those proceedings, despite the uncertainty of the ultimate outcomes. Accordingly, Great American has a ripe claim for declaratory judgment.

For much the same reasons, Great American's claim for declaratory judgment is not duplicative of its breach claim. A claim of breach inherently relates only to those damages that have already been incurred; it does not reach into the future.[5] Great American cannot now assert a ripe breach claim for expenses that it has not incurred. It can and does assert a ripe claim for

---

[5] *See In re Navidea Biopharmaceuticals Litig.*, No. 19-CV-1578 (VEC), 2024 WL 1311896, at *11 (S.D.N.Y. Mar. 25, 2024) ("In this case, the declaratory judgment claim is not duplicative of the Company's breach of contract claim; the Company sought to recover damages allegedly caused by Goldberg's breaches of the August Agreement while the claim for declaratory relief is to prevent future harm that it would experience if it were required to perform its outstanding contractual obligations."); *Starr Indem. & Liab. Co. v. Exist, Inc.*, No. 23-912, 2024 WL 503729, at *1 (2d Cir. Feb. 9, 2024) (declaratory claim had no useful purpose of where "Starr's requested declaration goes only to liability for past damages, not the avoidance of (nonspeculative) future damages. Liability for past damages can be addressed just as easily in an ordinary suit for breach of contract . . . .").

declaratory judgment as to those expenses, because there is a practical likelihood that it will incur those expenses.

But there is another reason why Great American's declaratory judgment claim is ripe and not duplicative of its breach claim. The issue here is not simply that Gallagher has failed to pay; it is that the parties fundamentally disagree about the meaning and breadth of the indemnity provisions and the Producer Agreement. For example, Great American asserts, and Gallagher denies, that the duty to defend is separate from the duty to indemnify; Great American asserts, and Gallagher denies, that Gallagher has breached the Producer Agreement and triggered its obligation to indemnify. A declaratory judgment will directly address and resolve these disputed issues of contract construction.

### B. The Court Should Exercise Its Discretion to Hear Great American's Claim for Declaratory Relief.

A district court has discretion to decline to exercise jurisdiction over a declaratory judgment claim that is ripe for purposes of the Constitution's "case or controversy" requirement. The Second Circuit has stated that the following considerations govern the exercise of that discretion:

> (1) whether the declaratory judgment sought will serve a useful purpose in clarifying or settling the legal issues involved; (2) whether such a judgment would finalize the controversy and offer relief from uncertainty; (3) whether the proposed remedy is being used merely for procedural fencing or a race to res judicata; (4) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; (5) whether there is a better or more effective remedy; and (6) whether concerns for judicial efficiency and judicial economy favor declining to exercise jurisdiction.

*Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 99-100 (2d Cir. 2023) (simplified).

All these factors favor exercising jurisdiction. First, as shown above, a declaratory judgment would prevent relitigation of the same issues concerning future costs in the pending arbitrations, or in new claims or arbitrations yet to be filed under the Program. Second, while a declaratory judgment would not resolve all issues related to the problems of the Program, it would finalize all issues between Great American and Gallagher. A declaratory judgment need not provide a global resolution to be worth entering. *See Brunckhorst v. Bischoff*, No. 21 CIV. 4362 (JPC), 2024 WL 5443172, at *1–2 (S.D.N.Y. Oct. 7, 2024) (declaratory judgment "serves to finalize a major component of this controversy"). Moreover, a declaratory judgment will relieve the parties of uncertainty concerning their liability, which may assist them in prosecuting or defending related cases. *See Harleysville Ins. Co. v. Certified Testing Lab'ys Inc.*, 681 F. Supp. 3d 155, 165–66 (S.D.N.Y. 2023) ("Declaratory judgment here. . . will relieve the parties of uncertainty over the coverage issue."). To be sure, the specific amount of indemnity due from Gallagher to Great American for the latter's liability, if any, to UMB Bank would remain to be determined in the Related Arbitrations or future claims; however, the amount of indemnity *always* remains open in declaratory judgments concerning future claims, so that is no reason for this Court to abstain.

The third and fourth factors relate to the common situation in which an insured or insurer angles for *res judicata* by filing a declaratory action in federal court when a state court action on the same issues is already pending. This is not the case here: this is the only action concerning the issues between the parties, and it has been filed in the appropriate forum. As to the fifth factor, there is no better remedy, because the breach claim will not reach future related actions.

Finally, judicial economy strongly favors exercising jurisdiction. All the issues between the parties can be resolved at one stroke, rather than addressing them in piecemeal litigation. If the Court agrees that Great American has stated a ripe claim for breach of contract, it would be the very opposite of judicial economy to decline to hear the declaratory judgment claim in the same action.

Gallagher's argument to the contrary is unpersuasive. It asserts, without explanation, that a declaratory judgment would serve no useful purpose. Mem. at 17. It argues that "while the Underlying Arbitrations remain pending, it is impossible to determine whether Great American has suffered any loss that could potentially be subject to indemnification." *Id.* But this is just a restatement of the position that liability must be established before a declaratory judgment is ripe, a position flatly rejected by the Second Circuit in *Associated Indemnity,* 961 F.2d at 35, and several times since.

Finally, Gallagher contends that declining to hear the declaratory judgment claim would serve judicial economy. It argues that the Related Arbitrations could "streamline this dispute" by resolving such issues as whether the borrowing companies were undercapitalized, the value of the collateral was overstated, the loans were inadequately monitored, and the collateral was improperly marketed. Mem. at 17-18. But, as shown above, the Related Arbitrations involve the respective contractual obligations of Great American and UMB Bank under the policies and other loan documents in each borrower transaction.

## III. THE ECONOMIC LOSS DOCTRINE DOES NOT BAR GREAT AMERICAN'S CLAIMS FOR NEGLIGENT PROVISION OF PROFESSIONAL SERVICES AND NEGLIGENT MISREPRESENTATION.

Gallagher argues that the economic loss doctrine bars Great American's claim for negligent provision of professional services and negligent misrepresentation. Although it makes this argument in two different sections, *see* Mem. at 25-26 (Part IV) and 26-27 (Part V), the argument is the same for both claims, and it fails for the same reasons.

Under the economic loss doctrine, where a plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory. *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 585 F. Supp. 3d 540, 584–85 (S.D.N.Y. 2022), *aff'd*, 66 F.4th 365 (2d Cir. 2023). Put differently, a tort action will not lie where "there was no injury alleged . . . that a separate negligence claim would include that is not already encompassed in [the plaintiff's] contract claim." *Dormitory Auth. v. Samson Constr. Co.*, 30 N.Y.3d 704, 713, 94 N.E.3d 456, 461–62 (2018). However, as Gallagher acknowledges, Mem. at 25, the doctrine is subject to a major exception where the defendant has an independent duty to the plaintiff: "'a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated.'" *Negrete v. Citibank, N.A.*, 187 F. Supp. 3d 454, 471 (S.D.N.Y. 2016), *aff'd* 759 F. App'x 42 (2d Cir. 2019).

Gallagher asserts that this exception does not apply because "Great American does not allege such an independent legal duty exists." In fact, Great American does allege such a duty – twice. In its professional negligence claim, it alleges: "Gallagher owed Great American a duty of care in connection with its provision of professional services." Complaint ¶ 83. In its negligent misrepresentation claim, it alleges: "Because of its special relationship with Great

American, Gallagher had a duty to provide Great American with correct and accurate information." *Id.* ¶ 87. Gallagher nonetheless asserts that "Great American concedes the legal duties alleged arise out of the contracts at issue" because it notes that it was "[p]ursuant to the Producer Agreement and the Underwriting Addendum as well as the Disbursement Monitoring Agreements [that] Gallagher agreed to provide certain professional services." Mem. at 25-26 (quoting Complaint ¶ 82). But this is nonsense: virtually all professional services arise out of a contract, and if that fact alone ruled out a tort action, malpractice actions would not exist. The New York Court of Appeals has explained why tort liability does exist for service contracts, not only for professionals but also for others: "***Professionals, common carriers and bailees***, for example, may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties. In these instances, it is policy, not the parties' contract, that gives rise to a duty of due care." *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 551–52, 593 N.E.2d 1365, 1369 (1992) (emphasis added).

Gallagher knows this: in a footnote, it concedes that "certain 'Professionals' have an independent legal duty extraneous from a contract under New York law." Mem. at 26 n.8. It therefore falls back on a slightly more plausible argument: "courts addressing the issue have uniformly held that insurance agents and brokers like Gallagher are not considered 'Professionals' for purposes of a professional negligence claim." *Id.* But this is misleading or wrong in three different ways. First, both cases Gallagher cites – *Sandoor Alex Telegdi v. A.M.R. Servs. Corp.*, No. 97 CV 1177 RJD, 2000 WL 264333, at *1 (E.D.N.Y. Jan. 21, 2000), and *New York & Presbyterian Hosp. v. Tishman Const. Co.*, 180 Misc. 2d 193, 195, 688 N.Y.S.2d 424 (Sup. Ct. 1999) – concern not the economic loss doctrine but rather the issue of whether claims

against an insurance broker are subject to the six-year limitation period applicable to contract claims or for the three-year period applicable to malpractice other than medical, dental, or podiatric malpractice. *See* N.Y. C.P.L.R. 214(6). The policy considerations are very different here.[6]

Second, Gallagher's argument is wrong in relying on the pretense that it "merely served as the broker." Mem. at 7. Great American alleged, and at the pleading stage the Court is bound to accept, that PIUS and Newlight "designed, promoted, and administered the Program." Complaint ¶ 29. Moreover, on the homepage of its website, Gallagher describes itself as "your trusted partner for insurance and consulting," touts its "innovative, industry-leading insurance and risk management solutions," and promises to "guide you through your unique risk profile." *See* ajg.com. In presentations to Great American, Gallagher touted its "extensive expertise in evaluating intellectual property and high-growth technology companies." In short, Gallagher bills itself as having professional expertise, and it ought to be treated as a provider of professional services for purposes of the economic loss doctrine.

In the case of this Program, the contract terms make clear that Gallagher undertook professional services far beyond those of a mere broker. In the Underwriting Authority Addendum, as cited in Paragraph 42 of the Complaint, Gallagher's underwriting services included, for example, detailed evaluation of the potential borrowers' businesses including "competitive markets, products, technology, collateral and the insured loan". This is far beyond

---

[6] *See Chase Sci. Rsch., Inc. v. NIA Grp., Inc.*, 96 N.Y.2d 20, 28–30, 749 N.E.2d 161, 165–67 (2001) ("While the term ["professional"] has myriad applications in law—as, for example, in insurance policy exclusions and peer negligence standards—**we underscore that our definition is limited to the context presented: CPLR 214(6)**.") (emphasis supplied).

the role of typical insurance broker. Additionally, as referenced in Paragraph 47 of the Complaint, "Newlight's Agents" as defined in the DMA included "…attorneys, accountants, auditors…" which are undoubtedly "professionals" in any sense of the word. Gallagher's attempt to recast its role as "non-professional" services is belied by the terms of the contracts.

Third, even if Gallagher were not a professional advisor, as it plainly is, the exception to the economic loss rule is not limited to the provision of *professional* services. In *Sommer*, the Court of Appeals made that plain: "Professionals, common carriers and bailees, for example, may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties." 79 N.Y.2d 540, 551-52, 593 N.E.2d 1365, 1369 (1992). Accordingly, the court recognized tort liability exposure for more than just professionals. And its use of "for example" extends that the list of possible services beyond the three listed. Certainly the services provided to Great American by Gallagher were more professional in nature than a warehouseman. (The paradigm case of "bailee" is a warehouse. *See*, *e.g.*, *Singer Co. v. Stott & Davis Motor Exp., Inc.*, 79 A.D.2d 227, 230, 436 N.Y.S.2d 508, 510 (1981).)

Moreover, considerations of fairness strongly counsel against dismissing Great American's tort claims under the circumstances here. As shown above, the economic loss doctrine provides that a tort claim should be dismissed when it alleges no injury not already encompassed in the plaintiff's contract claim. *Dormitory Authority*, 30 N.Y.3d at 704. Here, Gallagher does not concede that its contracts with Great American obligate it to make good Great American's losses, even if Gallagher did everything Great American says it did. If Gallagher persuades the Court to dismiss Great American's tort claims, it will likely turn its focus to the contract claims and argue that its conduct does not breach the contracts because the

contractual terms are not specific enough or not stringent enough to bind it. Indeed, the germ of that argument is perceptible in the Memorandum supporting Gallagher's motion. As a matter of common sense, if a company holds itself as an expert in underwriting, receives handsome compensation from its client, induces the client to rely on its underwriting recommendations, and then the recommendations are so incompetently and negligently prepared that the client suffers ruinous losses, the client should have a claim in contract or a claim in tort, if not both. Gallagher is angling to deny Great American either one.

Of course, Gallagher is free to argue that the law absolutely demands strict application of the economic loss doctrine, regardless of fairness. But this argument too fails. The Second Circuit explained why in *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 16 (2d Cir. 2000). The court noted that the doctrine is of relatively recent vintage, having been adopted in *Schiavone Constr. Co. v. Elgood Mayo Corp.*, 56 N.Y.2d 667, 668–69, 451 N.Y.S.2d 720, 436 N.E.2d 1322 (1982), *rev'g on dissent below*, 81 A.D.2d 221, 227–234, 439 N.Y.S.2d 933 (1981) (Silverman, J., dissenting). It went on to explain that the doctrine does not necessarily apply in negligence cases because its original purpose was, and its chief purpose still is, to protect manufacturers from "open-ended liability" in products liability cases, "where the economic losses are essentially contractual in nature, and therefore the risk may be allocated by the parties[.]" 227 F.3d at 16. It is obvious that none of the policy considerations that gave rise to the economic loss doctrine apply here. Gallagher is not a manufacturer, and there is no question here of open-ended liability; Gallagher is a provider of services, and like other such providers, including not only professionals but also common carriers and even warehouses, it should be liable in tort for failure to exercise due care.

## IV. GREAT AMERICAN HAS ADEQUATELY PLEADED ITS CLAIM FOR NEGLIGENT MISREPRESENTATION.

Gallagher asserts that Great American has insufficiently pleaded its claim for negligent misrepresentation. Mem. at 27. This assertion is baseless. As Gallagher acknowledges, to state a claim for negligent misrepresentation, a plaintiff must allege that (1) the parties stood in some special relationship imposing a duty of care on the defendant to render accurate information, (2) the defendant negligently provided incorrect information, and (3) the plaintiff reasonably relied on the information given. Mem. at 27 (citing *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 452 (S.D.N.Y. 2017) (Oetken, J.)). Great American has expressly pleaded all of these elements:

> 87. Because of its **special relationship** with Great American, Gallagher had a duty to provide Great American with correct and accurate information.
>
> 88. On numerous occasions in the course of the Program, **Gallagher made incorrect and inaccurate representations** to Great American as to the financial condition of the Program Companies . . .
>
> 89. **Gallagher knew or should have known that these representations were incorrect**.
>
> * * *
>
> 92. **Great American intended to, and did, rely and act upon what turned out to be incorrect and inaccurate information provided by Gallagher**, and . . . upon Gallagher's compliance with its duties to Great American under the Program, and it did so to its detriment.

Complaint, ¶¶ 87-89, 92 (emphasis supplied). All the elements are there: special relationship, incorrect information negligently provided, and Great American's reliance. The Complaint as a whole fleshes out these allegations with considerable detail. It is hard to see how this pleading could be inadequate, and Gallagher does not bother to specify the alleged inadequacy.

Instead, it rushes on to its next contention: that "where a negligent misrepresentation claim sounds in fraud, it is subject to Rule 9(b)'s heightened pleading standard." Mem. at 27. Rule 9(b) applies to claims of fraud; the justification some courts cite for applying it to claims of negligent misrepresentation is that negligent misrepresentation is a "species of fraud," *Allen v. Westpoint-Pepperell, Inc.*, 11 F. Supp. 2d 277, 284 (S.D.N.Y. 1997), or "a type of fraud," *Maalouf v. Salomon Smith Barney, Inc.*, No. 02 CIV. 4770(SAS), 2003 WL 1858153, at *4 (S.D.N.Y. Apr. 10, 2003). This justification is questionable: the most obvious distinguishing feature of fraud is *scienter*, which is easy to allege and hard to prove, and *scienter* is precisely what is absent in negligence. A Westlaw search discloses that no New York appellate court, and only one trial court, has ever described negligent misrepresentation as either a "species" or a "type" of fraud.

As Gallagher acknowledges, Mem. at 27, in *Silvercreek Management., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 453 (S.D.N.Y. 2017) (Oetken, J.), this Court reached the plainly correct conclusion that courts should apply a case-by-case approach and require the Rule 9(b) heightened pleading standard "only where the specific claim of negligent misrepresentation at issue sounded in fraud" – that is, only where "the negligent misrepresentation claim is based on the same set of facts as those upon which a fraud claim is grounded." On the facts before it, the Court concluded that because the plaintiff might be able to state a claim of negligence factually independent of a claim for fraud in the same complaint, "it would be illogical to require a plaintiff to satisfy a heightened pleading requirement merely because she also, separately, alleges claims sounding in fraud that are entirely unrelated." *Id.*

Here, Great American's claims do not sound in fraud. First, Great American has made no fraud claim, so there is no question here of relabeling a fraud claim as negligence. More fundamentally, Great American does not anywhere allege scienter or anything close to it: it never uses the words "knowing," "deliberate," "intentional," and "willful," or their adverbial forms.[7]

But Gallagher nevertheless contends that Great American's claims sound in fraud because they allege that Gallagher provided a "misleadingly favorable picture" and "inaccurate facts" and certain information "known to Gallagher" was "withheld from Great American." Mem. at 27. But this is unpersuasive. Without using terms such as "misleadingly" and "inaccurate," Great American could not have stated any cause of action at all. As for "known to Gallagher . . . but withheld," there is no necessary implication of willful misconduct. Gallagher might have negligently failed to understand the significance of what it knew or the importance of conveying it to Great American. As noted above, Gallagher apparently has sufficient information to charge its employee Joseph Agiato with fraud, but it has not disclosed the facts on which it made its allegations. If in the course of discovery, Great American obtains information supporting a fraud claim, it will seek leave to amend.

## CONCLUSION

For the reasons stated above, Great American respectfully requests the Court deny Gallagher's motion to dismiss. To the extent the Court may find Great American's complaint insufficient, Great American asks leave to amend.

---

[7] The word "willful" appears once, quoting the indemnification provision in the Disbursement Monitoring Agreements. Complaint ¶ 48.

Dated February 27, 2026

Respectfully submitted,

/s/ *James P. Ruggeri*

James P. Ruggeri, Esq. (Bar ID 98489720)
Edward B. Parks, II, Esq. (*pro hac vice* pending)
Samuel J. Rouleau, Esq.
RUGGERI PARKS WEINBERG LLP
1875 K Street NW, Suite 800
Washington, DC 20006
Tel: (202) 984-1400
Fax: (202) 984-1401
jruggeri@ruggerilaw.com
eparks@ruggerilaw.com
srouleau@ruggerilaw.com

Alexander E. Potente, Esq. (*pro hac vice* forthcoming)
Joshua J. Bettencourt, Esq. (*pro hac vice* forthcoming)
Bradley R. Harding, Esq. (*pro hac vice* forthcoming)
Clyde & Co US LLP
150 California Street, 15th Floor
San Francisco, CA 94111
Telephone: 415-365-9869
alex.potente@clydeco.us
joshua.bettencourt@clydeco.us
brad.harding@clydeco.us

*Attorneys for Plaintiff Great American E&S Insurance Company*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this memorandum of law is in compliance with the word limit set forth in Rule 7(c) of the Local Civil Rules. According to the word processing program used to prepare this memorandum, the total number of words in the memorandum, including footnotes but excluding the caption, table of content, table of authorities, and signature block, is 8,681.

Dated: February 27, 2026

/s/ *James P. Ruggeri*______
James P. Ruggeri