UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GREAT AMERICAN E&S
INSURANCE CO.,

                    Plaintiff,                                    25-CV-5406 (JPO)

        -v-                                                       OPINION AND ORDER

ARTHUR J. GALLAGHER & CO., *et al.*,
                    Defendants.

J. PAUL OETKEN, District Judge:

Plaintiff Great American E&S Insurance Company ("Great American") brings this action against Defendants Arthur J. Gallagher & Co. ("AJG"), Arthur J. Gallagher Risk Management Services, LLC ("Gallagher Risk"), and Gallagher IP Solutions LLC ("GIPS") (collectively, "Gallagher"), asserting claims for breach of contract, negligent provision of professional services, negligent misrepresentation, and seeking a declaratory judgment and specific performance. (*See generally* ECF No. 1 ("Compl.").) Before the Court now is Gallagher's motion to dismiss in part. (ECF No. 23.) For the reasons that follow, the motion is denied.

I.      **Background**

        A.      **Factual Background**

The following facts are taken from Great American's complaint and from agreements incorporated therein, and are presumed true for purposes of the present motion. *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

Great American's claims arise out of a program (the "Program") pursuant to which Gallagher arranged commercial loan transactions for various companies (the "Program Companies"), most of which were engaged in high-technology businesses. (Compl. ¶ 21.) Two

1

sister companies, Newlight Capital, LLC, and PIUS Limited, LLC, initially operated the Program, including loan underwriting, loan monitoring, and loss mitigation. (*Id.* ¶¶ 28-29.) On November 8, 2022, Gallagher Risk assumed the business and obligations of Newlight Capital and PIUS Limited, including Newlight Capital's loan monitoring and secured property liquidation services. (*Id.* ¶¶ 30-31.) AJG was also a signatory to the bill of sale and assignment, and AJG went on to employ the former director and officer of PIUS Limited and Newlight Capital. (*Id.* ¶¶ 33, 36.) In 2023, Gallagher Risk and/or AJG formed GIPS, which also assumed the obligations of Newlight Capital and PIUS Limited. (*Id.* ¶¶ 38-39.)

Great American complains of conduct related to the Program that largely occurred after Gallagher assumed operations of the Program. (*Id.* ¶ 30.) Under the Program, Program Companies provided their entire business, including their intellectual property, as collateral for the loans. (*Id.* ¶¶ 21, 42.) Gallagher solicited institutional lenders to lend to the Program Companies. (*Id.* ¶ 22.) UMB Bank, National Association ("UMB Bank") operated as trustee for the Program lenders. (*Id.*) Great American issued insurance policies to UMB Bank that covered residual value loss amounts in the event of payment default and the inadequacy of the Program Companies' collateral to repay the loans (the "Program Policies"). (*Id.* ¶ 23.)

A U.S. Producer Agreement (the "Producer Agreement"), dated October 15, 2021, and a subsequent Underwriting Authority Addendum (the "Underwriting Addendum"), governed the relationship between Great American and PIUS Limited. (*Id.* ¶ 41.) Section IX of Appendix A to the Underwriting Addendum enumerates certain Producer underwriting services. (*Id.* ¶ 42.) In particular, such services include "analysis of the borrower, competitive market, products, technology, collateral, and the insured loan," and key borrower underwriting considerations for each submission include, among other things, financial condition and capitalization, assessment

of technology and products, and historical financial performance and validation of repayment history.  (ECF No. 27-2 ("Underwriting Agmt.") App'x A § IX.)  The Producer Agreement contains an indemnification provision that requires Gallagher to "indemnify, hold harmless and defend [Great American] . . . against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees, that are incurred by [Great American], arising out of, or related to any: (i) breach or non-fulfillment of any representation, warranty or covenant under this Agreement by [Gallagher], its employees, agents, contractors or Subproducers; or (ii) any negligent or more culpable act or omission of [Gallagher], its employees, agents, contractors or Subproducers."  (ECF No. 27-1 ("Producer Agmt.") § 16.)

Under the Program, each individual loan also requires Gallagher, UMB Bank, and Great American to enter into a Disbursement Monitoring Agreement ("DMA"), which obligates Newlight Capital to perform various services.  (Compl. ¶¶ 44-45.)  Each DMA requires Newlight Capital to, "in such manner and at such times as [it] determines in its sole discretion to be advisable," perform certain enumerated services, including inspection of the books and records of the obligors, evaluation of the obligors' financial statements, and—in the event of payment default—marketing and assisting the disbursing agent and/or insurer in liquidating or monetizing the obligor's collateral.  (*Id.* ¶ 45; ECF No. 27-3 ("DMA") ¶ 2.)  Each DMA also requires Newlight Capital "to indemnify, defend and hold harmless [Great American] . . . from and against any and all liabilities, claims, suits, actions, demands, settlements, losses, judgments, costs, damages, expenses (including reasonable attorneys' fees), fines, penalties, and all reasonable costs of defense . . . arising out of, caused by or resulting from: (A) any negligent act or omission by Newlight or its members, officers, directors, employees, representatives,

contractors, consultants, or agents related to or arising out of this Agreement or (B) a breach by Newlight of any of its agreements contained in this Agreement." (DMA ¶ 13(b).)

Gallagher did not comply with the underwriting criteria in the Producer Agreement and the Underwriting Addendum. (Compl. ¶ 49.) Instead, Gallagher conducted inadequate analyses that omitted important financial information, failed to fulfill promises of active monitoring, provided incomplete and inaccurate facts, underplayed problems at the Program Companies, and failed to make Great American aware of key information that contradicted the financial condition of the Program Companies presented by Gallagher in order to induce Great American into agreeing to the issuance of Program Policies. (*Id.* ¶¶ 50-52.) In one or more underwriting submissions for each Program Company, Gallagher specifically recommended that Great American issue various Program Policies based on Gallagher's financial evaluations. (*Id.* ¶ 53.) Virtually every underwriting submission stated that PIUS Limited had conducted an underwriting review, including an analysis of borrower creditworthiness and the intellectual property collateral, that the Program Company at issue would be able to pay back their loans, and that Gallagher would be able to dispose of the company's assets in the unlikely event of default to ensure that a claim does not result in a loss. (*Id.* ¶¶ 55-56.) Gallagher also promised a financial covenant methodology to monitor the Program Companies' abilities to pay back the proposed loans and provide adequate time to react in the event of a deteriorating credit profile. (*Id.* ¶ 59.) But the underwriting submissions contained gross understatements of the problems with the various Program Companies, and Gallagher failed to provide the promised monitoring methodology. (*Id.* ¶¶ 57, 59.)

Various Program Companies have defaulted on their repayment obligations and others have threatened to do so. (*Id.* ¶ 25.) Consequently, UMB Bank has made claims upon Great

4

American under several Program Policies. (*Id.* ¶ 62.) Arbitrations have commenced between UMB Bank and Great American, but Gallagher refuses to join in those arbitrations. (*Id.* ¶ 63.) Great American continues to argue in arbitration against UMB Bank that there is no coverage available to UMB Bank under the Program Policies. (*Id.* ¶ 64.)

### B.    Procedural Background

Great American commenced this action on June 30, 2025, asserting claims for declaratory judgment, breach of contract, negligent provision of professional services, negligent misrepresentation, and specific performance. (*See generally* Compl.) Gallagher filed the present motion to dismiss in part on January 30, 2026, alongside an accompanying memorandum of law. (ECF No. 23; ECF No. 24 ("Mem.").) Great American filed its opposition on February 27, 2026. (ECF No. 42 ("Opp.").) Gallagher filed a reply in further support on March 20, 2026. (ECF No. 53 ("Reply").)

## II.    Legal Standards

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings." *Id.*

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To establish facial plausibility, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully."

*Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (cleaned up). "Plausibility depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *Fink*, 714 F.3d at 741 (cleaned up). "The court must also construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the complaint." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (quotation marks omitted).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco*, 622 F.3d at 111. "Where a document is not incorporated by reference, the court may never[the]less consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." *Id.* (quotation marks omitted).

## III.    Discussion

As a threshold matter, the Court has subject matter jurisdiction over Great American's claims pursuant to 28 U.S.C. § 1332, as Great American is a citizen of Ohio, all Gallagher Defendants are citizens of Delaware and Illinois, and the amount in controversy exceeds $75,000. (Compl. ¶¶ 13-15.) *See* 28 U.S.C. § 1332(a). Gallagher moves to dismiss all but Great American's request for specific performance. (Mem. at 7.) The Court takes each claim in turn.

### A.    Declaratory Judgment

Great American seeks a declaration that Gallagher is obligated to cover all of Great American's financial losses resulting from the Program, including any future payments which are or may become due from the arbitrations pending between Great American and UMB Bank, or which may arise in the future.[1]  (Compl. at 22.)

### 1.    Standing and Ripeness

Gallagher first argues that Great American lacks standing to bring this claim because there is no actual controversy absent any finding of liability against Great American in the underlying arbitrations.  (Mem. at 14.)

The Declaratory Judgment Act (the "DJA") "does not *expand* the subject-matter jurisdiction of the federal courts; rather, the relevant inquiry for the DJA's case-of-actual-controversy prerequisite is *coextensive* with the analysis applicable to the case-or-controversy standard embodied in Article III [of the United States Constitution]." *Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 92 (2d Cir. 2023) (cleaned up).  "To pursue declaratory relief, a plaintiff must establish 'the three familiar elements of standing: injury in fact, causation, and redressability.'" *Tzumi Innovations LLC v. Regan*, 557 F. Supp. 3d 499, 508 (S.D.N.Y. 2021) (quoting *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011)).  The DJA also incorporates the ripeness requirements of Article III.  *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126-27 (2007).  "The difference between an abstract question and a 'controversy'

---

[1]  Although Great American styles its request for declaratory relief as a cause of action, declaratory judgment is a remedy, not a cause of action.  *See Garland v. City of New York*, 665 F. Supp. 3d 295, 304 (E.D.N.Y. 2023), *aff'd sub nom. Garland v. New York City Fire Dep't*, No. 23-663, 2024 WL 445001 (2d Cir. Feb. 6, 2024).  Neither party addresses this point in their briefing on the motion to dismiss.  Accordingly, the Court "will simply construe plaintiff's cause of action for a declaratory judgment as a request for such relief." *Yantha v. Omni Childhood Ctr., Inc.*, No. 13-CV-1948, 2013 WL 5327516, at *13 (E.D.N.Y. Sept. 20, 2013).

contemplated by the [DJA] is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy." *Admiral Ins. Co.*, 57 F.4th at 92 (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). "Basically, however, the critical question is whether there is a substantial controversy, between parties having adverse legal interests, of *sufficient immediacy and reality* to warrant the issuance of a declaratory judgment." *Id.* (quotation marks omitted).

Great American has standing to seek declaratory relief. Gallagher argues that there is no actual case or controversy because Great American has not yet been found liable in any of the underlying arbitrations. (Mem. at 14.) But that reads the contractual indemnification language too narrowly. The Producer Agreement requires Gallagher to "indemnify, *hold harmless and defend* [Great American] . . . *against any and all losses*, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees," that arise out of Gallagher's negligent conduct or breach of contract. (Producer Agmt. § 16 (emphases added).) The DMA contains similar language. (*See* DMA ¶ 13(b).) In light of this language, Gallagher is liable for *all* of Great American's losses and expenses arising from Gallagher's breach or negligent conduct, including defense costs in the pending arbitrations. (Opp. at 12-13.) Because Great American has already incurred such costs (Compl. ¶ 65), it has suffered a real injury in fact, irrespective of any future finding of liability.

Unable to dispute that Great American has already incurred defense costs, Gallagher instead argues that a claim regarding a defendant's duty to defend is ripe before a finding of liability only if the defendant is an insurer. (Mem. at 15.) This argument hinges on a line of case law that has held that a non-insurer's "duty to defend its contractual indemnitee is no broader

8

than its duty to indemnify." *Barbagallo v. Marcum LLP*, No. 11-CV-1358, 2012 WL 1664238, at *5 (E.D.N.Y. May 11, 2012). But those cases involved contractual language that either did not mention a duty to defend at all or did so in a way that tethered the duty on a duty to indemnify. *See id.* at *2, *5 (concerning a contract that only required defendant to "forever indemnify and hold [the plaintiff] harmless from and against all liability," without mentioning a duty to defend); *Dresser-Rand Co. v. Ingersoll Rand Co.*, No. 14-CV-7222, 2015 WL 4254033, at *7 (S.D.N.Y. July 14, 2015) (concerning a contract that required real-time reimbursement of defense costs only if the party is entitled to indemnification).

In contrast, the provisions at issue here identify a duty to defend and a duty to hold harmless, both of which are in addition to and non-dependent on a duty to indemnify. (*See* Producer Agmt. § 16; DMA ¶ 13(b).) As this Court has previously held, although "the 'duty to defend' is *presumed* only in insurance policies, . . . if a contractual defense obligation is, by its own terms, exceedingly broad, a court will not artificially circumscribe it simply because the indemnitor is not an insurer." *VR Optics, LLC v. Peloton Interactive, Inc.*, No. 16-CV-6392, 2020 WL 1644204, at *7 (S.D.N.Y. Apr. 2, 2020) (cleaned up), *aff'd*, No. 2021-1900, 2023 WL 2031213 (Fed. Cir. Feb. 16, 2023). Gallagher's cited cases, therefore, stand for little more than the straightforward proposition that, "outside the context of insurance policies, contractual defense obligations are generally treated like any other contractual provision." *Id.* (cleaned up).

The contractual language here instantiates a duty to defend independent of a duty to indemnify. In a case concerning nearly identical contractual language, which required a non-insurer to "indemnify, defend, and hold harmless" its contracting partner "from and against lawsuits, claims, causes of action, damages, losses, interest, judgments, liens and expenses (including but not limited to reasonable attorney's fees and legal costs, disbursements and

9

expenses)," Judge Liman held that the contract imposed separate obligations on a non-insurer defendant to indemnify, defend, and hold harmless the owner. *See Catlin Ins. Co. v. Champ Constr. Co.*, No. 24-CV-4499, 2025 WL 2494291, at *5 (S.D.N.Y. Aug. 29, 2025). To hold otherwise would be to render the duty to defend "illusory," as it would "impose[] no more than an obligation on [Gallagher], after liability was determined, to reimburse [Great American] for its legal expenses." *Id.* at *6. Indeed, if liability in an underlying action were necessary to trigger Gallagher's duty to defend, then Great American would face a confounding situation in which it would lose the opportunity to recover its defense costs if it successfully defends itself against liability. "By winning, it would lose at the same time." *Id.* This fairly absurd result is unwarranted here, where the language of the contracts unambiguously contemplates a duty to defend in addition to a duty to indemnify. Gallagher "agreed to 'indemnify, defend, and hold harmless [Great American]'—not just 'indemnify,'" and "the agreement . . . shows that the parties understood the duty to defend was distinct from the duty to indemnify." *VR Optics, LLC v. Peloton Interactive, Inc.*, No. 2021-1900, 2023 WL 2031213, at *9 (Fed. Cir. Feb. 16, 2023).

In reply, Gallagher contends that *Catlin* is distinguishable because the court there had to determine only whether the underlying claim arose out of services performed under the contract, and not the merits of that underlying claim. (Reply at 7.) But *Catlin* rejects that logic, stating that "the fact that the court may have to address a merits question does not make the lawsuit unripe." *Catlin Ins. Co.*, 2025 WL 2494291, at *7. "With respect to ripeness, it is irrelevant that the same questions that the Court might have to address in determining whether [Gallagher] is obligated to defend [Great American] will be the same as or similar to those that the [arbitrator] might have to address in determining [Great American's] liability." *Id.* at *6.

10

In any event, it is unclear whether the underlying arbitrations will even resolve Gallagher's purported breach or negligence. Those arbitrations are between UMB Bank and Great American, and Great American alleges only that "it is not liable to [UMB Bank] under its Program Policies for various reasons under the policies' terms." (Compl. ¶ 62.) Absent additional information, it may well be that the arbitrations could be resolved on an entirely unrelated ground. Thus, even though allegations in the arbitrations "include that the borrowing companies were undercapitalized, that the value of their collateral was overstated, that the loans were not adequately monitored and . . . [that] the collateral was not properly marketed for sale to mitigate losses" (*id*. ¶ 3), at the motion-to-dismiss stage, and construing all reasonable inferences in favor of Great American, the arbitrations may not reach the question of Gallagher's culpability. What matters for present purposes is that Great American alleges that the defense costs it has already incurred are a result of Gallagher's negligence and breach of contract. Its claim is therefore ripe, notwithstanding whether the underlying question of coverage is decided based on Gallagher's conduct or some unrelated ground.

### 2. Abstention

Gallager argues, in the alternative, that the Court should exercise its discretion to decline jurisdiction over the request for declaratory relief. (Mem. at 16.) District courts enjoy a broad grant of discretion "to refuse to exercise jurisdiction over a declaratory action that they would otherwise be empowered to hear." *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003). A district court's exercise of such discretion should be informed by:

> (1) whether the declaratory judgment sought will serve a useful purpose in clarifying or settling the legal issues involved; (2) whether such a judgment would finalize the controversy and offer relief from uncertainty; (3) whether the proposed remedy is being used merely for procedural fencing or a race to res judicata; (4) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; (5) whether there is a

11

better or more effective remedy; and (6) whether concerns for judicial efficiency and judicial economy favor declining to exercise jurisdiction.

*Admiral Ins. Co.*, 57 F.4th at 99-100 (cleaned up).  Gallagher argues that judicial efficiency and judicial economy counsel in favor of declining jurisdiction, and that a declaratory judgment in this action would not serve a useful purpose in clarifying or settling the legal issues involved while the arbitrations remain pending.  (Mem. at 17.)  But largely for the reasons discussed above, declaratory judgment will in fact serve a useful purpose in clarifying Gallagher's obligations to Great American as it defends in the underlying arbitrations, and it is not apparent to this Court that there would be a better or more effectively remedy.[2]  Likewise, because it is unclear that the underlying arbitrations will even address the question of Gallagher's purported negligence or breach of contract, it does not serve judicial efficiency to dismiss the request for declaratory relief on the uncertain premise that the questions presented here may be resolved in the underlying arbitrations.  Because the remaining factors also do not favor dismissal, the Court chooses to exercise its jurisdiction over Great American's request for declaratory relief.

### 3.    Duplicity

Gallagher further argues that the request for declaratory relief should be dismissed as duplicative of the breach of contract claim.  (Mem. at 18-19.)  "If a claim for declaratory judgment seeks distinct relief from a breach of contract claim, then notwithstanding some overlap between the two claims, it is not duplicative."  *Pers. Watercraft Prod. SARL v. Robinson*, No. 16-CV-9771, 2017 WL 4329790, at *11 (S.D.N.Y. Sept. 1, 2017) (Nathan, J.) (quotation marks omitted).  "However, if a claim for declaratory judgment seeks a declaration of the same

---

[2]  Gallagher does not argue, for example, that it would be more effective and better further efficiency for the Court to stay this action until after resolution of the underlying arbitrations.

rights as will be determined under an action for breach of contract, it must be dismissed as duplicative of the breach of contract claim." *Id.* (cleaned up).

Great American correctly argues that its request for declaratory relief is not duplicative because it asserts a declaratory judgment claim as to ongoing litigation expenses that it will continue to incur, whereas a breach of contract claim can only remedy damages that have already been incurred.  (Opp. at 23-24.)  This is not a case where a plaintiff seeks declaratory relief only "targeted at Defendant's past conduct." *JTRE Manhattan Ave. LLC v. Cap. One, N.A.*, No. 21-CV-5714, 2022 WL 2901402, at *4 (S.D.N.Y. July 22, 2022).  Rather, Great American alleges that it is currently incurring defense costs and will continue to incur defense costs in the underlying arbitrations, and that Gallagher has and will continue to deny any obligation to pay those costs.  (Compl. ¶¶ 65-66.)  Accordingly, because "any decision here on [Great American's] breach of contract claim will settle the controversy only with respect to the [defense costs] of the earlier period, and not with respect to future [costs]," the two claims "seek distinct relief" and are not duplicative. *Novartis Pharma AG v. Incyte Corp.*, No. 20-CV-400, 2024 WL 3610438, at *62 (S.D.N.Y. July 29, 2024) (cleaned up).

### 4.    Failure to State a Claim

Lastly, Gallagher argues that the declaratory judgment claim should be dismissed for failure to state a claim.  (Mem. at 19-20.)  Because this argument relies on the same arguments that Gallagher makes for dismissal of the breach of contract claim, the Court denies the motion for reasons explained below.

### B.    Breach of Contract

Great American also asserts a breach of contract claim against Gallagher, arguing that Gallagher owes Great American certain defense, indemnification, and hold-harmless obligations under the Producer Agreement and the DMAs.  (Compl. ¶¶ 74-80.)  The parties agree that New

13

York law applies to the DMA and Ohio law applies to the Producer Agreement, and the parties further agree that the two states' laws are not materially different for purposes of a breach of contract analysis. (Mem. at 22; Opp. at 19.) To state a claim for breach of contract under both New York and Ohio law, a plaintiff must allege (1) an agreement; (2) adequate performance by plaintiff; (3) breach by defendant; and (4) damages. *See, e.g., Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011); *Brock v. Servpro*, 183 N.E.3d 491, 497-98 (Ohio Ct. App. 2022).

Once again, Gallagher argues that the claim should be dismissed because it is not ripe, relying on the same arguments it made as to the declaratory judgment claim. (Mem. at 21.) But for the reasons stated above, Great American has sufficiently alleged an actual case or controversy because it has already incurred defense costs.

Gallagher additionally argues that Great American fails to plausibly allege a breach of contract, on the basis that indemnification is warranted only if Great American's losses were caused by Gallagher's breach of contract or negligent conduct and that the complaint fails to plausibly allege either. (Mem. at 22-25.) But contrary to these arguments, Great American sufficiently alleges factual allegations raising a right to relief "above a speculative level." *Twombly*, 550 U.S. at 555. Great American alleges that Gallagher agreed to indemnify, defend, and hold harmless Great American from and against any all liabilities arising out of Gallagher's negligence or breach of contract. (Compl. ¶¶ 43, 48.) It also alleges that Gallagher agreed to contractual provisions requiring it to, among other things, analyze Program Companies' repayment ability and financial condition and capitalization, perform certain monitoring services, and perform certain services in the event of payment default. (*Id.* ¶¶ 42, 45.) Great American goes on to allege that "Gallagher did not comply with the underwriting criteria in the Producer

Agreement and the Underwriting Addendum," and instead relied on inadequate analyses and false promises of active monitoring to compile incomplete, inaccurate, and misleadingly favorable summary submissions of the Program Companies. (*Id.* ¶¶ 49-59.) Great American further states that, had it "been made aware of the true facts and state of affairs at the various Program Companies, it would not have agreed to the issuance of the Program Policies." (*Id.* ¶ 60.)

Unlike cases in which parties failed to "identify the essential terms of the contract," here Great American alleged that Gallagher breached specific provisions of the contract that obligated it to undertake certain analyses and services. *Cf. Dittes v. ChargeAfter USA, Inc.*, No. 24-CV-746, 2025 WL 1984273, at *4 (S.D.N.Y. July 17, 2025). These allegations plausibly plead a breach of the Producing Agreement and DMAs. Gallagher would like to require Great American to allege the summary submissions that it claims are inaccurate or misleading, "along with some well-pled facts supporting a plausible inference that each particular Summary Submission was in fact deficient." (Reply at 13.) "While many of these allegations are quite generalized, reading them within the context of the Complaint often clarifies the exact allegation at issue." *Blue v. City of Hartford*, No. 18-CV-00974, 2019 WL 612217, at *3 (D. Conn. Feb. 13, 2019), *adhered to in part on reconsideration*, No. 18-CV-00974, 2019 WL 1559430 (D. Conn. Apr. 10, 2019). At the motion-to-dismiss stage, Great American has sufficiently alleged that Gallagher repeatedly breached its contractual obligations in providing inaccurate or incomplete summary submissions and failing to provide the promised monitoring services. A complaint will not be dismissed simply because it could have been *more* detailed. *See, e.g.*, *Dan-Bunkering (Am.), Inc. v. Tecnologias Relacionadas Con Energia y Servicios Especializados, S.A. de C.V.*, No. 17-CV-9873, 2019 WL 1877344, at *7 (S.D.N.Y. Apr. 26, 2019) (rejecting motion to dismiss a "bare-

15

bones Complaint" where the allegations sufficiently alleged an agreement, performance by the plaintiff, breach by the defendant, and damages).

### C.    Negligent Provision of Professional Services

Great American also asserts a claim for negligent provision of professional services. (Compl. ¶¶ 81-85.)  Gallagher argues that the claim must be dismissed pursuant to the economic loss rule or, in the alternative, because it was insufficiently pleaded.  (Mem. at 25-28.)  Because both parties assume that New York law applies to Great American's tort claims (*id.*; Opp. at 27-31), the Court applies New York law.  *See Drabinsky v. Actors' Equity Ass'n*, No. 22-CV-8933, 2023 WL 2955294, at *3 (S.D.N.Y. Apr. 14, 2023) ("New York law applies to the tort claims in the [complaint] because the parties assume it does." (citing *In re Snyder*, 939 F.3d 92, 100 n.2 (2d Cir. 2019)), *aff'd,* 106 F.4th 206 (2d Cir. 2024).

The economic loss doctrine "provides that where plaintiffs allege primarily economic loss as an injury in a tort claim, the usual means of redress is an action for breach of contract; a tort action for economic loss will not lie." *Aretakis v. Caesars Ent.*, No. 16-CV-8751, 2018 WL 1069450, at *12 (S.D.N.Y. Feb. 23, 2018) (quotation marks omitted).  "A defendant is not liable to a plaintiff for economic loss unless there exists a special relationship that requires the defendant to protect against the risk of harm to plaintiff." *Toretto v. Donnelley Fin. Sols., Inc.*, 583 F. Supp. 3d 570, 590 (S.D.N.Y. 2022) (quotation marks omitted).  It has long been unclear whether the economic loss doctrine applies outside of the products liability context, with many courts concluding that it does.  *See, e.g.*, *Hydro Inv'rs, Inc.* v. *Trafalgar Power Inc.*, 227 F.3d 8, 18 (2d Cir. 2000); *Houbigant, Inc. v. Dev. Specialists, Inc.*, 229 F. Supp. 2d 208, 217 (S.D.N.Y. 2002).  However, the New York Court of Appeals recently clarified that its "economic loss rule stands for the proposition that an end-purchaser of a product is limited to contract remedies and may not seek damages in tort for economic loss against a manufacturer, and does not have

application beyond the products liability context." *IKB Int'l, S.A. v. Wells Fargo Bank, N.A.*, 40

N.Y.3d 277, 290 (N.Y. 2023) (quotation marks omitted).  Accordingly, in a case concerning a

business transaction, the economic loss doctrine does not apply.  *Id.*; *see also Terry v. NexPoint*

*Diversified Real Est. Tr.*, No. 25-643, 2025 WL 3229006, at *2 n.2 (2d Cir. Nov. 19, 2025)

(summary order).

As the New York Court of Appeals acknowledged, most references to the economic loss

doctrine "conflate [the] 'economic loss' rule with the prohibition against duplicative contract and

tort claims." *IKB Int'l, S.A.*, 40 N.Y.3d at 290.  "A simple breach of contract is not to be

considered a tort unless a legal duty independent of the contract itself has been violated and

where plaintiff is essentially seeking enforcement of the bargain, the action should proceed under

a contract theory."  *Id.*  That doctrine extends beyond the products liability context.  *Id.*

However, Gallagher does not urge dismissal of the negligence claims on the basis that they are

duplicative of Great American's breach of contract claim.  Accordingly, the Court does not

address whether the negligence claims are duplicative.  *See Tammaro v. City of New York*, No.

13-CV-6190, 2018 WL 1621535 at *11 n.10 (S.D.N.Y. Mar. 30, 2018) (holding that a court

cannot dismiss an action for failure to state a claim on grounds not raised or briefed by the

parties).

Gallagher's only remaining argument in support of dismissing the professional

negligence claim is that Great American's conclusory allegations do not state a claim.  (Mem. at

26.)  This argument, which Gallagher raises in only a sentence, relies entirely on the same

arguments it made in the breach of contract context.  (*Id.*)  As discussed above, the complaint

adequately alleges that Gallagher breached its duties to Great American concerning its

investigation, monitoring, and recommendation of Program Companies.  Because Gallagher does

17

not raise any new arguments specific to the professional negligence claim, the Court denies the motion to dismiss the professional negligence claim. *See Ikigai Mktg. Works LLC v. Brofsky*, No. 24-CV-7864, 2025 WL 1183975, at \*4 (S.D.N.Y. Apr. 23, 2025) ("It isn't the Court's job to develop a series of one or two-sentence morsels into an argument to dismiss the complaint.").

### D.    Negligent Misrepresentation

Great American also asserts a claim for negligent misrepresentation. (Compl. ¶¶ 86-92.) As with the professional negligence claim, Gallagher urges dismissal based on the economic loss doctrine. (Mem. at 26.) For the same reasons as discussed above, the economic loss doctrine does not bar Great American's negligent misrepresentation claim.

Gallagher also argues that the claim should be dismissed for deficient pleading. (Mem. at 27-28.) "Under New York law, 'a claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information.'" *Pall Corp. v. CleanSpace Modular, LLC*, No. 23-CV-02082, 2023 WL 7412096, at \*3 (S.D.N.Y. Nov. 9, 2023) (quoting *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1109 (N.Y. 2011)).

Gallagher contends that the negligent misrepresentation claim is subject to the heightened pleading standard set out in Federal Rule of Civil Procedure 9(b). (Mem. at 27-28.) But this Court has previously "opted to apply Rule 9(b) only where the specific claim of negligent misrepresentation at issue sounded in fraud," reasoning that "Rule 9(b) should apply only where 'the negligent misrepresentation claim is based on the same set of facts as those upon which a fraud claim is grounded.'" *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 453 (S.D.N.Y. 2017) (quoting *Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 254-55 (S.D.N.Y. 2011)). The negligent misrepresentation claim here does not sound in fraud. The complaint

does not assert a fraud or intentional misrepresentation claim, and it does not make any allegations as to intent to defraud, an element of common law fraud, *see Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006), or as to Gallagher's scienter. (*See generally* Compl.) Gallagher argues that a negligent misrepresentation claim sounds in fraud whenever a complaint alleges that misleading or inaccurate information was provided. (Reply at 17.) But given that an element of negligent misrepresentation is the provision of incorrect information, *Pall Corp.*, 2023 WL 7412096, at *3, this argument would subject all negligent misrepresentation claims to Rule 9(b). This Court has expressly rejected that outcome. *Silvercreek Mgmt., Inc.*, 248 F. Supp. 3d at 453. "[G]iven the possibility of a stand-alone claim sounding in negligence, it would be illogical to require a plaintiff to satisfy a heightened pleading requirement." *Id.*

Gallagher again argues that Great American has failed to meet the normal pleading standard. (Mem. at 27-28.) In particular, Gallagher posits that Great American has failed to allege any negligent conduct because it does not point to specific statements or explain why those statements were false.[3] (*Id.*) But the complaint alleges that "Gallagher provided an incomplete, inaccurate, and misleadingly favorable picture of the financial condition of various Program Companies," "underplayed the problems at the Program Companies and failed to make Great American aware of key information that contradicted the financial condition of the

---

[3] Gallagher also makes a one-sentence argument in its Reply that Great American has failed to allege a special relationship, citing its prior arguments about whether Great American qualifies as a professional for purposes of the economic loss doctrine. (Reply at 17-18.) Even if that were sufficient argument for the Court to take it under consideration, it fails at the motion-to-dismiss stage. Great American has alleged that, starting as early as 2021, the two parties had a relationship "that included [Gallagher] providing [Great American] with information that they knew would be used by [Great American] in making its [insurance] decisions." *Silvercreek Mgmt., Inc.*, 248 F. Supp. 3d at 453. "Given that the 'determination of whether a special relationship exists is essentially a factual inquiry,' these allegations are sufficient to survive the motion to dismiss." *Id.* (quoting *Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 104 (2d Cir. 2001)).

Program Companies presented by Gallagher," falsely represented that it had completed a thorough underwriting review of the Program Companies, misrepresented the ability to recover on any payment defaults through the sale of the Program Companies' assets, and misrepresented Gallagher's monitoring of the Program Companies' abilities to pay back the loans.  (Compl. ¶¶ 50-52, 55-59.)  These allegations, read in light of the allegations of the complaint as a whole, are specific enough to survive a motion to dismiss for failure to state a claim.  *See New York State Workers' Comp. Bd. v. Comp. Risk Managers, LLC*, 59 Misc. 3d 254, 268-69 (N.Y. Sup. 2017) (denying the motion to dismiss where the complaint alleged that the defendant "provided inaccurate and/or incomplete information . . . with respect to the financial status of the Trust, the risks associated with becoming a member of the Trust, the ongoing risk associated with remaining a member of the Trust, and the competency of [the defendant] in acting as an administrator of the Trust" (quotation marks omitted)).

## IV.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss in part (ECF No. 23) is DENIED.

Defendants shall file an answer to the remaining claims within fourteen days of the date of this Opinion and Order.

SO ORDERED.

Dated:  August 13, 2026
        New York, New York

_____
                 J. PAUL OETKEN
              United States District Judge

20