UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GREAT AMERICAN E&S INSURANCE COMPANY,<br><br>Plaintiff,<br><br>-v-<br><br>ARTHUR J. GALLAGHER & CO., ARTHUR J. GALLAGHER RISK MANAGEMENT SERVICES, LLC and GALLAGHER IP SOLUTIONS, LLC,<br><br>Defendants. | Case No. 1:25-cv-05406<br><br>Hon. J. Paul Oetken |

**DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO COMPLAINT AND COUNTERCLAIMS AGAINST PLAINTIFF**

Defendants ARTHUR J. GALLAGHER & CO., ARTHUR J. GALLAGHER RISK MANAGEMENT SERVICES, LLC and GALLAGHER IP SOLUTIONS, LLC ("Gallagher"), by and through their undersigned counsel, hereby submit Gallagher's Answer and Affirmative Defenses to Plaintiff's Complaint ("Complaint") and Counterclaims as to Plaintiff. Headings and prefatory material contained in the Complaint are not substantive allegations to which an answer is required. To the extent these items are intended as substantive allegations, Gallagher denies them.

**INTRODUCTION**

1. This litigation arises out of a business program in which private lenders made loans to companies selected by Gallagher (the "Program"). UMB Bank, National Association ("UMB Bank") acted as trustee for the lenders. Great American insurance policies were issued to UMB Bank insuring, subject to all the policies' terms and conditions, the covered residual

value loss amount following a payment default and the inadequacy of the borrowing companies' collateral to repay the loan in full. Gallagher brought all the parties together, and served a number of different roles, including underwriting the loans, brokering and underwriting the policies, servicing and monitoring the loans and collateral and, in the event of a payment default, marketing the collateral for sale and mitigating any loss. The loans were secured by certain collateral, as represented by Gallagher.

**ANSWER**: Gallagher admits that what the Complaint describes as "the Program" involved private lenders making loans to companies, that UMB acted as trustee for the lenders, and that Great American issued insurance policies to UMB. Gallagher denies that Gallagher "selected" the borrowing companies. Under the Producer Agreement that governs the relationship between Great American and Gallagher, Great American delegated underwriting authority to Gallagher for any loans of $10 million or less. All of the loans at issue exceeded $10 million. For the loans at issue, Gallagher made recommendations to Great American, and Great American retained discretion over whether to approve or deny the risk. It was Great American, therefore, that "selected" the companies in the Program. Gallagher admits that Gallagher served a number of different roles, including as a broker for the transactions, but denies that Paragraph 1 contains an accurate description of those roles. Gallagher denies the remaining allegations in Paragraph 1.

2. Gallagher received fees and payments through the duration of the loan transactions: at the outset, it received fees from the borrowers, fees from the lenders, and a share of the policy premium; during the pendency of the loans, it received fees for monitoring the progress of the loans and preserving the collateral; and, in the event of a payment default, it could charge fees for marketing the collateral.

**ANSWER:** Gallagher denies that Gallagher received fees from the lenders. Gallagher admits that Gallagher received up-front fees from the borrowing companies and that it received commission calculated as a percentage of the policy premiums. Gallagher admits that Gallagher could contractually charge fees for marketing the collateral in the event of a default.

3. After a time, losses began to emerge in the Program. UMB Bank, as trustee for certain lenders involved in the Program, is seeking to recover Program losses from, among others, Great American. Three arbitrations involving UMB Bank and Great American are currently pending before the American Arbitration Association. Allegations in the arbitrations

include that the borrowing companies were undercapitalized, that the value of their collateral was overstated, that the loans were not adequately monitored and, when the borrowing companies defaulted on required payments under the loans, the collateral was not properly marketed for sale to mitigate losses.

**ANSWER**: Gallagher admits that some of the borrowing companies defaulted on their loans. Gallagher is not a party to the arbitrations and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 3.

4. Great American believes that its policies do not provide coverage for the losses. But if Great American is nevertheless found liable for coverage, Gallagher is obligated to indemnify it for any amounts it must pay in connection with the Program per its contracts with Great American. In addition, even if Great American is not found liable for coverage under any of the policies, Gallagher is obligated to defend it, indemnify it, and hold it harmless for all sums incurred in mitigating losses, in addressing the claims, and in prosecuting and defending the arbitrations.

**ANSWER**: Gallagher lacks knowledge or information sufficient to form a belief as to the truth of Great American's stated belief. Whether Gallagher is obligated to indemnify Great American for any losses is a legal conclusion to which no response is required. To the extent a response is required, Gallagher denies that Great American is entitled to indemnification from Gallagher for any losses Great American incurs related to the Program, and denies the remaining allegations in Paragraph 4.

5. Although the Great American policies provide for arbitration of disputes, Gallagher is not a party to those policies or to any arbitration agreement with Great American, and it has declined to voluntarily participate in arbitration. Earlier this year, the arbitrator in one of the arbitrations granted Great American's motion to join Gallagher on the principle, recognized in New York law, that a party that has received benefits under an agreement may be compelled to arbitrate.

**ANSWER**: Gallagher admits that it is not a party to any arbitration agreement with Great American. Gallagher admits that an arbitrator ordered Gallagher to participate in the arbitration.

Gallagher denies that Paragraph 5 fully or accurately describes the arbitrator's opinion and denies all remaining allegations in Paragraph 5.

6. In response to the arbitrator's order, Gallagher filed a petition for injunctive relief in the United States District Court for the Northern District of Illinois seeking to enjoin Great American from pursuing arbitration with Gallagher.

**ANSWER**: Admitted.

7. The federal court in Illinois denied Gallagher's motion on procedural grounds. Gallagher responded by amending its petition to seek declarations that it is not bound by the arbitration. Although Great American believes the arbitrator's order was proper and it would have been appropriate for Gallagher to participate in the arbitration, Great American has reached the conclusion that continuing to pursue arbitration against an unwilling party will dissipate the efficiencies arbitration presents. Accordingly, Great American has now withdrawn its request to add Gallagher to the arbitration and has withdrawn its discovery request to Gallagher in the arbitration.

**ANSWER**: Gallagher admits that a Northern District of Illinois Judge denied Gallagher's motion for a preliminary injunction and that Great American has withdrawn its request to add Gallagher to the arbitration. Gallagher lacks knowledge or information to form a belief as to the truth of Great American's stated belief.

8. Great American now submits to this Court for its adjudication the claims described below, as required by several of the contracts at issue in the dispute.

**ANSWER**: Gallagher denies that any contract at issue in this case requires Great American to bring suit against Gallagher and denies that Great American is entitled to any relief whatsoever.

## PARTIES

9. Great American is an Ohio corporation with its principal place of business in Ohio.

**ANSWER**: Admitted.

10. Defendant AJG is a Delaware corporation with its principal place of business in Illinois.

**ANSWER**: Admitted.

11. Gallagher Risk, f/k/a Arthur J. Gallagher Risk Management Services, Inc., is a limited liability company. AJG is the sole member of Gallagher Risk.

**ANSWER**: Gallagher admits that Arthur J. Gallagher Risk Management Services, LLC is a limited liability company, and that AJG is its sole member. Gallagher denies the remaining allegations in Paragraph 11.

12. GIPS is a limited liability company. AJG is the sole member of GIPS.

**ANSWER**: Admitted.

## JURISDICTION AND VENUE

13. Plaintiff Great American is solely an Ohio citizen.

**ANSWER**: Admitted.

14. Defendants AJG, Gallagher Risk, and GIPS are all Delaware and Illinois citizens.

**ANSWER**: Admitted.

15. The amount in controversy here exceeds $75,000, exclusive of interest and costs.

**ANSWER**: Admitted.

16. Accordingly, complete diversity exists between the plaintiff and all defendants, and the amount in controversy is sufficiently high such that this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

**ANSWER**: Admitted.

17. Personal jurisdiction over AJG, Gallagher Risk, and GIPS is proper in New York, and New York is a proper venue, because various of the contracts at issue state as follows or contain very similar language: "This Agreement shall be governed in all respects by the laws of

the State of New York applicable to the contracts executed and to be performed wholly within such State, and without regard to principles of conflicts of law which might result in the application of the laws of any other State. Each party submits to the exclusive jurisdiction of the State and Federal courts in the Borough of Manhattan, New York[.]"

**ANSWER**: Gallagher admits that venue is proper in New York. Gallagher admits that certain agreements contain language similar to the language cited in Paragraph 17. Gallagher lacks knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 17, including because the Complaint does not specify the "various" contracts being referenced.

18. Additionally, a substantial part of the events or omissions giving rise to Great American's claims occurred in New York, and specifically involved Gallagher employees based in New York, such that venue is also proper pursuant to 28 U.S.C. § 1391(b)(2).

**ANSWER**: The allegations in Paragraph 18 consist of legal conclusions to which no response is required. Gallagher admits that venue is proper in New York.

19. Further, because all of AJG, Gallagher Risk, and GIPS are subject to personal jurisdiction in New York, venue is also proper pursuant to 28 U.S.C. § 1391(b)(3).

**ANSWER**: Admitted.

## FACTS

### A. The Program

20. This litigation involves the Program, which was designed and implemented by Gallagher.

**ANSWER:** Gallagher admits that this litigation involves the Program. Gallagher denies that the program was designed and implemented solely by Gallagher, as Great American and others played an active role in the design and implementation of the Program, including each of the transactions at issue.

21. The Program involved Gallagher arranging commercial loan transactions to various companies (the "Program Companies"), most of them engaged in high-technology

businesses, who provided as collateral their entire business, including their purportedly valuable intellectual property. Gallagher evaluated the creditworthiness of the Program Companies.

**ANSWER:** Gallagher admits that the Program involved arranging commercial loan transactions with companies, most of which were engaged in high-technology businesses, and which provided their businesses' assets as collateral for the loans. Gallagher admits that it provided summary submissions to Great American with information that included, among other things, the companies' historical and projected financial information. Gallagher denies the remaining allegations in Paragraph 21.

22. Gallagher solicited various institutional lenders (the "Noteholders") to lend to the Program Companies through the purchase of promissory notes. UMB Bank, a national bank, acted as trustee for the lenders (the "Trustee").

**ANSWER**: Gallagher admits that UMB Bank acted as trustee for the lenders. Gallagher denies that is "solicited" the Noteholders to lend to the Program Companies and denies the remaining allegations in Paragraph 22.

23. Great American insurance policies, subject to all of their terms and conditions, covered residual value loss amounts following payment default and inadequacy of the Program Companies' collateral to repay the loans (the "Program Policies").

**ANSWER:** Admitted.

24. The Trustee was the named insured of the various Program Policies.

**ANSWER:** Admitted.

25. Various of the Program Companies have defaulted on their repayment obligations and others have threatened to do so.

**ANSWER:** Gallagher admits that certain companies who received loans under this Program have defaulted on their repayment obligations. Gallagher denies that "threatened to do so" is a complete or accurate characterization of the status of other companies, but admits that other companies have not, as of the date of this Answer, repaid the loans in full.

26. Gallagher's evaluation of the financial condition and creditworthiness of the various Program Companies proved to be grossly incomplete and inaccurate. The Program

Companies' collateral had far too little commercial value to repay the millions of dollars that the Program Companies were being lent by the Noteholders.

**ANSWER**: Denied.

27. As related to this action, at least three commercial arbitrations have been initiated between the Trustee and Great American relating to the Trustee's demands for payment under the Program Policies.

**ANSWER:** Gallagher is not a party to any arbitration between the Trustee and Great American and lacks sufficient knowledge to form a belief as to the truth of Paragraph 27.

**B. Gallagher's Instrumentalities**

28. For a lengthy period of time, Gallagher conducted its operations under the Program through Newlight Capital, LLC ("Newlight") and PIUS Limited, LLC ("PIUS"). PIUS and Newlight were sister companies, sharing the same principal officer and the same employees, so that they were functionally alter egos of one another.

**ANSWER**: Gallagher denies that it "conducted its operations" through Newlight Capital and PIUS Limited. Newlight and PIUS were independent companies until November 8, 2022, when Gallagher acquired the business assets of Newlight and PIUS. Gallagher admits that PIUS and Newlight shared the same principal officer. Whether those companies were alter egos of one another is a legal conclusion to which no response is required. To the extent a response is required, Gallagher denies the remaining allegations in Paragraph 28.

29. PIUS and Newlight, and their common principal officer and director, designed, promoted, and administered the Program. They carried out the underwriting of the loans, issued the Program Policies, were responsible to monitor and service the loans, and, in the event of payment default, they were charged with mitigating loss and managing recovery from the sale of the collateral.[1]

[1] The obligations undertaken by Gallagher do not relieve UMB Bank of its independent obligations under the policies. Any disputes between UMB Bank and Great American are being addressed in arbitrations pending before the American Arbitration Association, and are not a part of this case.

**ANSWER:** Gallagher admits that under the Producer Agreement that governs the relationship between Great American and Gallagher, Great American delegated underwriting authority to Gallagher for any loans of $10 million or less. All of the loans at issue exceeded $10 million. For those loans, Gallagher made recommendations to Great American, and Great American retained full discretion and final decision-making authority over whether to approve or deny the risk. Gallagher admits that it had monitoring and mitigation obligations governed by certain contracts. Gallagher denies the remaining allegations in Paragraph 29.

30. On November 8, 2022, Gallagher Risk assumed the business and obligations of PIUS and Newlight by virtue of an assignment, the "Bill of Sale and Assignment." All, or the vast majority, of the acts and omissions complained of by Great American occurred after the Bill of Sale and Assignment was entered.

**ANSWER**: Gallagher admits that Arthur J. Gallagher Risk Management Services, Inc. entered into an agreement pursuant to which it acquired substantially all of the assets of PIUS and Newlight on November 8, 2022. Gallagher admits, on information and belief, that Great American's allegations involve conduct occurring after November 8, 2022. The remaining allegations in Paragraph 30 are legal conclusions to which no response is required.

31. By the terms of the Bill of Sale and Assignment, Gallagher Risk assumed "[a]ll of the assets, property (whether real, personal or mixed), business and goodwill of Sellers of every kind, nature and description used or held for use by Sellers[,]" including "[a]ll of the right, title and interest of (i) PIUS in its managing general agency business in which PIUS places insurance policies which insure loans or other indebtedness secured by borrower's assets, including intellectual property and (ii) Newlight service business which provides loan monitoring and secured property liquidation services (collectively, the 'Acquired Business')[.]"

**ANSWER:** Admitted.

32. Great American was asked to, and did, consent to that assignment.

**ANSWER:** Gallagher admits that Great American consented to the assignment.

33. AJG and Gallagher Risk were both signatories of the Bill of Sale and Assignment.

**ANSWER:** Denied. Arthur J. Gallagher Risk Management Services, Inc. is the only Gallagher entity that signed the Bill of Sale and Assignment.

34. Subsequently, upon information and belief, some if not all PIUS and Newlight employees became employees of AJG.

**ANSWER:** Admitted.

35. Both before and after the execution of the Bill of Sale and Assignment on November 8, 2022, Newlight and PIUS were operated without regard to any purported separate corporate identity.

**ANSWER:** Denied.

36. Upon information and belief, AJG not only employed the former director and officer (and a seller) of PIUS and Newlight, but also specifically directed him and other former PIUS and Newlight employees in matters at the core of this dispute.

**ANSWER:** Admitted that AJG employed the former director and officer and other employees of PIUS and Newlight. Gallagher denies the remaining allegations in Paragraph 36.

37. AJG is, therefore, also the alter ego of PIUS and Newlight.

**ANSWER:** Paragraph 37 asserts a legal conclusion to which no response is required. To the extent a response is required, denied.

38. In mid-2023, Gallagher Risk and/or AJG further formed the entity GIPS.

**ANSWER:** Admitted.

39. Gallagher representatives have advised Great American that GIPS also assumed the PIUS and Newlight obligations, presumably from Gallagher Risk, and performed certain functions previously performed by Newlight or PIUS.

**ANSWER:** Gallagher admits that GIPS has performed certain functions previously performed by Newlight or PIUS, and that Gallagher representatives advised Great American as such. The remaining allegations in Paragraph 39 are legal conclusions to which no response is required. To the extent a response is required, Gallagher denies the remaining allegations in Paragraph 39.

40. In short, all three Gallagher Entities are directly involved in all issues impacting the dispute between Great American and the Trustee and, thus, Great American has claims against all three Gallagher entities to present in this case.

**ANSWER**: Denied.

**C. Gallagher's Contractual Obligations**

1. The Producer Agreement and Underwriting Authority Addendum

41. The relationship between Great American and the Gallagher Entities is governed in part by the U.S. Producer Agreement between Great American and PIUS dated as of October 15, 2021 (the "Producer Agreement"), as amended by an Underwriting Authority Addendum between the same parties and also dated as of October 15, 2021 (the "Underwriting Addendum") (with minor subsequent written amendments), particularly as respects the Gallagher Entities' underwriting responsibilities.

**ANSWER**: Admitted.

42. Appendix A to the Underwriting Addendum contains the underwriting guidelines, stating in part:

> VI. Insured Loan Criteria
>
> The loan associated with the insured collateral will:
>
> ***
>
> 2. have a loan agreement that includes protective and financial covenants to ensure adherence to the borrower's plan and repayment of the insured loan.
>
> ***
>
> 6. be fully secured by all assets of the borrower, including the pledge of all intellectual property (i.e., Senior secured on all IP; senior secured on all other assets, subject to PERMITTED LIENS).

At closing of the loan associated with the insured collateral:

1. there will be a discernible path to the insured collateral liquidation in the event of a payment default, and

2. the borrower enterprise value will be at least 2.5x the loan commitment amount, regardless of whether the loan commitment has been fully funded.

VII. Borrower Criteria

The borrower:

***

2. possesses adequate intellectual property, whether in the form of trade secrets, know-how, contractual rights, patents, and/or patent applications, or other intangible assets that provide either the underpinnings of the business or accounts for a significant portion of the cash flows of the enterprise.

***

4. has achieved commercial acceptance. If not already achieved, commercial acceptance is not perceived to be a significant hurdle to overcome.

5. has achieved break-even annual cash flow. If break-even has not been achieved yet, the borrower has provided reasonable projections and break-even is expected to be achieved during the term of the insured loan and the business plan is fully funded.

***

7. has an active board of directors.

***

IX. Producer Underwriting

Producer underwriting services will include analysis of the borrower, competitive market, products, technology, collateral, and the insured loan. Each insured loan will be individually underwritten by Producer without reliance on lender or trustee underwriting. Key borrower underwriting considerations for each submission include:

***

4. Historical financial performance and validation of repayment history

5. Financial condition and capitalization

6. Business strategy, plan, and projections

   a. Validation of revenue growth assumptions

   b. Stress analysis of projections based on business risks

   c. Repayment ability

7. Assessment of Technology & Products

   a. Benefits and applications

   b. Differentiators

   c. Product development

***

**ANSWER:** Gallagher admits Paragraph 42 contains an accurate excerpt from the Producer Agreement, but denies that the selective excerpt fully characterizes the parties' obligations.

43. The Producer Agreement also sets forth the following indemnification obligations for Gallagher:

> Producer will indemnify, hold harmless and defend Company and its officers, directors, employees, agents, affiliates, subsidiaries, successors and permitted assigns (collectively, "**Company Indemnified Parties**") against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees, that are incurred by Company Indemnified Parties, arising out of, or related to any: (i) breach or non-fulfillment of any representation, warranty or covenant under this Agreement by Producer, its employees, agents, contractors or Subproducers; or (ii) any negligent or more culpable act or omission of Producer, its employees, agents, contractors or Subproducers.

**ANSWER:** Gallagher admits Paragraph 43 contains an accurate excerpt from the Producer Agreement, but denies that the selective excerpt fully characterizes the parties' obligations.

2. <u>The Disbursement Monitoring Agreements</u>

44. Great American, Gallagher, the Trustee, and the various Program Companies entered into a monitoring agreement for each Program Company called the "Disbursement Monitoring Agreement."

**ANSWER:** Admitted.

45. The Disbursement Monitoring Agreements, the basic form of which is attached to the Underwriting Addendum, are substantially identical form contracts drafted primarily by Gallagher. Each contains a provision identical or practically identical to the following section 2:

> 2. Services. During the term of this Agreement:
>
> (a) Newlight shall, in such manner and at such times as Newlight determines in its sole discretion to be advisable, perform the following services (collectively, the "Monitoring Services"):
>
> (i) inspect, monitor and assess the books and records of the Obligors and their Subsidiaries (A) to determine the amounts and sources of all revenue, expenses and cash flow of the Obligors and their Subsidiaries, including all other consideration and remuneration collected or received by the Obligors and their Subsidiaries, (B) to determine whether the use of funds is consistent with the terms of the Loan Documents and (C) to evaluate such other matters as Newlight determines, in its sole discretion, may be necessary or advisable;
>
> (ii) evaluate the financial statements, annual budgets and projections prepared by the Obligors and their Subsidiaries and all such other information from the books and records of the Obligors and their Subsidiaries, and any deviations from prior periods or such budgets and projections (including, if possible, the explanation of the basis or bases for any such deviations provided by the Obligors or their Subsidiaries);
>
> (iii) obtain information and assist Insurer in obtaining additional information reasonably requested by Insurer relating to the operations, property (including without limitation the Collateral), condition and prospects of the Obligors and their Subsidiaries; and
>
> (iv) monitor the compliance of the Obligors and their Subsidiaries with the covenants set forth in the Loan Documents.

(b) Newlight shall, in such manner and at such times (if any) as Newlight determines in its sole discretion to be advisable, perform the following services on behalf of the Disbursing Agent and/or Insurer (the "Collateral Enforcement Services") during the continuance of any Triggering Event or Payment Default:

(i) prepare and submit a Claim Notice to Insurer in accordance with the terms of the Insurance Policy;

(ii) consult with Disbursing Agent and Insurer regarding any possible responses and responses to any Occurrences (as defined in Section 5(a) of this Agreement);

(iii) market and assist the Disbursing Agent and/or Insurer in liquidating or monetizing the Collateral;

(iv) prepare and submit a Proof of Loss to Insurer in accordance with the terms of the Insurance Policy;

(v) take such other actions as Disbursing Agent or Insurer reasonably requests to protect their interests in the Collateral; and

(vi) direct the Disbursing Agent regarding what Disbursing Agent enforcement actions, costs and expenses and other actions are commercially reasonable, do not have an adverse impact on Insurer and do not unnecessarily impair the Collateral and shall be approved as commercially reasonable Collection Efforts and Collection Costs and shall be deemed to satisfy the obligation to have Mitigated Losses as required under the Insurance Policy.

For the avoidance of doubt, Newlight may not enter into any commitment to sell or transfer any of the Collateral without first obtaining any prior written consents required pursuant to the Insurance Policy.

* * *

(c) Each of the Insurer, the Disbursing Agent and each of the Obligors acknowledges and agrees that any information obtained by Newlight in the course of performance of the Services may be provided by Newlight to Insurer or Disbursing Agent (or both) at Newlight's sole discretion.

(d) The Insurer, the Disbursing Agent, and the Obligors shall, and the Obligors shall direct and cause their Subsidiaries to, authorize Newlight to perform the Services to be provided by Newlight under this Agreement and consent thereto. Insurer and Disbursing

> Agent further consent to the performance by the Obligors and their Subsidiaries of their obligations under this Agreement.

**ANSWER:** Gallagher admits that Paragraph 45 purports to quote and characterize certain Disbursement Monitoring Agreements and contains accurate excerpts from a representative Disbursement Monitoring Agreement. Gallagher denies the allegations in Paragraph 45 to the extent they inaccurately or selectively quote and characterize the Disbursement Monitoring Agreements, which speak for themselves.

46. Each of the Disbursement Monitoring Agreements also contains a provision identical or practically identical to the following section 5:

> 5. Disbursing Agent and Other Newlight Duties.
>
> (a) Upon the occurrence of a Triggering Event, Payment Default and/or the acceleration of the Loan or any other amounts under the Loan Documents (each, an "Occurrence") Disbursing Agent and Newlight shall:
>
> (i) promptly notify the other (and, if required under Article 6 of the Insurance Policy, notify the Insurer), which notice shall provide reasonable detail of the nature and cause of such Occurrence; provided, however, that Disbursing Agent's or Newlight's failure to provide such notice shall not affect Disbursing Agent's rights hereunder or under the Insurance Policy, provided that such notice (if required under Article 6 of the Insurance Policy) is provided promptly after Disbursing Agent or Newlight becomes aware of such Occurrence (and notice of any Payment Default is provided within the time required under the Insurance Policy); and
>
> (ii) promptly provide additional information to, and cooperate with, Insurer as may reasonably be requested.

**ANSWER:** Gallagher admits that Paragraph 46 purports to quote and characterize certain Disbursement Monitoring Agreements and contains accurate excerpts from a representative Disbursement Monitoring Agreement. Gallagher denies the allegations in Paragraph 46 to the extent they inaccurately or selectively quote and characterize the Disbursement Monitoring Agreements, which speak for themselves.

47. Each of the Disbursement Monitoring Agreements also contains a provision identical or practically identical to the following section 6:

> 6. Newlight's Execution of its Duties.

(a) Subject to Sections 4.3 and 6.3(c) of the PDSA, each Obligor shall, and each Obligor shall cause each of its Subsidiaries to, give Newlight access to such properties, books and records of such Obligor and its Subsidiaries as Newlight may request for the purposes of performing the Services. However, prior to the occurrence of a Triggering Event Newlight (i) shall provide each Obligor with at least three (3) Business Days' written notice of any requested access, and (ii) shall access and inspect the properties, books and records of such Obligor and its Subsidiaries only during regular business hours. Newlight shall be allowed to make copies of all such books and records as determined by Newlight in its discretion. Notwithstanding the foregoing or any other provision of this Agreement, any audit or inspection of live Collateral or Inventory shall be subject to Newlight's compliance with the reasonable biosecurity requirements of the Obligors.

In carrying out the Services or any of its other obligations under this Agreement, Newlight may act either directly or through agents, attorneys, accountants, auditors and/or independent contractors (collectively, "Newlight Agents") and may enter into agreements with any of them, and whose reasonable, documented and out-of-pocket fees, costs and expenses shall be paid by the Obligors as provided in Section 7(d) of this Agreement. Failure to advance or reimburse Newlight for any such fees, costs and expenses shall be considered a material breach of this Agreement and the other Loan Documents by the Obligors.

For the avoidance of doubt, Newlight is not obligated to pay any fees, costs or expenses associated with Newlight's responsibilities under this Agreement unless advanced or reimbursed by the Obligors. If Newlight is not advanced or reimbursed fees, costs and expenses associated with this Agreement, Newlight will be relieved of any obligations under this Agreement without any liability.

**ANSWER:** Gallagher admits that Paragraph 47 purports to quote and characterize certain Disbursement Monitoring Agreements and contains accurate excerpts from a representative Disbursement Monitoring Agreement. Gallagher denies the allegations in Paragraph 47 to the extent they inaccurately or selectively quote and characterize the Disbursement Monitoring Agreements, which speak for themselves.

48. The Disbursement Monitoring Agreements, in most instances in paragraph 13, further provided for Gallagher's assumption of the following indemnification obligations:

Indemnification

***

(b) Between Newlight and Insurer: Newlight agrees to indemnify, defend and

> hold harmless Insurer, its parent, subsidiaries and affiliates and their respective officers, directors, employees and agents from and against any and all liabilities, claims, suits, actions, demands, settlements, losses, judgments, costs, damages, expenses (including reasonable attorneys' fees), fines, penalties, and all reasonable costs of defense (collectively "Indemnified Losses") arising out of, caused by or resulting from: (A) any negligent act or omission by Newlight or its members, officers, directors, employees, representatives, contractors, consultants, or agents related to or arising out of this Agreement or (B) a breach by Newlight of any of its agreements contained in this Agreement; provided, that neither Newlight nor Insurer shall have any obligation to any Indemnified Party to the extent directly caused by or directly resulting from the willful misconduct or gross negligence of such Indemnified Party.
>
> ***
>
> (d) Subject to the terms of the foregoing sub-sections (a) through (c), assuming that the indemnification demand has been accepted, each indemnifying party covenants that it will reimburse or pay over to the indemnified parties on demand all monies which the indemnified parties shall pay or become legally liable to pay by reason of any of the foregoing and will make such payments to the indemnified parties as soon as the indemnified parties shall have paid out any such sums.

**ANSWER:** Gallagher admits that Paragraph 48 purports to quote and characterize certain Disbursement Monitoring Agreements and contains accurate excerpts from a representative Disbursement Monitoring Agreement. Gallagher denies the allegations in Paragraph 48 to the extent they inaccurately or selectively quote and characterize the Disbursement Monitoring Agreements, which speak for themselves.

**D. Gallagher's Breaches**

49. Gallagher did not comply with the underwriting criteria in the Producer Agreement and the Underwriting Addendum.

**ANSWER:** Denied.

50. On the contrary, relying on an inadequate analysis that failed to share important financial information with Great American, and based on promises of active monitoring that was not in place and did not occur, Gallagher provided an incomplete, inaccurate, and misleadingly favorable picture of the financial condition of various Program Companies.

**ANSWER:** Denied.

51. Gallagher provided incomplete and inaccurate facts, misstatements, and omissions that were not the result of diligent underwriting and evaluation of the Program Companies and were provided to induce Great American into agreeing to the issuance of the various Program Policies.

**ANSWER:** Denied.

52. Gallagher underplayed the problems at the Program Companies and failed to make Great American aware of key information that contradicted the financial condition of the Program Companies presented by Gallagher.

**ANSWER:** Denied.

53. Gallagher provided Great American with one or more underwriting submissions (the "Summary Submissions") for each Program Company, specifically recommending that Great American agree to the issuance of the various Program Policies based on Gallagher's financial evaluations of each Program Company.

**ANSWER:** Gallagher admits that it provided Great American with Summary Submissions, each of which contained a "Recommendation" section, which speaks for itself. Further answering, Great American retained complete discretionary and final decision-making authority regarding whether to accept the risk. Gallagher denies the remaining allegations in Paragraph 53.

54. The incomplete and inaccurate facts, misstatements, or omissions presented to Great American in the Summary Submissions cannot be reconciled with the facts discovered after various claims were submitted.

**ANSWER:** Denied.

55. The introduction of virtually each Summary Submission stated that "PIUS has completed its underwriting review for the Transaction. Our review includes, among other things,

consideration of loan terms, borrower creditworthiness and technical analysis of the intellectual property collateral." This was inaccurate.

**ANSWER:** Gallagher admits that Paragraph 55 purports to quote and characterize certain portions of Summary Submissions, but Gallagher denies that the allegations in Paragraph 55 fully or accurately quote, characterize, or describe the Summary Submissions, which speak for themselves. Gallagher denies any inaccurate or selective quotation, characterization, or description of the Summary Submissions that is inconsistent with the submissions themselves, and denies the remaining allegations in Paragraph 55.

56. Each Summary Submission contained a Deal Executive Summary, Recommendation, which stated that every Program Company respectively would be able to pay back their loans and that "in the unlikely event of default" Gallagher would be able to dispose of the respective Program Companies' assets "to ensure that a claim does not result in a loss."

**ANSWER:** Gallagher admits that Paragraph 56 purports to quote and characterize certain portions of Summary Submissions, but Gallagher denies that the allegations in Paragraph 56 fully or accurately quote, characterize, or describe the Summary Submissions, which speak for themselves. Gallagher denies any inaccurate or selective quotation, characterization, or description of the Summary Submissions that is inconsistent with the submissions themselves, and denies the remaining allegations in Paragraph 56.

57. The Deal Executive Summary, Recommendation of each Summary Submission contained gross understatements of the problems with the various Program Companies.

**ANSWER:** Denied.

58. Based on the information known to Gallagher at the time of underwriting, but withheld from Great American, no reasonable person would conclude that Gallagher had conducted a meaningful, diligent, and independent evaluation of the Program Companies' respective future prospects and abilities to repay their substantial, multi-million dollar loans.

**ANSWER:** Denied.

59. In the Summary Submissions, Gallagher also promised a financial covenant methodology to monitor the Program Companies' abilities to pay back the proposed loans and provide adequate time to react in the event of a deteriorating credit profile. Gallagher failed to do so.

**ANSWER:** Gallagher admits that certain Summary Submissions contained a section titled "Covenant Methodology." Gallagher denies that it "promised" Great American a specific financial covenant methodology through any Summary Submission. Gallagher denies the remaining allegations in Paragraph 59.

60. Had Great American been made aware of the true facts and state of affairs at the various Program Companies, it would not have agreed to the issuance of the Program Policies.

**ANSWER:** Gallagher denies that Great American was not made aware of the "true facts and state of affairs" of the Program Companies and denies the remaining allegations in Paragraph 60.

61. In addition, Gallagher did not perform the services required in Sections 2, 5, and 6 of the various Disbursement Monitoring Agreements in the manner required or befitting the services described and required in good faith.

**ANSWER:** Denied.

**E. Consequences of Gallagher's Breaches**

62. The Trustee has made claims upon Great American under several Program Policies and is seeking sums from Great American after the failures of various Program Companies to make their respective loan repayments. Great American maintains that it is not liable to the Trustee under its Program Policies for various reasons under the policies' terms.

**ANSWER:** Gallagher is aware that Great American has paid claims under certain Program Policies and, on that information and belief, denies that Great American disputes its liability to the Trustee under its Program Policies. Gallagher is not a party to the insurance contracts between Great American and the Trustee or to the related arbitrations between them, and therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 62.

63. Arbitrations have been commenced pursuant to the arbitration provisions of those various Program Policies. Gallagher refuses to join in those arbitrations.

**ANSWER:** Gallagher is not a party to the insurance contracts between Great American and the Trustee or to the related arbitrations between them, and therefore lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 63. Gallagher admits that, as a non-party to any arbitration agreement between the Trustee and Great American, it declined to join the arbitrations.

64. While Great American maintains that there is no coverage available for the Trustee under those Program Policies currently subject to arbitration, Great American contends that Gallagher would be liable to Great American for any arbitration awards in favor of the Trustee because of the acts or omissions of Gallagher and/or its employee(s), including breaches of the respective various agreements and because of the negligent or more culpable acts and omissions of Gallagher and/or its employee(s) in underwriting the Program Policies, monitoring the loans, mitigating losses, marketing the collateral, and otherwise.

**ANSWER**: Gallagher admits that Great American contends Gallagher is liable to Great American. Gallagher denies that it is liable to Great American or that Great American is entitled to any relief whatsoever, and denies the remaining allegations in Paragraph 64.

65. Great American also contends that, even if Great American is not found liable for coverage under any of the Program Policies, Gallagher is obligated to defend it, indemnify it, and hold it harmless for any and all sums it incurs in mitigating losses, in addressing the claims, in prosecuting and defending the arbitrations, and otherwise. Great American already has incurred well in excess of $75,000 of such sums and expects to incur more in the future.

**ANSWER**: Gallagher admits that Great American contends Gallagher is liable to Great American. Gallagher denies that it is liable to Great American or that Great American is entitled to any relief whatsoever, and denies the remaining allegations in Paragraph 65.

66. Upon information and belief, Gallagher disputes that it is liable to Great American for any awards in the arbitrations, as well as for any sums Great American incurs in

mitigating losses, in addressing the claims, in prosecuting and defending the arbitrations, or otherwise, for Great American's attorneys' fees and costs, or for any settlement payments that may be made.

**ANSWER**: Gallagher admits that it disputes it is liable to Great American for any of the sums listed in Paragraph 66.

67. Great American, accordingly, seeks a declaration of the various obligations and liabilities of Gallagher to Great American relating to the Program and future recoveries under the Program Policies, if any, as well as damages due to Gallagher's failures to perform and its breaches.

**ANSWER**: Gallagher admits that Great American seeks a declaration. Gallagher denies that Great American is entitled to any relief whatsoever.

**COUNT I – DECLARATORY JUDGMENT**

68. Great American incorporates paragraphs 1 through 67 as if pled herein.

**ANSWER:** Gallagher incorporates by reference its previous answers to each of the allegations in all of the preceding paragraphs.

69. Gallagher owes Great American certain defense, indemnification and hold-harmless obligations, as more fully set out in the various contracts at issue, for its various roles in the Program.

**ANSWER:** Denied.

70. Gallagher has denied any and all of those defense, indemnification and hold-harmless obligations and has refused to perform them.

**ANSWER:** Gallagher denies that it owes Great American any defense, indemnification, or hold harmless obligations and admits that it has refused to defend and indemnify Great American.

71. Gallagher has also repudiated those obligations, asserting that it has done no wrong and will not defend, indemnify, or hold harmless Great American in the future.

**ANSWER:** Gallagher admits that it does not have any obligation to defend, indemnify, or hold harmless Great American and that it does not presently intend to do so in the future.

72. There is, accordingly, a live controversy between the parties.

**ANSWER:** Paragraph 72 asserts a legal conclusion for which no answer is required. To the extent an answer is required, denied.

73. Great American seeks a declaration of the scope of the defense, indemnification and hold-harmless obligations owed by Gallagher to Great American.

**ANSWER**: Gallagher admits that Great American is seeking a declaration regarding defense, indemnification, and hold harmless obligations. Gallagher denies that Great American is entitled to any relief whatsoever.

**COUNT II – BREACH OF CONTRACT**

74. Great American incorporates paragraphs 1 through 73 as if pled herein.

**ANSWER:** Gallagher incorporates by reference its previous answers to each of the allegations in all of the preceding paragraphs.

75. Gallagher owes Great American certain defense, indemnification and hold-harmless obligations, as more fully set out in the various contracts at issue, for its various roles in the Program.

**ANSWER:** Denied.

76. Gallagher has denied any and all of those defense, indemnification and hold-harmless obligations and has refused to perform them.

**ANSWER:** Gallagher denies that it owes Great American any defense, indemnification, or hold harmless obligations and admits that it has refused to defend and indemnify Great American.

77. Gallagher has also repudiated those obligations, asserting that it has done no wrong and will not defend, indemnify, or hold harmless Great American in the future.

**ANSWER:** Gallagher admits that it does not have any obligation to defend, indemnify, or hold harmless Great American and that it does not presently intend to do so in the future

78. Great American has already incurred costs, such as attorneys' fees, that are specifically contemplated in the defense, indemnification and hold harmless obligations of Gallagher.

**ANSWER**: Denied.

79. Pursuant to the terms of some or all of the various contracts between Great American and Gallagher, Gallagher's performance is due and payable, yet has not been performed.

**ANSWER**: Denied.

80. Great American, accordingly, seeks actual damages for all costs within the scope of Gallagher's defense, indemnification and hold harmless obligations.

**ANSWER**: Gallagher admits that Great American is seeking damages. Gallagher denies that Great American is entitled to any damages or to any relief whatsoever.

**COUNT III – NEGLIGENT PROVISION OF PROFESSIONAL SERVICES**

81. Great American incorporates paragraphs 1 through 80 as if pled herein.

**ANSWER:** Gallagher incorporates by reference its previous answers to each of the allegations in all of the preceding paragraphs.

82. Pursuant to the Producer Agreement and the Underwriting Addendum as well as the Disbursement Monitoring Agreements, Gallagher agreed to provide certain professional services for Great American.

**ANSWER**: Gallagher admits that it undertook contractual obligations with regard to Great American in the Producer Agreement and the Underwriting Addendum as well as the Disbursement Monitoring Agreements. The remaining allegations in Paragraph 82 are legal conclusions to which no response is required. To the extent a response is required, denied.

83. Gallagher owed Great American a duty of care in connection with its provision of professional services.

**ANSWER**: Paragraph 83 asserts a legal conclusion for which no answer is required. To the extent any answer is required, denied.

84. Gallagher breached that duty.

**ANSWER:** Denied.

85. As a result of Gallagher's breaches, Great American has suffered damages.

**ANSWER:** Denied.

**COUNT IV – NEGLIGENT MISREPRESENTATION**

86. Great American incorporates paragraphs 1 through 85 as if pled herein.

**ANSWER:** Gallagher incorporates by reference its previous answers to each of the allegations in all of the preceding paragraphs.

87. Because of its special relationship with Great American, Gallagher had a duty to provide Great American with correct and accurate information.

**ANSWER:** Paragraph 87 asserts a legal conclusion for which no answer is required. To the extent any answer is required, denied.

88. On numerous occasions in the course of the Program, Gallagher made incorrect and inaccurate representations to Great American as to the financial condition of the Program Companies, the value of the collateral of the Program Companies, and the measures it was taking to comply with its duties to Great American under the Program.

**ANSWER:** Denied.

89. Gallagher knew or should have known that these representations were incorrect.

**ANSWER:** Denied.

90. Gallagher knew that Great American sought information about the Program and specifically about the collateral of the Program Companies for a serious purpose and that Great American relied on Gallagher to provide such information.

**ANSWER**: Gallagher admits that, on certain occasions, Great American sought certain information about the Program Companies from Gallagher. Gallagher denies that Great American relied on Gallagher. Great American had its own obligations and the full and final discretion to approve or deny the risks presented. Gallagher lacks knowledge or information sufficient to form a belief as to Great American's purpose. Gallagher denies the remaining allegations in Paragraph 90.

91. Gallagher knew that Great American relied on Gallagher to comply with its duties to Great American under the Program.

**ANSWER:** Gallagher denies that Great American relied on Gallagher. Great American had its own obligations and the full and final discretion to approve or deny the risks presented.

92. Great American intended to, and did, rely and act upon what turned out to be incorrect and inaccurate information provided by Gallagher, and that Great American intended to, and did, rely and act upon Gallagher's compliance with its duties to Great American under the Program, and it did so to its detriment.

**ANSWER**: Denied.

**COUNT V – SPECIFIC PERFORMANCE**

93. Great American incorporates paragraphs 1 through 92 as if pled herein.

**ANSWER:** Gallagher incorporates by reference its previous answers to each of the allegations in all of the preceding paragraphs.

94. Among other of Gallagher's obligations to Great American is Gallagher's ongoing obligation to turn over all of its books and records about the Program to Great American at Great American's request.

**ANSWER:** Paragraph 94 consists of a legal conclusion to which no response is required. To the extent a response is required, denied.

95. The Producer Agreement contains the following obligations:

11. Records.

a. Great American has the right upon reasonable written notice and during normal business hours of Producer, to inspect and audit all records,

systems, Policy files, claims files, documents and other data related to the Business (collectively, "**Books and Records**") as Great American, in its sole discretion, deems necessary. Producer agrees to reasonably cooperate with Great American in conducting such inspections and audits. Producer will provide reasonable access to employees, records, data, and office facilities in the event of any audit, inspection, suit, complaint, claim, or regulatory exam or inquiry.

b. Producer will maintain all Books and Records in hard copy or electronic form. Such Books and Records will be retained for the longer of seven years after Policy termination, or such longer time as may be required by law.

c. At any time, upon written request of Great American, Producer will deliver copies of all, or any portion of, Books and Records to Great American, in a format designated by Great American, which may include electronically readable format, at no cost to Great American.

d. Producer agrees to provide Great American with any information Great American reasonably requests to maintain its status as an admitted insurer or an eligible surplus lines insurer.

**ANSWER:** Gallagher admits that Paragraph 95 contains an accurate excerpt from the Producer Agreement, but denies that the selective excerpt fully characterizes the parties' obligations.

96. As is provided by the Producer Agreement, "[a]t any time, upon written request of Great American, Producer **will deliver** copies of all, or any portion of, Books and Records to Great American, in a format designated by Great American, which may include electronically readable format, at no cost to Great American." Producer Agreement ¶ 11.c.

**ANSWER:** Gallagher admits that Paragraph 96 contains an accurate excerpt from the Producer Agreement, but denies that the selective excerpt fully characterizes the parties' obligations.

97. Gallagher has repeatedly refused to provide Great American with the Books and Records, notwithstanding its mandatory obligation that it "will deliver copies of all, or any portion of, Books and Records to Great American, in a format designated by Great American, which may include electronically readable format, at no cost to Great American." Producer Agreement ¶ 11.c.

**ANSWER:** Denied.

98. Gallagher's obligation to turn over "all" of the Books and Records is not compensable as damages, nor is there any other remedy at law which would remedy Gallagher's breach other than to compel Gallagher to specifically perform this obligation.

**ANSWER**: Paragraph 98 asserts a legal conclusion to which no answer is required. To the extent any answer is required, Gallagher denies that Great American is entitled to any relief whatsoever and denies all remaining allegations in Paragraph 98.

99. Great American accordingly requests that the Court grant Great American relief and compel Gallagher's specific performance to provide Great American with an electronically readable format of all Books and Records, in unredacted form, as expressly provided in the Producer Agreement.

**ANSWER:** Gallagher admits that Great American seeks specific performance. Gallagher denies that Great American is entitled to any relief whatsoever.

## JURY DEMAND

100. Plaintiff hereby demands a trial by jury on all issues triable before a jury.

**ANSWER:** Gallagher admits that Plaintiff demands a jury trial.

## AFFIRMATIVE AND OTHER DEFENSES

Gallagher asserts the following affirmative and other defenses, without assuming the burden of proof on any such defenses or portions thereof which would otherwise rest with Great American. Gallagher expressly reserves the right to supplement, amend, or delete any or all of the following defenses, as warranted by discovery or other investigation, or as justice may require.

### FIRST DEFENSE

The Complaint fails to state a cause of action upon which relief can be granted.

### SECOND DEFENSE

Great American lacks standing to assert indemnification claims to the extent it has not yet

incurred or become liable for any covered losses, and any claims for speculative or anticipated losses are not ripe.

**THIRD DEFENSE**

Great American's claims alleging Gallagher is obligated to defend, indemnify, and hold Great American harmless under the Producer Agreement are barred, in whole or in part, because Gallagher has not committed any conduct or act triggering Section 16(a) of the Producer Agreement. Specifically, Gallagher has not breached any representation, warranty, or covenant under the Producer Agreement or committed any negligent or more culpable act or omission.

**FOURTH DEFENSE**

Great American's claims alleging Gallagher is obligated to defend, indemnify, and hold Great American harmless under any Disbursement Monitoring Agreement are barred, in whole or in part, because Gallagher has not committed any conduct or act triggering the indemnification clause of any Disbursement Monitoring Agreement. Specifically, Gallagher has not committed any negligent act or omission related to or arising out of any Disbursement Monitoring Agreement or breached any agreements contained in a Disbursement Monitoring Agreement.

**FIFTH DEFENSE**

Great American's claims are barred to the extent it fails to prove, policy by policy and cost category by cost category, that each claimed loss arose from Gallagher's covered conduct.

**SIXTH DEFENSE**

Great American's claims alleging Gallagher is obligated to defend, indemnify, and hold Great American harmless are barred, in whole or in part, because they are predicated on Gallagher's exercise of discretionary authority expressly delegated under either the Underwriting Authority Addendum or any Disbursement Monitoring Agreement. The exercise of discretion

within the scope of that authority does not constitute a breach (or any other culpable conduct) sufficient to trigger indemnification, defense, or hold harmless obligations.

**SEVENTH DEFENSE**

Gallagher was not the cause of any alleged injury or damages suffered by Great American. Great American's claims are therefore barred, in whole or in part, due to the absence of loss causation or proximate cause.

**EIGHTH DEFENSE**

Great American's claims alleging Gallagher is obligated to indemnify, defend, and hold Great American harmless are barred, in whole or in part, to the extent Great American seeks indemnification for any alleged losses, damages, costs or expenses that do not arise out of, are not related to, or otherwise fail to satisfy the contractual causation requirement set forth in either Section 16(a) of the Producer Agreement or the indemnification clause in any Disbursement Monitoring Agreement.

**NINTH DEFENSE**

Great American's claims are barred, in whole or in part, by superseding and/or intervening causes of any alleged damages.

**TENTH DEFENSE**

Great American's claims are barred, in whole or in part, because if Great American suffered cognizable damages (which Gallagher denies), such damages arise out of or result from Great American's own negligence or more culpable conduct.

**ELEVENTH DEFENSE**

Under the Underwriting Authority Addendum, Great American had a three-day business review window, the right to request additional information, and the authority to decline any risk.

Its failure to exercise these contractual rights precludes recovery for losses that could have been avoided.

**TWELFTH DEFENSE**

Great American's claims relating to any alleged wrongdoing by Gallagher, in connection with its underwriting obligations, are barred because under the Underwriting Authority Addendum, only Great American—not Gallagher—had the authority to approve risks exceeding $10 million. Therefore, if Great American suffered cognizable damages (which Gallagher denies), such damages arise out of or relate to Great American's own exercise of its independent underwriting judgment.

**THIRTEENTH DEFENSE**

Under the Underwriting Authority Addendum, only Great American—not Gallagher—had the authority to approve risks exceeding $10 million. Any decision made by Great American to approve a risk over $10 million was an exercise of Great American's independent underwriting judgment. Relatedly, David Ferron of Great American took an active role in preparing and reviewing the Summary Submissions that Great American now contends contain "inaccurate facts, misstatements or omissions." Therefore, Great American's negligent provision of professional services and negligent misrepresentation claims are barred, in whole or in part, or subject to diminution of damages by the doctrines of contributory negligence and/or comparative negligence.

**FOURTEENTH DEFENSE**

Great American's claims alleging Gallagher is obligated to indemnify, defend, and hold Great American harmless under Section 16(a) of the Producer Agreement is barred, in whole or in part, or subject to allocation, reduction, offset, and/or recoupment under the mirror-image indemnification provision set forth in Section 16(b) of the Producer Agreement, providing that

Great American will indemnify, hold harmless, and defend Gallagher against any and all losses arising out of, or related to, any (i) breach or non-fulfillment of any representation, warranty, or covenant by Great American, its employees, agents, or contractors, or (ii) any negligent or more culpable act or omission of Great American, its employees, agents, or contractors. This mirror-image provision creates a comparative fault regime: a bilateral, fault-triggered allocation framework under which each party bears the losses arising from its own covered conduct. To the extent Great American seeks to recover under Section 16(a) for any losses arising from Great American's own covered conduct—including, without limitation, the negligent or more culpable acts and omissions of Great American's employee, David Ferron—those losses must be allocated to Great American.

**FIFTEENTH DEFENSE**

The indemnification provision in the Disbursement Monitoring Agreements contains a carve-out stating "neither [Gallagher] nor Insurer shall have any obligation to any Indemnified Party to the extent directly caused by or directly resulting from the willful misconduct or gross negligence of such Indemnified Party." Great American's own willful misconduct or gross negligence bars its indemnification, defense, and hold harmless demand under any Disbursement Monitoring Agreement, in whole or in part.

**SIXTEENTH DEFENSE**

Any alleged damages sustained by Great American were the result of its own acts or omissions and/or the acts or omissions of third parties for which Gallagher is not responsible.

**SEVENTEENTH DEFENSE**

Great American's claims for negligent provision of professional services (Count III) and negligent misrepresentation (Count IV) are barred by the economic loss doctrine because they seek

only economic damages arising from a contractual relationship governed by express agreements between the parties.

**EIGHTEENTH DEFENSE**

Great American's claims for negligent provision of professional services (Count III) and negligent misrepresentation (Count IV) are barred because they are duplicative of Great American's breach of contract claim.

**NINETEENTH DEFENSE**

Great American's claims for negligent provision of professional services (Count III) and negligent misrepresentation (Count IV) are barred because Great American did not maintain a special relationship with Gallagher.

**TWENTIETH DEFENSE**

Great American's claims for negligent provision of professional services (Count III) and negligent misrepresentation (Count IV) are barred because Gallagher owed no duty to Great American independent of the contracts. The duties alleged arise solely from the Producer Agreement, the Underwriting Authority Addendum, and the Disbursement Monitoring Agreements—they are not duties imposed by law.

**TWENTY-FIRST DEFENSE**

Gallagher is not liable because, at all times, and with respect to all matters contained herein, it acted in good faith, exercised reasonable care, and did not know—and in the exercise of reasonable care could not have known—of any purported untruths, misstatements, and/or omissions that are the subject of any claim asserted by Great American in the Complaint.

**TWENTY-SECOND DEFENSE**

Gallagher is not liable for any claim asserted by Great American because any alleged

misrepresentation or omission made by or caused to be made by Gallagher were based in good faith and in reasonable reliance upon the work, opinions, information, representation, and advice of others upon which they were entitled to rely.

**TWENTY-THIRD DEFENSE**

Great American's negligent misrepresentation claim (Count IV) and its claims under Section 16(a)(ii) of the Producer Agreement, if any, fail because Great American could not have reasonably or justifiably relied upon any misstatement or omission by Gallagher.

**TWENTY-FOURTH DEFENSE**

Great American's negligent misrepresentation claim (Count IV) and its claim under Section 16(a)(ii) of the Producer Agreement, if any, fail to the extent any information purportedly concealed by Gallagher was publicly available or independently accessible to Great American.

**TWENTY-FIFTH DEFENSE**

Great American's claims alleging Gallagher is obligated to indemnify, defend, and hold Great American harmless under the Producer Agreement are barred, in whole or in part, because even if any alleged wrongdoing by Gallagher constitutes covered conduct under Section 16(a) of the Producer Agreement, Great American must prove that such conduct was the operative cause of its decision to approve and issue each policy and the operative cause of the loss. The operative cause of Great American's decision and any alleged loss was Great American's independent review and approval of the risks, Great American's exercise of its underwriting authority, David Ferron's active role in preparing the Summary Submissions, and/or other intervening causes.

**TWENTY-SIXTH DEFENSE**

Great American's claims alleging Gallagher is obligated to indemnify, defend, and hold Great American harmless are barred, in whole or in part, or subject to reduction, offset, or

recoupment, to the extent Great American contends it was induced to issue one or more policies yet seeks to recover any ensuing or downstream losses without accounting for the substantial premiums it collected and retained on those policies. Great American cannot simultaneously claim it would never have issued the policies and retain the economic benefit of having issued them. Any indemnification award must be reduced by the premiums Great American received, which it has not returned and which represent a direct benefit of the transaction Great American now characterizes as harmful.

**TWENTY-SEVENTH DEFENSE**

Great American's claims are barred, in whole or in part, to the extent Great American seeks rescission, rescissory damages, disgorgement, restitution, unwinding of any transaction or policy, or any other remedy that would place Great American in the position it would have occupied had the parties' contractual agreements and/or the transactions and insurance policies under the Program never been entered into or issued. No contractual duty or legal theory asserted in the Complaint creates, authorizes, or expands any right to rescind the parties' contracts, rescind or unwind any transaction or policy, recover rescissory damages, or obtain a rescission-based measure of damages.

**TWENTY-EIGHTH DEFENSE**

Great American's claims alleging Gallagher is obligated to indemnify, defend, and hold Great American harmless are barred, in whole or in part, to the extent Great American seeks to recover a category of loss that is not recoverable under the express terms of the indemnification provision set forth in either the Producer Agreement or any Disbursement Monitoring Agreement.

**TWENTY-NINTH DEFENSE**

Great American's claims are barred, in whole or in part, by the doctrine of *In Pari Delicto*.

To the extent Great American accuses Gallagher of wrongdoing in connection with the Program, Great American engaged in intentional wrongdoing in connection with the Program that was equal to, or more than, Gallagher's.

**THIRTIETH DEFENSE**

Great American's claims are barred, in whole or in part, by the doctrines of waiver, estoppel, waiver by estoppel, laches, acquiescence, and/or ratification.

**THIRTY-FIRST DEFENSE**

Great American's claims are barred, in whole or in part, by the doctrine of res judicata.

**THIRTY-SECOND DEFENSE**

Great American's claims sounding in negligence are barred, in whole or in part, or are subject to diminution of damages by the doctrine of assumption of risk because Great American assumed a known risk by issuing Program Policies despite its independent knowledge of the red flags, warnings, and adverse information concerning the Program Companies.

**THIRTY-THIRD DEFENSE**

Great American's claims for negligent provision of professional services (Count III) and negligent misrepresentation (Count IV) are barred, in whole or in part, by the equitable doctrine of unclean hands. The very losses Great American now attributes to Gallagher's alleged negligence were caused or substantially contributed to by the inequitable conduct of Great American's own personnel.

**THIRTY-FOURTH DEFENSE**

Great American's claim for specific performance of the books-and-records obligation (Count V) is barred, in whole or in part, by the equitable doctrine of unclean hands. Great American does not seek the books and records for any legitimate business purpose contemplated by Section

11 of the Producer Agreement. Instead, Great American's demand for books and records is part and parcel of its broader strategy to manufacture claims against Gallagher in anticipation of — and in connection with — the claims under the Program Policies, the underlying arbitration demands, and this litigation.

**THIRTY-FIFTH DEFENSE**

Great American's claims are barred, in whole or in part, by its failure to mitigate its alleged damages.

**THIRTY-SIXTH DEFENSE**

Great American's claims are barred, in whole or in part, because if Great American suffered cognizable damages (which Gallagher denies), such damages resulted from market conditions outside of Gallagher's responsibility and control.

**THIRTY-SEVENTH DEFENSE**

Great American's claim for specific performance of the books-and-record obligation (Count V) is barred because Great American has an adequate remedy at law through its breach of contract claim (Count II) and this Court's discovery mechanisms (Federal Rules of Civil Procedure 34 and 45), barring the equitable remedy of specific performance.

**THIRTY-EIGHTH DEFENSE**

To the extent it is found liable to Great American, Gallagher is entitled to all rights of setoff for monies that Great American has received from any collateral sources, including, but not limited to, payments received from any reinsurer.

**THIRTY-NINTH DEFENSE**

Great American's claims are barred, in whole or in part, because Gallagher acted in good faith and pursuant to legitimate business justifications.

## FORTIETH DEFENSE

None of the Gallagher Defendants or any other subsidiary or affiliate of Arthur J. Gallagher acquired the liabilities of either PIUS Limited, LLC or Newlight Capital, LLC in the asset purchase transactions, therefore, Gallagher does not have any responsibility or liability for pre-acquisition acts or omissions of PIUS and Newlight.

## GALLAGHER'S COUNTERCLAIMS

1. Defendants and Counterclaim-Plaintiffs Arthur J. Gallagher & Co., Arthur J. Gallagher Risk Management Services, LLC, and Gallagher IP Solutions, LLC (collectively, "Gallagher" or "Counterclaim-Plaintiff") bring these Counterclaims against Plaintiff and Counterclaim-Defendant Great American E&S Insurance Company ("Great American" or "Counterclaim-Defendant") for declaratory judgment, breach of contract/contractual indemnification, allocation and recoupment under Section 16(b) of the Producer Agreement, common law recoupment, breach of contract (forum selection clause), aiding and abetting a breach of fiduciary duty, tortious interference with the Disbursement Monitoring Agreements, and the breach of the implied covenant of good faith and fair dealing under both the Producer Agreement and Disbursement Monitoring Agreements.

## NATURE OF THE ACTION

2. This dispute arises out of an insurance program (the "Program") involving a series of commercial loan transactions in which start-up companies (collectively, the "Borrowers," and each, a "Borrower") received loans funded by private institutional lenders (the "Noteholders") and secured by the Borrowers' intellectual property and other business assets (the "Transactions").

3. As part of each Transaction, Great American issued an insurance policy to UMB Bank, National Association ("UMB Bank"), acting as trustee for the Noteholders. Collectively,

these policies are referred to as the "Program Policies." The Program Policies insured the residual value loss in the event a Borrower defaulted on its loan repayment and the Borrower's collateral was insufficient to repay the outstanding debt owed to the Noteholders.

4. Great American knew that the Program Companies were inherently risky ventures. Great American understood at the inception of the Program that the collateral for any loans would be primarily intellectual property, not tangible assets. Great American knew that the Borrowers faced challenges, that there was a substantial risk those companies would ultimately fail, and that claims would be made against the Program Policies. In exchange for this known enhanced risk, Great American received extraordinary premiums for these policies. Great American made a bet: it took on risks, betting that the exceptional premiums and underwriting profits it earned would outweigh any losses it suffered from paying claims under the policies. For years, Great American enjoyed substantial premiums in exchange for issuing the Program Policies.

5. But now, claims have been made against the Program Policies, and Great American does not want to keep its part of the bargain. Instead of paying out on the risky policies it knowingly issued or rescinding the policies and returning the substantial premiums it collected, Great American pocketed the premiums, denied coverage on the majority of claims, and attempted to shift all blame to Gallagher,[2] who acted as the broker for the Transactions. Great American is engaged in arbitrations with UMB regarding its improper claim denials and wrongly attempted to join Gallagher to its arbitration efforts. When that did not work, it filed suit against Gallagher in this Court, alleging Gallagher provided "incomplete and inaccurate facts, misstatements, and omissions" that "were provided to induce Great American into" issuing the Program Policies.

---

[2] In 2022, Gallagher acquired the assets of two entities—PIUS Limited, LLC ("PIUS") and Newlight Capital LLC ("Newlight")—which had been working with Great American on the Program. For simplicity, these Counterclaims will sometimes refer to each of these entities, and to them collectively, as Gallagher.

6. While Great American paints Gallagher as the architect of the insurance program, allegedly deceiving Great American at every turn, the reality is very different. It was Great American, and particularly David Ferron, the Senior Vice President and Managing Director of Great American's Innovative Markets, who was the driver of all decision-making and knowingly took on the risks that Great American now tries to avoid. Indeed, Ferron was a key contributor or co-author of many of the very documents that Great American now claims were misleading. And when Gallagher and others alerted Ferron to concerns associated with these Transactions, Ferron forged ahead, making clear it was his decision—and not Gallagher's—whether Great American would take on these risks.

7. Ferron was motivated by his own financial incentives and personal interests in keeping the Program alive and his pockets full, even if that meant exposing Great American to additional risk. Ferron earned substantial income based on the premiums Great American received from the Program. The longer the Program stayed alive, the more lucrative it was for Ferron.

8. Unbeknownst to Gallagher, Ferron had enlisted former PIUS principal, Joe Agiato, as his secret collaborator. Indeed, before Gallagher ever acquired PIUS and became involved in the Program, Ferron and Agiato worked together to ensure Gallagher purchased PIUS. Both Ferron and Agiato viewed Gallagher's acquisition of PIUS as important to their collective futures. Thereafter, Agiato worked for Gallagher as a non-officer employee to continue leading his PIUS and Newlight team.

9. Ferron and Great American demanded Agiato's loyalty, and they received it. Agiato shared with Ferron key information that Ferron knew Agiato had concealed from Gallagher management, and he worked with Ferron to ensure that certain Transactions (and the Program) could proceed, to their mutual benefit and to Gallagher's detriment. Indeed, in May 2022, prior to

Gallagher's acquisition of PIUS, Ferron privately told Agiato that he (Ferron) had his whole "livelihood" riding on the continuation of the PIUS insurance program: "My livelihood is also at risk if the program blows up … this is also very real for me too. I'm just interested in aligning our fates as closely as possible, whether good or bad."

10. Great American now tries to place blame on Gallagher for the mis- or malfeasance of Ferron, its own Senior Vice President. Ferron persuaded Agiato to share information with Ferron that he actively concealed from Gallagher. Agiato and Ferron also both worked together to convince Gallagher—not Great American—to allow PIUS to participate in the Transactions.

11. As a result of Great American's conduct, including through its representative Ferron, Gallagher has suffered damages and is now exposed to more damages. Gallagher brings this action to recover those damages and to obtain a declaration that it is not contractually obligated to pay Great American's losses.

## PARTIES

12. Counterclaim-Plaintiff Arthur J. Gallagher & Co. is a Delaware corporation with its principal place of business in Illinois.

13. Counterclaim-Plaintiff Arthur J. Gallagher Risk Management Services, LLC is a Delaware LLC with its principal place of business in Illinois. It is a wholly owned subsidiary of Arthur J. Gallagher & Co. Arthur J. Gallagher & Co. is the sole member of Arthur J. Gallagher Risk Management Services, LLC.

14. Counterclaim-Plaintiff Gallagher IP Solutions LLC is a Delaware LLC with its principal place of business in Illinois. It is a wholly owned subsidiary of Arthur J. Gallagher & Co. Arthur J. Gallagher & Co. is the sole member of Gallagher IP Solutions LLC.

15. Counterclaim-Defendant Great American E&S Insurance Company is an Ohio corporation with its principal place of business in Ohio.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over Gallagher's counterclaims pursuant to 28 U.S.C. § 1332 because complete diversity of citizenship exists between the parties and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. In addition, these counterclaims arise out of the same transactions and occurrences that form the basis of Great American's claims, and this Court has supplemental jurisdiction over them pursuant to 28 U.S.C. § 1367.

17. Personal jurisdiction over Great American is proper, and the Southern District of New York is a proper venue. The Disbursement Monitoring Agreements contain forum selection clauses submitting the parties to the exclusive jurisdiction of the "State and Federal courts in the Borough of Manhattan, New York." In addition, Gallagher's counterclaims arise out of the same transactions and occurrences as Great American's claims, and venue is proper in any district where the original action is pending.

## FACTUAL ALLEGATIONS

### I. The Parties' Respective Roles in the Program.

18. On November 8, 2022, Gallagher acquired the assets of PIUS and Newlight, which had a preexisting relationship with Great American. For more than a year prior to Gallagher's acquisition, PIUS acted as a "producer" or "broker" for Great American in connection with the Program. PIUS's role under the Producer Agreement was to identify potential Borrowers, preliminarily evaluate proposed Transactions, and refer risks to Great American so that Great

American could independently determine whether or not it wished to offer coverage in connection with the referred Transaction.

19. PIUS's relationship with Great American was governed by a Producer Agreement and an Underwriting Authority Addendum to the Producer Agreement ("UAA"), both of which PIUS and Great American entered into effective as of October 15, 2021.

20. Under Appendix A, Section II.1 of the UAA, PIUS's "Delegated Underwriting Authority" was limited to $10 million. For any proposed Transaction involving a loan exceeding $10 million, PIUS had no authority to approve the Transaction or issue a Program Policy.

21. Instead, PIUS had to refer any proposed Transaction for a loan over $10 million to Great American for approval. Great American retained sole and exclusive underwriting authority for all risks over $10 million.

22. Great American's retention of exclusive underwriting authority for risks over $10 million was deliberate and non-negotiable. In July 2021, before Gallagher got involved, Ferron rejected Agiato's request to increase PIUS's Delegated Underwriting Authority to $20 million.

23. For each Transaction, the UAA required PIUS to submit each referral in an agreed-upon format—the "Summary Submission"—as set forth in Appendix A, Section X of the UAA.

24. Ferron, and thus Great American, was involved in drafting these submissions. Great American, therefore, was evaluating the risk from the inception and exercised control over how the risk was presented in the Summary Submission. After the Summary Submission was sent to Great American, it decided whether or not to accept the risk. Silence never meant approval. Each decision to accept a referred risk was an affirmative exercise of Great American's independent underwriting judgment.

25. There were also occasions when a Borrower received a loan under the Program and later wanted to refinance the loan. A refinance resulted in a new loan, requiring Great American to underwrite and issue a new Program Policy. The approval process for a refinance was substantially the same as for an original Transaction: PIUS was required to submit a Summary Submission, and Great American retained sole authority to approve or decline the risk if the proposed loan exceeded $10 million.

26. On information and belief, when Agiato and Ferron first began working together on the Program in late 2021, Ferron had individual approval authority within Great American for Transactions up to $45 million. For any referred risk exceeding $45 million, Ferron was required to approve the Summary Submission and then refer it to Great American management for a second level of review before a Program Policy could be issued, providing a check on Ferron's decision-making within Great American. On or around February 2023, Ferron's individual approval authority was increased to $60 million. With this increased authority, Ferron could approve Transactions up to $60 million without referring them to management for a second level of review. This removed the independent check that previously existed on Ferron's underwriting decisions for the Program's largest risks.

27. Newlight was a separate entity from PIUS. After each Transaction closed, Newlight's role was to monitor the loan and, in the event of default, market the collateral for sale and mitigate losses. As part of each Transaction, Newlight entered into various agreements with the Borrowers, the Trustee, and Great American, including a Disbursement Monitoring Agreement ("DMA"), which governed Newlight's monitoring and mitigation obligations.

28. Importantly, the DMAs provided that Newlight would perform the monitoring and enforcement services "in such manner and at such times (if any) as Newlight determines in its sole

discretion to be advisable." In other words, the contract committed to Newlight's sole discretion whether and how to perform certain actions to monitor and enforce the loans and to mitigate damages in the event of default.

## II. Great American and Ferron Collaborated With Agiato Prior to Gallagher's Acquisition.

29. In the lead-up to Gallagher's potential acquisition, Gallagher engaged in a dialogue with Great American regarding the Program. Gallagher understood that the Program relied on Great American as a single carrier. Thus, Gallagher needed assurances that Great American understood the Program and was committed to it, because if Great American was not, Gallagher would be purchasing a business without a product. Great American provided these assurances.

30. On September 12, 2022, Michael Pesch, the CEO of Gallagher Global Brokerage, Americas, requested a conference call with David Thompson, Great American's President and COO. In requesting the call, Pesch noted that Gallagher was considering a large acquisition opportunity for a unique program for which Great American was the only insurance carrier.

31. When Agiato learned that Gallagher executives would be interviewing Thompson as part of their due diligence process, Ferron and Agiato collaborated and attempted to convince Gallagher executive, Patrick Kennedy, that Kennedy and Pesch should speak only with Ferron. Agiato BCC'd Ferron on an email to Kennedy in which he advocated for Kennedy to change his due diligence approach, telling him that "Ferron is really the only relevant person to speak to."

32. Nonetheless, the call with Thompson proceeded on September 15, 2022, with Kennedy participating along with Pesch. During the call, Pesch and Kennedy asked Thompson various questions about the Program. Thompson said that the Program was a new business unit within Great American, led by Ferron. Thompson also assured Pesch and Kennedy that Great

American considered the Program one of its key verticals, specifically stating that Great American was "100% committed" to the Program.

33. Great American also held Ferron out as the key to the Program. Great American strongly desired the Gallagher acquisition to go through, but due to Gallagher's presence in the marketplace and its relationship with other insurance carriers, Great American also appeared concerned that Gallagher may find another carrier to supplement or replace Great American. Accordingly, Great American emphasized Ferron's experience in both the marketplace and in the Program. Great American made it clear to Gallagher that it was Ferron's Program—he was the one who had both the underwriting authority and expertise, and the buck stopped with him.

34. Behind the scenes, Ferron guided Agiato to help ensure the Gallagher acquisition went through. Ferron emailed Agiato just one week before the Gallagher acquisition closed, expressing a shared, mutual interest in closing the deal: "We collectively have a lot on our plate and we need to stay focused on the transactions at hand … i.e. AJG acquisition of PIUS…."

35. Ultimately, based in large part on representations by Great American and its high-ranking executives, including Ferron, Gallagher moved forward with the acquisition of PIUS and Newlight, and Great American continued to place Program Policies following Gallagher's acquisition.

## III. Gallagher Refers Transactions For Great American's Review, and Ferron Knowingly Causes Great American To Take on the Risks, Causing the Transactions to Close.

36. Without the underlying insurance from Great American, none of the at-issue Transactions happen. Great American's insurance policies were the key to the PIUS business running and the engine that made the entire transaction go. Without Great American's independent decision to issue the Program Policies, the Program would not exist. As such, Great American's decision to underwrite and issue policies was critical.

37. Great American was not misled or induced by Gallagher into issuing the Program Policies. Gallagher complied with its obligations under the Producer Agreement and the UAA by gathering the agreed-upon information and presenting it to Great American in the agreed-upon Summary Submission format. Great American was involved in, and had the opportunity to guide, that process and, per the UAA, had "the opportunity to ask [Gallagher] questions about the Submission[s]" after receiving them. Ultimately, once Great American asked whatever questions it wanted to ask and felt it had the information it needed, it was up to Great American (through Ferron) to make a "decision to accept or decline the risk." UAA, Appendix A, Section III.

38. Ferron is a sophisticated insurance executive who has been with Great American for over 19 years—the last 15 of which he has served as a Senior Vice President and Managing Director of Great American's Innovative Markets Division. He understood how company and asset valuations work, and he had—or had access to—all of the underlying financial information he needed to make an underwriting determination on behalf of Great American. He was free to (and did) ask questions of Gallagher and to conduct his own analysis. Gallagher's role was to gather the agreed-upon information and provide it to Great American in the agreed-upon form. But it was ultimately Great American's responsibility to underwrite and issue the Program Policies.

39. Despite knowing or having access to all the information showing the risks associated with issuing the various Program Policies, Great American continued to issue them because it was extremely profitable to do so. Great American earned approximately $50 million in net premiums on policies issued in the Program. On information and belief, Ferron himself enjoyed continued good standing at Great American and reaped significant financial benefits as well. Great American and Ferron were able to profit from these extraordinarily high premiums because everyone knew these were inherently risky transactions.

40. For example, the Summary Submissions referring Borrowers Blast Motion, Inc. ("Blast Motion") and C3 Nano, Inc. ("C3 Nano") disclosed that each company had lost money in the prior year and included projections showing each would continue to lose money in the years following the proposed refinancings.

41. The Summary Submission for Borrower Adomni, Inc. ("Adomni") raised "concerns" with Adomni's general business model and execution risks.

42. In another example, the Summary Submission for a Transaction involving Borrower Cooks Venture, LLC ("Cooks Venture") disclosed that Cooks Venture had serious financial issues. The Summary Submission disclosed to Great American that Cooks Venture did not meet its expectations in the previous year, had lower-than-anticipated revenues, had missed its EBITDA target by over $50 million, and had a cash burn that was significantly higher than expected.

43. The Summary Submissions also contained contingencies that highlighted the inherent risks of the proposed Transactions. In the Blast Motion Transaction, for example, the Borrower's strategy depended on broadly licensing its technology—something it had been unwilling to do previously—and the Summary Submission acknowledged that, if this strategy failed, raising the capital Blast Motion required to continue operations would be prohibitively expensive.

44. Indeed, the very fact that many of these Transactions were refinancings necessitated by the Borrowers' inability to repay their existing obligations was itself a sign of financial distress that obligated Ferron, in the exercise of his independent underwriting authority and on behalf of Great American, to scrutinize the proposed Transaction with heightened care before committing Great American to additional risk. Great American was also informed of other setbacks the

Borrowers faced prior to refinancing, including violations of covenants in the original loan agreements, notices of claims submitted by UMB Bank, and prior refinances. Each of these circumstances alerted Ferron to the inherent risks of approving the refinanced loans. In each instance, Ferron pushed the Transactions to closing because he believed he and Great American would profit in the end.

45. As the party with sole underwriting authority, Great American was not entitled to—and did not—blindly rely on the information in the Summary Submissions without conducting its own analysis. For each Transaction identified above, as well as others, Ferron approved the risk with eyes wide open, with the goal of enriching himself and Great American.

46. Moreover, Great American was not a mere passive recipient of the Summary Submissions. To the contrary, Great American, through Ferron, was an active participant in the creation and content of the Summary Submissions, and in many cases, was essentially a co-author of these and other documents. By Ferron's own admission, his livelihood depended on the success of the insurance program, and his own fate was tied to Agiato—all unbeknownst to Gallagher.

47. In one loan Transaction involving entities StorCentric, Inc. ("StorCentric") and Enceladus Development ("Enceladus"), Ferron and Agiato exchanged multiple drafts of the Summary Submission before it was finalized. In the exchange of the Summary Submission drafts, Ferron made significant substantive revisions. For example, on November 14, 2022, Ferron completely overhauled sections of the Summary Submission related to the "Use of Funds," "Loan Details and Timing," and "Disposition Strategy," among other significant changes. On information and belief, Ferron made these changes to make the risk appear more acceptable to Great American from an underwriting perspective.

48. Another illustrative example of Ferron's involvement in the Summary Submission process comes from a series of July and August 2023 emails regarding refinancing Transactions for Borrowers C3 Nano, Blast Motion, and Uniquify, Inc. ("Uniquify"). In those emails, Ferron delivered instruction and direction on critical portions of the submissions Great American now claims it relied upon to its detriment. For instance, in a July 27, 2023 email to Agiato, Ferron directed Agiato to structure the deals and written submissions in a particular way to "remove[] some of the strange optics." Ferron's effort to control the "optics" was driven by his desire to make the risk appear more favorable to Great American from an underwriting perspective.

49. The Uniquify refinancing Transaction is particularly notable because Great American has denied coverage on the Uniquify Transaction, claiming, among other things, that in a July 23, 2023 Summary Submission, "Mr. Agiato misrepresented in the submission that the company had a valuation of $200 million." But the allegedly misleading valuation in the Summary Submission submitted to Great American was actually ***developed by Ferron***. On July 31, 2023, after Agiato had sent the July 23 draft for Ferron's review, Ferron demanded several edits, including directing Agiato to "[p]lease use the 10x multiple of revenues (actual 22 or P23) as the basis of the value." The final Summary Submission submitted to Great American incorporated the valuation methodology Ferron demanded, providing: "The current valuation is estimated at $188M, based on a revenue multiple; typically in this sector, companies sell for 10x revenue and the projected 2023 revenue is $18.8M." In other words, and incredibly, Great American's own executive developed and dictated the valuation as it appeared in the final Summary Submission, Great American then issued the Program Policy and later denied the claim under it on the basis that the valuation Great American's own executive developed was a purported misrepresentation.

## IV. Ferron Enlists Agiato To Help Preserve His "Livelihood" Through a "Scheme," Concealed From Gallagher, To Keep the Program Alive.

50. The biggest portion of Great American's purported loss (and the largest claims it has wrongly denied) stems from the August 2023 refinancing of the C3 Nano, Uniquify, and Blast Motion loans. Gallagher had nothing to do with these troubled loans that were being refinanced, as each of the original transactions predated Gallagher's acquisition of PIUS. Not only is Ferron responsible for the losses on these refinancings, but he also worked with Agiato to conceal material facts from Gallagher's management.

51. By May 2023, Agiato and Ferron had started plotting a "scheme"—Ferron's words—to refinance the troubled loans in the Great American program using a $250 million letter of credit ("LOC") as collateral. In a May 27, 2023 email, Ferron asked Agiato: "Given the delays on this first [LOC], what is the likelihood of things getting hung up on the $250M leg of the scheme?" Agiato responded: "OUCH … did you have to use the word 'scheme'?"

52. Ferron knew that pursuing a transaction involving an LOC as collateral was an "outlier" for the Program and had previously expressed to Agiato that pursuing such a transaction carried "both personal and programmatic risk." Nonetheless, Ferron and Agiato were contemplating this scheme because they were desperate to avoid losses on these loans that would hit Great American, as it would have drawn negative attention and crippled the Program. In Ferron's mind, the end of the Program would have been the end of his "livelihood." Ferron and Agiato thus turned to the use of extraneous financial instruments as collateral. Ferron knew that C3 Nano, Uniquify, and Blast Motion were in such dire financial positions that traditional refinancing was impossible.

53. Ferron's self-described "scheme" collapsed because Agiato and his partners were unable to secure a valid LOC, but ever persistent (and motivated by their own self-interests and

desperation), Ferron and Agiato went back to the drawing board. Unbeknownst to Gallagher, they concocted a new "scheme" to secure refinancing for C3Nano, Uniquify, and Blast Motion. They developed a plan to use a different financial instrument—a $450 million certificate of deposit ("CD") from a Japanese bank—as collateral for the refinanced loans. Ferron clearly understood that the use of the Japan CD was necessary only because these companies were in dire financial straits and did not have sufficient assets to use as collateral for the refinancings. Accordingly, in a July 24, 2023 email to Agiato, Ferron referred to the CD as the "linchpin" of the refinancings. And because the CD was the "linchpin" of the refinancings, Ferron requested that Agiato engage the law firm of Morgan Lewis & Bockius to investigate the CD and provide an "opinion or memo regarding the suitability & liquidity of the collateral."

54. At Ferron's direction, Agiato enlisted Morgan Lewis, but rather than confirm the validity of the CD, a Morgan Lewis attorney sent an email to both Agiato and Ferron on August 14, 2023, warning that "certain information has come to the attention of Morgan Lewis which calls into question the authority of the persons purporting to act as officers of Mizuho Bank to so act … and to enter into a Bank Confirmation Letter related to the Pledge transaction." But that's not all. The purported CD that was to serve as collateral for these Transactions was so suspect and raised so many alarm bells that Morgan Lewis actually determined it had to withdraw from the representation altogether. The attorney advised Ferron and Agiato that, specifically due to its concerns over the validity of the CD, Morgan Lewis determined it was "not able to represent PIUS/Newlight or its principal Great American in connection with the Pledge transaction and [ ] must respectfully withdraw." Ultimately, as it turned out, the CD was a complete fiction. It never existed and never provided any collateral for these Transactions.

55. While any reasonable insurance executive acting in good faith would have stopped in his tracks after being informed that the collateral he considered the "linchpin" of the refinancing Transactions was deemed highly suspect by the respected law firm that completed the review of the CD at his direction, Ferron doubled down. On information and belief, Ferron and Agiato agreed to conceal from Gallagher the fact that not only had Morgan Lewis been unable to validate the CD, but the review had raised serious red flags and that Morgan Lewis had been so concerned about the transaction that it had to withdraw. Indeed, Ferron and Agiato did not share the Morgan Lewis email with Gallagher management before the August 2023 refinancing Transactions closed.

56. Moreover, after Gallagher's Patrick Kennedy raised questions and concerns to Agiato about the use of the CD as collateral, Ferron strategized with Agiato about how to allay Kennedy's concerns and persuade Gallagher to proceed with the Transactions. Demonstrating his loyalty to Ferron rather than Gallagher, Agiato forwarded one of his email conversations with Kennedy—internal communications among only Gallagher employees—to Ferron and Hugh O'Donnell (a reinsurance broker), stating, "I need to strategize with you. . . . They just do not get it at all and I am knocking my head against the wall. ***The only one I am accountable to is GAI [Great American]***. Now I am supposed to run what I do past guys with no understanding about what we do?" Ferron responded: "Sorry things seem so difficult right now. . . . When are you anticipating the pre-meeting with Enceladus, me, and Patrick, etc[?] . . . We'll get through this."

57. Ferron strategized with Agiato—who owed fiduciary duties of loyalty to Gallagher at the time—about how to convince Kennedy to allow Gallagher to participate in the Transactions. After Kennedy requested a meeting with Agiato and Ferron regarding the CD, Ferron worked with Agiato to prepare "Talking Points" designed to persuade Kennedy at that meeting. After Ferron edited the talking points, Agiato asked Ferron to resend the revised talking points in "a fresh email"

with a lead-in sentence that Agiato drafted and proposed ("Joe, since this is all so new to Patrick it might be helpful if he had the following points in advance. I will leave it to you if you think sending in advance makes sense"), so that Agiato could forward and use it with Kennedy. Agiato then separately forwarded the scripted and rehearsed email to Kennedy and others. Agiato wrote to Ferron about Kennedy: "I can't have him shut this down, thanks[.]" .

58. When the meeting requested by Kennedy took place, Ferron was among the in-person attendees. During the meeting, Ferron secretly exchanged WhatsApp text messages with Agiato behind Kennedy's back. Among other things, Agiato told Ferron: "You need to grab PK [Patrick Kennedy] and not let him screw this up[.]"

59. Following the initial meeting, Kennedy met with Ferron, Agiato, and others and requested additional background on the Transactions and an explanation as to why Ferron and Agiato sought the CD as collateral. Kennedy also suggested Great American reconsider the refinancing Transactions altogether, but Ferron flatly refused. In fact, in response to Kennedy's suggestion, Ferron became irate, stating it was his (Ferron's) Program and Kennedy had no authority to say what Ferron and Great American could and could not underwrite. Ferron echoed this sentiment in secret WhatsApp communications sent to Agiato. In an August 21, 2023 message, Ferron wrote, "It will be best to have Patrick come[] to the right conclusion today on his own. Otherwise, I'm going to have to tell him that I'm not asking for his permission on the underwriting decisions that have already been made and I'll need to have a discussion with him about exposure from us in addition to that from borrowers, bond holders, etc[.] if he thwarts these refi[nances] and the result is unrecovered claims." Ferron, earlier in that same conversation, expressed doubt regarding Agiato seeking Kennedy's approval for the Transactions, stating "the train has left the

station (deals accepted, note calls and borrowers making commitments). [Patrick Kennedy] just doesn't know what happens if he tries to step in front of the train."

60. In short, Ferron was conspiring with Agiato against the interests of Gallagher and its senior executive, working to push through risky transactions for Ferron's own benefit.

61. Ultimately, in reliance on false and misleading representations and omissions by Ferron—including his concealment of Morgan Lewis's red flags identified and resulting withdrawal—Kennedy permitted Gallagher's continued participation in the refinancing Transactions, but made it perfectly clear to Ferron that Gallagher was not backing the validity of the CD. In an email to Ferron and Agiato, Kennedy explicitly disclaimed any responsibility on Gallagher's part regarding the "authenticity or adequacy of the additional collateral used for the three transactions, including the CD that was obtained." The Transactions, from an underwriting perspective, had to rise and fall on their own merits without the CD. In the face of Gallagher's explicit warning and disclaimer, and with full knowledge of Morgan Lewis's assessment of the CD, Ferron made the decision on behalf of Great American to move forward with the refinancing Transactions.

62. Ferron's conduct makes clear that he was calling the shots, and that he was making his own decisions about the risks regardless of the information Gallagher provided. (Indeed, Ferron had access to far more information than Gallagher management.) Ferron's desire to refinance the Uniquify Transaction is particularly revealing. Unlike the other refinanced loans, Great American was not the insurer on the original Uniquify Transaction. Thus, Great American had absolutely no exposure if Uniquify defaulted. Absent a personal motive on Ferron's part, it would make no sense for Ferron to involve Great American in a risky refinancing Transaction with a company that all

parties knew was in dire financial condition, was already in default, and had already produced a claim with the carrier who insured the original loan Transaction.

63. Although Great American did not insure the original Uniquify Transaction, on information and belief, the reinsurers on that deal also reinsured several Program Policies issued by Great American. Thus, a loss on the Uniquify policy—regardless of the insurer— risked upsetting the reinsurers and causing them to decline future deals, putting the Program in peril. Ferron's self-interested motivation to keep the Program afloat is the only way to explain his desire to push the Uniquify refinancing forward.

### V. Great American Tortiously Interferes With Gallagher's Obligations Under the DMAs.

64. After the Borrowers began defaulting, Great American's strategy changed. Rather than trying to keep the Program alive, Great American decided to shift all blame to Gallagher for Great American's own conduct. To that end, Great American interfered with Gallagher's efforts to market the collateral and maximize recoveries in order to manufacture reasons to deny coverage and attempt to shift blame for losses onto Gallagher.

65. As noted above, each Transaction involves a DMA. Each DMA was a valid, existing, and enforceable contract under which Newlight undertook specific monitoring, collateral-enforcement, and marketing obligations, which it was to perform in its sole discretion.

66. Great American intentionally interfered with Gallagher's ability to carry out its discretionary obligations under the DMAs in order to manufacture reasons to both deny UMB's claims and manufacture subsequent litigation against Gallagher. Great American's actions ultimately decreased recoveries in the Transactions.

67. For example, Newlight, Great American, UMB Bank, and Borrower Cooks Venture entered into a DMA on June 5, 2023, the same day Cooks Venture's loan was refinanced and a

new Program Policy was issued by Great American. Great American was a signatory to the DMA and had knowledge of its terms.

68. On or around November 11, 2023, Cooks Venture failed to repay its refinanced loan in breach of its loan obligations. UMB Bank sent notice of a Payment Default to Cooks Venture, Gallagher, and Great American on or around November 17, 2023. UMB Bank also sent a Notice of Claim on November 27, 2023.

69. As required by the applicable Program Policy and associated loan documents, Gallagher promptly began marketing the collateral for sale on behalf of UMB Bank and Great American.

70. Gallagher provided Great American with periodic updates on the sales process and potential buyers of Cooks Venture.

71. Gallagher engaged with dozens of potential buyers, many of which entered into NDAs so they could move forward in the process and access Cooks Venture's diligence materials. As a result of this process, Gallagher obtained a Letter of Intent from a potential buyer, which it transmitted to Great American and UMB Bank.

72. Yet Great American engaged in a deliberate pattern of intentional and improper conduct designed to prevent Gallagher from performing its DMA obligations, for the purpose of later claiming that Gallagher breached the DMA and using that manufactured breach to support its claim denial and pursue indemnification under the DMA.

73. Among other things, on or around January 3, 2024, Great American unilaterally decided to engage a chief restructuring officer and supporting personnel for Cooks Venture. Sometime thereafter, and without Gallagher's input, Gallagher was notified that Matt Beresh, who had been working as a financial advisor supported by Accordion Partners LLC, had been retained

with the intent of becoming chief restructuring officer for Cooks Venture. Gallagher only became aware of this retention when Great American directed Gallagher to defer to the CRO on letters of intent and Accordion on all matters related to the sales process, thereby stripping Gallagher of the discretionary authority the DMA expressly granted it. Prior to this directive, Great American failed to provide Gallagher with the CRO's name, contact information, or any description of his role and authority.

74. Great American initially volunteered to provide operational funding to Cooks Venture, then issued at least thirteen (13) reservation-of-rights letters weaponizing those voluntary payments by asserting that Gallagher and the Trustee were breaching their mitigation and collateral-preservation obligations by not financing purportedly reasonable expenditures required to maximize recovery, including a Chapter 11 proceeding and Cooks Venture's day-to-day operating expenses, and by not releasing funds from the Payment Reserve Fund controlled by the Noteholders—none of which was required by the Policy or Loan Documents.

75. Great American abruptly withdrew its funding commitment without warning and pressured Cooks Venture into filing for bankruptcy by conditioning further funding on only a DIP Loan The timing of this contingent funding was a transparent attempt to manipulate the sales process and to undermine Gallagher's collateral-protection work, a tactic merely designed to strengthen Great American's coverage position and indemnification claims against Gallagher

76. Great American manufactured a mortgage deficiency by waiting five months after closing to raise purported issues regarding missing mortgages, despite being present at closing and involved in drafting the Loan Documents, which contained no mortgage-granting clause. After demanding that Gallagher cure the supposed deficiency, Great American attempted to force a bankruptcy timed to destroy those very mortgages.

77. Great American pressured Cooks Venture and the other transaction participants to pursue an accelerated, value-destructive bankruptcy without a final sale agreement or appropriate financing, despite the risks to the incomplete sales process and the collateral.

78. Great American also concealed an alleged subordination agreement from November 2023 until March 2024, then used that as a pretext to pressure an accelerated bankruptcy timeline and further constrain Gallagher's ability to manage the collateral and sales process in its sole discretion.

79. Great American asserted false claims about spurious marketing deficiencies, including asserting that Gallagher refused to make expenditures to protect the collateral, made only vague statements about potential buyers, presented no marketing plan, failed to hire a chief restructuring officer, failed to fund operations, and refused to fund Chapter 11 costs, even though Gallagher had fulfilled all of its obligations under the DMA, actively marketed the collateral, and generated competitive bids.

80. Great American's conduct ultimately led to a smaller recovery than what would have occurred had Gallagher been permitted to properly exercise its discretion. Great American engaged in similar tactics with respect to other Transactions.

81. For example, in one Transaction, Great American repeatedly questioned a series of relatively insignificant events and situations relating to Gallagher's loan monitoring services, forcing Gallagher to expend legal fees and engage in letter correspondence to defend itself against Great American's baseless accusations, which were levied against Gallagher for the purpose of concocting frivolous claims against Gallagher and creating a pretext for a potential claim denial.

82. Gallagher's team expended considerable time and efforts performing loan servicing for the Transaction and providing Great American with requested information. Instead of allowing

Gallagher to perform its duties under the DMA without interference, Great American continued to thwart Gallagher's actions at every turn.

83. In another Transaction, Great American refused to amend an existing forbearance agreement, purportedly because Great American had not received sufficient information concerning the marketing process. Continued forbearance was necessary to further the sale process, preserve the value of the collateral, and permit Gallagher to continue performing its duties and obligations under the DMA.

84. Great American's refusal threatened to disrupt the sale process and prematurely force the company into liquidation, thereby impeding Gallagher's ability to perform its obligations under the DMA. Gallagher was consequently required to divert substantial time and resources to addressing Great American's objections, preserving the sale process, and taking measures necessary to continue performing its contractual obligations under the DMA.

85. As Gallagher continued to work to market the company for a potential sale, the stakeholders again worked toward an amendment to the existing forbearance agreement to permit the going-concern sale process to continue. Great American actively participated in those efforts and represented that it supported an extension of the forbearance period for that purpose. On or about July 2, 2026, Great American suddenly, and without explanation, changed course and claimed it did not consent to a forbearance. Great American's reversal jeopardized the ongoing sale process, again placed the company at risk of a premature forced liquidation, and impeded Gallagher's continued performance under the DMA. As before, Great American cited several purported breaches by Gallagher, which, in reality, were pretext and manufactured claims to support Great American's litigation positions.

86. Through this conduct, Great American knowingly and intentionally interfered with Gallagher's performance of its obligations under the DMAs and frustrated Gallagher's ability to carry out the purposes for which it had been retained. Great American's actions impeded Gallagher's efforts to preserve the going-concern sale process, mitigate losses, and maximize recoveries for stakeholders.

87. As a direct and proximate result of Great American's interference, Gallagher was required to expend substantial time and resources responding to Great American's purported breach allegations, addressing the obstacles Great American created, and taking measures necessary to prevent a premature liquidation and continue performing under the DMA. Gallagher thereby incurred costs, expenses, and other damages that it would not have incurred but for Great American's conduct.

**VI. Great American Breaches The Forum Selection Clause of the DMA.**

88. After the Trustee submitted claims on behalf of Cooks Venture, C3 Nano, Uniquify, Blast Motion, and StorCentric/Enceladus, Great American denied the claims. On information and belief, Great American is engaged in arbitration with the Trustee concerning the coverage disputes on these claims.

89. As Great American itself alleges, Great American agreed that its dispute with Gallagher would be subject to "the exclusive jurisdiction of the State and Federal courts in the Borough of Manhattan, New York." *See* Compl. ¶ 17.

90. In direct contravention to Great American's express agreement, on January 27, 2025, it sought to join Gallagher as a party to its ongoing arbitration against Cooks Venture. On April 18, 2025, the arbitrator, over Gallagher's objection, granted Great American's request and purported to join Gallagher to the arbitration.

91. Gallagher was damaged as a result of Great American's conduct. Gallagher was forced to expend substantial resources contesting its improper joinder in the arbitration proceeding, including by filing an action in the United States District Court for the Northern District of Illinois, before Great American ultimately abandoned its efforts to wrongfully force Gallagher to arbitrate.

**VII. Great American's Conduct Causes Substantial Damages.**

92. Gallagher paid tens of millions of dollars to acquire PIUS and Newlight—both in initial upfront costs as well as contingent payments based on certain financial metrics following the acquisition—in part based on representations made by Great American regarding its commitment to the Program and its sophistication and experience in the market. Great American's misconduct described herein destroyed the value of this Gallagher business. Because of Great American, Gallagher paid tens of millions of dollars to acquire and operate what is now a worthless business. As it stands, the Program is essentially defunct and no longer generating revenue, only expense; it is in a run-off period as Gallagher carries out the remainder of Newlight's servicing obligations on prior Transactions. In addition to the up-front purchase price, Great American's conduct caused Gallagher to incur significant third-party liability and forced Gallagher to make additional payments based on the risky refinancing Transactions that Ferron pushed through—transactions that did not benefit Gallagher and, to the contrary, substantially contributed to the destruction of the business. All of these damages arose out of, were related to, and were the foreseeable and proximate result of Great American's negligent or more culpable conduct.

93. All of these damages are in addition to the mitigation costs and legal fees that Gallagher has incurred, as well as the future damages to which Gallagher is exposed based on Great American's negligent or more culpable conduct.

**COUNTERCLAIM I**

**Declaratory Judgment**

94. Gallagher re-alleges and incorporates by reference the allegations in all of the foregoing paragraphs as if they are fully set forth herein.

95. An actual, justiciable controversy exists between Gallagher and Great American concerning the scope and application of the indemnification provisions in Section 16 of the Producer Agreement, including the reciprocal obligations created by Sections 16(a) and 16(b).

96. Gallagher seeks a declaration that Section 16(b) of the Producer Agreement requires Great American to indemnify, hold harmless, and defend Gallagher for the losses it has suffered and will suffer arising out of, or related to, any breach or non-fulfillment of any representation, warranty, or covenant by Great American, its employees, agents, or contractors, or any negligent or more culpable act or omission of Great American, its employees, agents, or contractors—including, without limitation, the acts and omissions of Great American and its representative David Ferron as described herein.

97. Gallagher further seeks a declaration that the bilateral, fault-triggered structure of Section 16 requires that, to the extent any losses claimed by Great American under Section 16(a) arose from Great American's own covered conduct under Section 16(b), such losses must be allocated, reduced, offset, or recouped rather than borne by Gallagher.

98. A judicial declaration of the rights and obligations of the parties under Section 16 of the Producer Agreement is necessary and appropriate to resolve the actual controversy between the parties, to guide the allocation of losses, if any, across the pending arbitrations and any future proceedings, and to avoid piecemeal litigation of the same contractual interpretation issues. This Court has jurisdiction to issue the requested declarations pursuant to 28 U.S.C. §§ 2201 and 2202.

**COUNTERCLAIM II**

**Breach of Contract/Contractual Indemnification, Allocation and/or Recoupment Under Section 16(b) of the Producer Agreement**

99. Gallagher re-alleges and incorporates by reference the allegations in all of the foregoing paragraphs as if they are fully set forth herein.

100. Section 16(b) of the Producer Agreement provides, in mirror-image language, that Great American will indemnify, hold harmless, and defend Gallagher against "any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees, arising out of, or related to any (i) breach or non-fulfillment of any representation, warranty or covenant under this Agreement by [Great American], its employees, agents or contractors; or (ii) any negligent or more culpable act or omission of [Great American], its employees, agents or contractors."

101. Great American's decision to push the Transactions forward despite known risks, Great American's concealment of material information from Gallagher, and Great American's wrongful joinder of Gallagher to the Cooks Venture arbitration each constitute a "negligent or more culpable act or omission" within the meaning of Section 16(b).

102. Great American's conduct has caused damage to Gallagher, including the lost value of the business for which Gallagher paid millions of dollars; additional third-party payments based on the risky refinancing transactions that Ferron pushed through, which did not benefit Gallagher and, to the contrary, substantially contributed to the destruction of the business; the expenditure of legal fees to avoid improper joinder to arbitration, to respond to subpoenas and inquiries from third parties, and to defend this proceeding; as well as incurring other costs associated with the

Transactions, including to mitigate losses; and reputational and other harm. Gallagher is entitled to indemnification of all such losses.

103. Great American has not indemnified Gallagher or otherwise paid for any of the losses for which it is required to indemnify Gallagher.

104. In addition, Great American's Complaint in this action seeks indemnification under Section 16(a) for losses Great American alleges arose from Gallagher's conduct. Section 16(a) of the Producer Agreement provides that Gallagher will indemnify, hold harmless, and defend Great American against losses arising out of, inter alia, any breach of the Producer Agreement by Gallagher or any negligent or more culpable act or omission of Gallagher, its employees, agents, or contractors.

105. As set forth herein, however, Great American's losses—and additional losses suffered by Gallagher—arose out of the negligent or more culpable acts and omissions of Great American and its employees within the meaning of Section 16(b), thereby triggering Great American's indemnification obligation to Gallagher.

106. Section 16(b) uses language identical in structure and scope to Section 16(a). Together, Sections 16(a) and 16(b) create a comparative fault regime: a bilateral, fault-triggered allocation structure under which each party bears the losses arising from its own covered conduct and that of its employees, agents, and contractors.

107. Accordingly, to the extent the factfinder determines that any loss claimed by Great American under Section 16(a) arose from Great American's own covered conduct under Section 16(b) and that Gallagher is obligated to pay any losses under Section 16(a), Gallagher is entitled to reduction, offset, allocation, or recoupment of any amounts for which Great American is obligated to indemnify Gallagher under Section 16(b).

108. The bilateral structure of Section 16 does not permit Great American to shift to Gallagher losses that Great American is obligated to bear under its own mirror-image indemnity obligations. The contractual allocation framework requires each party to bear the losses arising from its own comparative fault. In other words, the bilateral structure of Section 16 requires that losses attributable to Great American's own breaches or negligent or more culpable acts or omissions be allocated to Great American, rather than shifted to Gallagher.

109. To the extent Gallagher is ultimately found liable for any of Great American's claimed losses, Gallagher is entitled to a dollar-for-dollar offset for any portion of the losses that arose from the negligent or more culpable acts or omissions of Great American or its employees, agents, or contractors, including Ferron.

## COUNTERCLAIM III
### Common Law Recoupment

110. Gallagher re-alleges and incorporates by reference the allegations in all of the foregoing paragraphs as if they are fully set forth herein.

111. Great American alleges that Gallagher is liable to Great American for losses arising out of Gallagher's purported contractual breaches and negligent or more culpable conduct.

112. Gallagher alleges that Great American is liable to Gallagher for losses arising out of Great American's contractual breaches and negligent or more culpable conduct.

113. Great American's and Gallagher's cross demands arise out of the same contract, transaction, and series of transactions.

114. To the extent the factfinder determines that Gallagher is liable to Great American, Gallagher is entitled to reduction, offset, allocation, or recoupment of any amounts for which Great American is liable to Gallagher.

## COUNTERCLAIM IV

**Breach of Contract (Disbursement Monitoring Agreement Forum Selection Clause)**

115. Gallagher re-alleges and incorporates by reference the allegations in all of the foregoing paragraphs as if they are fully set forth herein.

116. The DMA entered into by Cooks Venture, UMB Bank, solely in its capacity as Trustee, Great American, and Gallagher is a valid and enforceable contract governed by New York law.

117. The DMA contains a forum selection clause, providing that New York shall be the "exclusive jurisdiction" in which to resolve Great American's dispute with Gallagher.

118. Great American breached the forum selection clause by joining Gallagher to its arbitration against Cooks Venture.

119. Gallagher suffered damages as a result, including the expenditure of legal fees to defend against its improper joinder to the arbitration.

## COUNTERCLAIM V

**Aiding and Abetting Breach of Fiduciary Duty**

120. Gallagher re-alleges and incorporates by reference the allegations in all of the foregoing paragraphs as if they are fully set forth herein.

121. Agiato was an employee of Gallagher. He owed fiduciary duties to Gallagher, including a duty of loyalty.

122. Agiato breached his duties to Gallagher as described herein, including by concealing material information from Gallagher concerning the CD he sought to obtain in connection with the Transactions that refinanced the C3 Nano, Uniquify, and Blast Motion loans, and by conspiring with Ferron to push those transactions forward, to Great American's and Ferron's benefit and to Gallagher's detriment.

123. Great American induced and participated in the breach, including by encouraging Agiato to conceal material information from Gallagher and by conspiring with Agiato to push those transactions forward, to Great American's and Ferron's benefit and to Gallagher's detriment.

124. Great American's conduct has caused damage to Gallagher, including the lost value of the business for which Gallagher paid millions of dollars; additional third-party payments based on the risky refinancing Transactions that Ferron pushed through, which did not benefit Gallagher and, to the contrary, substantially contributed to the destruction of the business; the expenditure of legal fees to avoid improper joinder to arbitration, to respond to subpoenas and inquiries from third parties, and to defend this proceeding; as well as incurring other costs associated with the Transactions, including to mitigate losses; and reputational and other harm.

**COUNTERCLAIM VI**

**Tortious Interference with Contract (Disbursement Monitoring Agreement)**

125. Gallagher re-alleges and incorporates by reference the allegations in all of the foregoing paragraphs as if they are fully set forth herein

126. The DMAs were each entered into by the respective Borrower, UMB Bank, solely in its capacity as Trustee, Great American, and Gallagher, and are valid and enforceable contracts governed by New York law.

127. Under New York law, a claim for tortious interference with contract requires a valid contract, the defendant's knowledge of the contract, intentional and improper interference causing a breach of contract or rendering the plaintiff unable to perform, resulting breach or non-performance, and damages.

128. Although a party ordinarily may not be held liable for interfering with a contract to which it is a party, New York law recognizes an exception where the alleged wrongful conduct is directed at the plaintiff's performance, the plaintiff has no breach-of-contract claim against the

defendant for that conduct, and the defendant's role with respect to the interfered-with obligation is essentially that of a third party because its contractual duties are separate and distinct.

129. That exception applies here because Great American's misconduct was directed at Gallagher's performance of its duties under the DMAs, not at Great American's own performance as an insurer, and no contract claim captures the interference alleged by Gallagher.

130. Great American engaged in a deliberate pattern of intentional and improper conduct designed to prevent Gallagher from performing its obligations under the DMAs, for the purpose of later claiming that Gallagher breached the DMAs and using that manufactured breach to deny coverage and pursue indemnification under both the Producer Agreement and the DMAs.

131. Great American's interference impaired Gallagher's contractual right to exercise its discretion in its monitoring, marketing, and collateral-enforcement duties under the DMAs.

132. Great American is now alleging in the arbitrations and this litigation that Gallagher failed to monitor, mitigate, and market the collateral. Those are the very functions with which Great American interfered.

133. As a direct and proximate result of Great American's tortious interference, Gallagher has suffered and continues to suffer damages, including indemnity exposure arising from Great American's attempt to impose liability for the manufactured DMA breaches, defense costs and reasonable attorneys' fees incurred in the related arbitrations and this litigation, reputational harm, and lost fees and commissions under the DMAs and related agreements.

134. Gallagher also seeks punitive damages to the extent permitted by New York law because Great American's conduct was willful, wanton, malicious, or undertaken in deliberate bad faith to manufacture breaches and shift liability to Gallagher.

## COUNTERCLAIM VII

**Breach of Implied Covenant of Good Faith and Fair Dealing (Producer Agreement and Underwriting Authority Addendum)**

135. Gallagher re-alleges and incorporates by reference the allegations in all of the foregoing paragraphs as if they are fully set forth herein.

136. Gallagher and Great American entered into a valid and enforceable contract, namely, the Producer Agreement.

137. By delegating underwriting authority to Gallagher only for transactions of $10 million or less, the Producer Agreement and the UAA contained an implicit promise that Great American would exercise its underwriting authority for transactions exceeding $10 million in good faith.

138. Great American breached the implied covenant by failing to exercise its underwriting authority in good faith, and instead, Ferron knowingly approved risky transactions for his benefit and to Gallagher's detriment. Ferron conspired with Agiato to conceal material information from Gallagher's management and push the transactions forward. On information and belief, at the time Ferron approved these transactions, Great American intended that, if things went south, it would deny coverage and blame Gallagher for the losses.

139. Great American's breach deprived Gallagher of the benefits of the Producer Agreement and the UAA.

140. As a result of Great American's breach, Gallagher has suffered damages, including the lost value of the business for which Gallagher paid millions of dollars; additional third-party payments based on the risky refinancing Transactions that Ferron pushed through, which did not benefit Gallagher and, to the contrary, substantially contributed to the destruction of the business; the expenditure of legal fees to avoid improper joinder to arbitration, to respond to subpoenas and

inquiries from third parties, and to defend this proceeding; as well as incurring other costs associated with the Transactions, including to mitigate losses; and reputational and other harm.

**COUNTERCLAIM VIII**
**Breach of Implied Covenant of Good Faith and Fair Dealing (Disbursement Monitoring Agreement)**

141. Gallagher re-alleges and incorporates by reference the allegations in all of the foregoing paragraphs as if they are fully set forth herein.

142. By granting Gallagher discretion to carry out its monitoring and collateral enforcement obligations as it saw fit, the DMAs contained an implied promise that Great American would not interfere with Gallagher's exercise of that discretion.

143. As described herein, Great American breached the implied covenant by interfering with Gallagher's exercise of its discretion.

144. Great American's breach deprived Gallagher of the benefits of the DMAs.

145. As a result of Great American's breach, Gallagher has suffered damages, including the expenditure of legal fees to respond to subpoenas and inquiries from third parties, and to defend this proceeding, as well as incurring other costs associated with the Transactions, including to mitigate losses, as well as reputational and other harm.

**JURY DEMAND**

146. Gallagher demands a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Gallagher respectfully requests that the Court enter judgment in its favor and against Great American as follows:

1. A judicial declaration that Section 16(b) of the Producer Agreement requires Great American to indemnify, hold harmless, and defend Gallagher for the losses it has suffered and will suffer, as described in these Counterclaims;

2. A judicial declaration that, to the extent any losses claimed by Great American under Section 16(a) of the Producer Agreement arose from Great American's own covered conduct under Section 16(b), such losses must be allocated, reduced, offset, or recouped rather than borne by Gallagher;

3. Judgment in favor of Gallagher on all counts of its Counterclaims against Great American;

4. Damages, including but not limited to all compensatory, special, incidental, consequential, and exemplary damages sufficient to compensate Gallagher for its losses;

5. Punitive damages to the extent provided by law;

6. Attorneys' fees, costs, and expenses as provided for in the parties' agreements and under the law;

7. Pre- and post-judgment interest;

8. For such other and further relief, both legal and equitable, as the Court may deem just and proper.

Dated: October 5, 2026

Respectfully submitted,

*/s/ Eli J. Litoff*

Ronald S. Safer (*pro hac vice*)
Eli J. Litoff (*pro hac vice*)
Megan DeMarco
RILEY SAFER HOLMES & CANCILA LLP
1 South Dearborn Street, Suite 2200
Chicago, Illinois 60603
Phone: 312-471-8700
Fax: 312-471-8701
rsafer@rshc-law.com
elitoff@rshc-law.com
mdemarco@rshc-law.com

Maegan McAdam
RILEY SAFER HOLMES & CANCILA LLP

810 Seventh Avenue, Suite 3505
New York, New York 10019
Telephone: (212) 660-1025
mmcadam@rshc-law.com

*Attorneys for Defendants*